**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA**

PHILIPS MEDICAL SYSTEMS
NEDERLAND B.V.; PHILIPS NORTH
AMERICA LLC; and PHILIPS
ELECTRONICS INDIA LTD.,

      Plaintiffs,

 v.

TEC HOLDINGS, INC., F/K/A
TRANSTATE EQUIPMENT
COMPANY, INC.,

      Defendant.

Civil Action No: _____

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiffs Philips Medical Systems Nederland B.V., Philips North America LLC, and Philips Electronics India Ltd. (collectively, "Philips" or "Plaintiffs"), by and through their undersigned counsel, hereby bring the following Complaint against TEC Holdings, Inc., formerly known as Transtate Equipment Company, Inc. ("Transtate" or "Defendant"), and plead as follows:

### Overview

1. Philips develops, sells, supports, maintains, and services medical imaging systems, such as X-ray systems, used at hospitals and medical centers, including the proprietary hardware and software used to operate, service, and repair such systems.

2.     Transate also provides maintenance and support services for certain of such medical systems.  Upon information and belief, several prior employees of Philips North America LLC are employed by Transate as service specialists, service technicians, or similar positions.

3.     Philips's medical imaging systems include Philips's copyrighted and proprietary intellectual property, and proprietary trade secrets, in the form of, among other things, proprietary software that Philips technicians can use to service the medical imaging systems.  Philips includes proprietary access controls on the medical imaging systems to restrict access to its proprietary software to authorized individuals.

4.     Transate has used misappropriated trade secret information from Philips to circumvent the access controls on Philips's medical imaging systems to gain unauthorized access to proprietary and copyrighted software.  Transate uses its unauthorized access to Philips's proprietary software to unfairly compete against Philips.

5.     Based upon Transate's conduct and actions, and the resulting damages suffered by Philips, Philips asserts claims in this Complaint for: violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030; violations of the Digital Millennium Copyright Act, 17 U.S.C. § 1201; violations of the Defend Trade Secrets Act, 18 U.S.C.§ 1836; misappropriation of trade secrets and

violations of the Georgia Trade Secrets Act, O.C.G.A. § 10-1-760, *et seq.*; unfair competition; and copyright infringement, 17 U.S.C. § 101, *et seq*.

6.     Philips additionally seeks a permanent injunction preventing Transtate from further improper and unauthorized access to, and use of, Philips's software and other trade secrets.

## Parties

7.     Plaintiff Philips Medical Systems Nederland B.V. is a Netherlands corporation with offices at Veenpluis 4-6, 5684 PC Best.

8.     Plaintiff Philips North America LLC is a Delaware LLC, formerly known and doing business as Philips Electronics North America Corporation (a Delaware Corporation), with a principal place of business in Andover, Massachusetts.

9.     Plaintiff Philips Electronics India Ltd. is a foreign corporation with a principal place of business in Bangalore, India.

10.     The named plaintiffs—Philips—are collectively in the business of developing, manufacturing, selling, supporting, maintaining, and servicing Philips's medical imaging systems, including the proprietary hardware and software and related trade secrets that are necessary—and/or may be used—to operate, service, and repair such systems.

11.    Defendant Transtate Equipment Company, Inc. is a North Carolina corporation with its principal place of business in Concord, North Carolina. Transtate is in the business of providing some maintenance and support services for certain medical imaging systems that include Philips imaging devices, such as x-ray machines, CT and PET scanners, MR scanners, and nuclear medicine scanners, and other devices used at hospitals and medical centers.

## Jurisdiction and Venue

12.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (diversity) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and complete diversity exists between the parties.

13.    This Court additionally has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) because claims asserted in this case arise under:  18 U.S.C. § 1030 (Computer Fraud and Abuse Act); 28 U.S.C. § 1338(a) (any act of Congress relating to patents, copyrights, and trademarks); 17 U.S.C. § 1201 (Digital Millennium Copyright Act); 18 U.S.C.§ 1836 (Defend Trade Secrets Act); and 28 U.S.C. § 1369 (supplemental jurisdiction) and the doctrines of ancillary and pendant jurisdiction.

14.    This Court has personal jurisdiction over Transtate because Transtate engaged in maintenance activities at a Piedmont Healthcare hospital located in or

around Atlanta, Georgia. In relation to those maintenance activities, Transtate used misappropriated trade secret information to intentionally circumvent system access controls to use Philips's copyrighted and proprietary service tools to perform the maintenance activities, thus giving rise to the claims below.

15. This Court also has personal jurisdiction over Transtate under O.C.G.A. § 9-10-91 because Transtate transacts business in this state; it has committed tortious acts or omissions in this state; and/or it regularly does or solicits business, engages in a persistent course of conduct, or derives substantial revenue from services rendered in this state.

16. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the conduct, events, or omissions giving rise to Philips's claims occurred in this judicial district and/or had and have connections to this judicial district.

## Facts and Allegations

17. Philips reasserts, re-alleges, and incorporates by reference the allegations in the above-stated paragraphs of this Complaint as if fully set forth herein under Facts and Allegations.

## ~ Background Concerning Philips and Philips's Systems ~

18.     Philips develops, manufactures, and sells—and subsequently supports, maintains, and services—medical imaging systems that are used at hospitals and medical centers ("Systems"), including developing, manufacturing, selling, supporting, maintaining, and servicing the proprietary hardware and software that are necessary—and/or that may be used—to operate, service, and repair the Systems.  The Systems include, but are not limited to, imaging devices such as x-ray machines, CT and PET scanners, MR scanners, and nuclear medicine scanners.

19.     The foregoing Systems include, but are not limited to:  a series of x-ray machines known as the "Allura" models; a series of CT and/or PET scanners known as the "Brilliance," "Ingenuity," "Vereos," "IQon," "iCT," "Big Bore," and "MX16" models; a series of MR scanners known as the "Ingenia" models; and a series of nuclear medicine and/or other scanners known as the "BrightView" models.

20.     The Systems are complex pieces of medical equipment that rely heavily on accompanying proprietary software developed and/or owned by Philips, the specific versions and functionalities of which can vary among Systems.

21.     When Philips sells Systems to a customer, the agreement with the customer permits Philips to deliver to the customer Proprietary Service Materials.

The Proprietary Service Materials provide authorized users with proprietary tools that assist with the maintenance and servicing, diagnostic, calibration, and other functionalities of Systems. The agreement establishes that the presence of Proprietary Service Materials will not give the customer any right or title to such property or any license or other rights to access or use such property. The agreement further establishes that the customer will use all reasonable efforts to prevent any access or use of such property by any unauthorized party.

22. While Philips includes Proprietary Service Materials to allow authorized users to provide certain services, it also provides levels of restricted access to allow customers or third-party service providers of their choosing to perform assembly, installation, adjustment, and testing ("AIAT") services on Philips Systems.

23. The Proprietary Service Materials allow Philips engineers and employees to provide advanced servicing and configurations. Philips prohibits non-authorized Philips persons from having access to such proprietary software through contractual agreements with employees and customers. Philips Systems further include hardware and software access controls to prohibit non-authorized Philips persons from having access to such proprietary software.

24. Certain Proprietary Service Materials require specialized expertise and training to use properly and safely. Accordingly, Philips access controls

restrict access to certain tools to only highly-trained specialists. Even Philips Field Service Engineers do not have access to such highly specialized Proprietary Service Materials.

25.     Philips's ability to control access to Philips Proprietary Service Materials—and to grant or deny certain levels of access to non-Philips individuals—is important and valuable to Philips because it provides Philips with a means of protecting its proprietary information and maintenance tools while also protecting the public from potential unnecessary radiation exposure as a result of modification or customization of a System by unauthorized or insufficiently trained users. The access controls also provide Philips with the ability to provide enhanced maintenance and support services to customers of a type that could not be legitimately provided to those customers by non-Philips individuals.

### ~ Protection of Philips Proprietary Service Materials ~

26.     Philips takes numerous, active steps to protect and keep confidential its proprietary information, including the Philips Proprietary Service Materials contained on and within the Systems. Philips Systems include a Field Service Framework that provides access control for such Philips Proprietary Service Materials.

27.     Philips Proprietary Service Materials and Field Service Framework are protected by copyright.

28.     Philips Proprietary Service Materials and Field Service Framework also contain and encompass trade secrets that are of commercial value to Philips and that Philips actively attempts to guard and preserve from disclosure or unauthorized access.

29.     Employees of Philips—including Former Philips Employees hired by Transtate—enter into contractual agreements to preserve and protect against unauthorized use and disclosure of Philips secret, proprietary and confidential information or data.  That information includes information about Philips's Proprietary Software and its access control systems.  Such agreements survive the cessation of each individual's employment with Philips and remain in effect beyond such employment.

30.     Philips Field Service Framework provides multiple levels of access to proprietary software on the Systems.  Certain Philips Systems, including the Allura Systems, utilize an access key dongle ("Access Key")—a device that attaches to a computer port and must be present to run a piece of software—to identify the access level of a user.  When a user attaches his or her Access Key to a System, the Field Service Framework provides the user with access to only the tools and components that they are authorized to access.  The Field Service Framework

prohibits non-authorized users from accessing Philips Proprietary Service Materials.

31.     The lowest access level provides some basic access to software tools and does not require an Access Key.

32.     Philips provides non-Philips persons with limited access to permit the AIAT of components on the Allura Systems.  Philips requires non-Philips persons accessing its software on the Systems to register with Philips for such AIAT access as a means of regulating authorized use and the authorized levels of software access for each user.  For the Allura Systems, once a user registers and Philips authorizes the user for AIAT access, Philips provides the user with an Access Key that the registered user can use to access certain AIAT tools on the Allura System. A Philips Field Service Engineer must program the Field Service Framework on the specific Allura System to accept the non-Philips person's Access Key and permit access to certain AIAT tools.

33.     Non-Philips persons, including both the purchasers of the System and third-parties hired to maintain the system, have no right to access the Philips Proprietary Service Materials on the Systems unless Philips expressly grants them such right.  Purchasers of the Systems agree that they do not have a right to access or use the Philips Proprietary Software and agree to use reasonable efforts to

prevent any access to or use of the Philips Proprietary Software by any unauthorized party.

34. AIAT access is one of multiple levels of access that exist within the Systems. Philips may grant certain Philips Field Service Engineers, specialists, developers, and other individuals levels of access higher than AIAT access, which results in those individuals having authorized access to elements and functionalities of the Philips's Proprietary Service Materials that are not available to AIAT access users. Philips Field Service Framework includes access controls that require an authorized user to present an Access Key configured to permit that user to access the higher level functionality. Such access controls protect the public from potential unnecessary radiation exposure as a result of the use of Philips Proprietary Service Materials by unauthorized or insufficiently trained users.

35. Additionally, for protection of Philips's Proprietary Service Materials, Philips ensures that it retains—and does retain—ownership of its Proprietary Service Materials even though the physical machine upon which Philips's Proprietary Service Materials resides may itself be owned by a hospital, medical center, or other Philips customer.

## ~ Background Concerning Transtate~

36.     Purchasers of Philips Systems—such as hospitals and health care providers throughout the United States—may obtain post-warranty maintenance and other servicing for the Systems from Philips or may use independent, non-Philips companies for maintenance and servicing.

37.     Transtate provides competing, non-Philips maintenance and servicing for certain Philips Systems (as well as for various systems of other major manufacturers in the medical field).

38.     Upon information and belief, Transtate offers such services, at least in part, by hiring former Philips employees and by improperly and knowingly using Philips's confidential and proprietary information that those employees learned during the course of their employment with Philips and which was provided to those employees on a confidential basis and as a condition of their employment.

39.     Transtate hired former Philips support specialists, including William Griswold and Dale Dorrow, and multiple other former Philips employees (collectively, "Former Philips Employees").

40.     The Former Philips Employees, during the course of their employment with Philips, entered into written agreements with their Philips employer titled "Employee Ethics and Intellectual Property Agreement."

41.     Pursuant to these agreements, the Former Philips Employees agreed not to disclose or use any secret or confidential information relating to the business of Philips that was acquired from any source during their employment at Philips.

**~ Transtate's Actions at the Lakewood Regional Medical Center ~**

42.     In or about July 2015, Transtate committed acts at the Lakewood Regional Medical Center ("Lakewood") in Lakewood, California, that resulted in Transtate providing maintenance and support services for Lakewood that were achieved only because Transtate unlawfully exceeded its authorized levels of access to Philips's proprietary software on an Allura System, and did so by using misappropriated trade secret information to actively circumvent and bypass access controls in violation of federal and state laws.

43.     Specifically, in or about July 2015, Lakewood purchased a replacement tube for an Allura model x-ray machine from North America Imaging ("NAI").  Upon information and belief, NAI retained Transtate as a subcontractor to perform the x-ray tube installation service for Transtate.  Upon information and belief, Transtate misrepresented or implied to NAI that it was authorized to perform the services it performed for Lakewood.

44.     Upon information and belief, on July 30, 2015, a technician from Transtate provided services to Lakewood to replace an x-ray tube on an Allura

System. Upon information and belief, the technician had not registered for AIAT access to the Allura System, and therefore was not authorized to access the System. The technician unlawfully circumvented and bypassed the access controls to gain access to and use the Allura System at Lakewood.

45. Specifically, upon information and belief, the Transtate employee accessed the Allura System without an Access Key. The Transtate employee then created a copy of a software file on the Allura System and modified the software file to alter the access levels required for access to certain Proprietary Service Materials. By modifying specific portions of the software file in a specific way, the Transtate employee was able to alter the access controls so that a user accessing the Allura System without an Access Key would be able to access and use Philips Proprietary Service Materials that would otherwise require a specific Access Key to access.

46. Lakewood was not authorized to access the Philips Proprietary Service Materials and could not have authorized Transtate to have access to the Philips Proprietary Service Materials.

47. The Transtate employee then used the Philips Proprietary Service tools he gained access to by circumventing access controls to perform services for Lakewood.

48.     Upon information and belief, the Transtate technician used knowledge of trade secrets and other proprietary knowledge that became known to the Former Philips Employees through their former employment with Philips to circumvent access controls on the Allura System.

49.     As a result of Transtate's actions, Transtate was able to perform servicing on the Allura System that they were not authorized or granted a license to perform, and that intruded upon Philips's proprietary software and trade secrets, and that interfered with Philips's business of providing maintenance and support services that cannot be legitimately offered by any non-Philips entity.

## ~ Philips's Investigation of the Transtate Incident ~

50.     A Philips Field Service Engineer ("FSE") was on site at Lakewood on July 30, 2015.  The FSE was providing services on a system in a room adjacent to the room in which an Allura System was located.  The FSE witnessed a technician from a then-unknown third-party perform x-ray tube replacement on the Allura System.

51.     The FSE introduced himself to the unknown third-party technician. The FSE inquired as to whether the technician was just doing a mechanical installation.  The third-party technician stated that he would be doing calibrations

and adjustments.  The FSE inquired how the technician could perform those calibrations and the technician responded that he had an Access Key.

52.     The Philips FSE was concerned that the necessary calibrations and adjustments had either not been performed or had not been performed correctly, which could risk patient safety.  The FSE reported his concerns to his Supervisor and to a National Support Specialist ("Specialist").

53.     Philips analyzed the Allura System's log files, which showed that the System had been accessed for calibrations without insertion of an Access Key.

54.     Philips analyzed files from the Allura System and eventually discovered that changes were made to two files.  The result of these changes effectively removed access controls on the use of Philips Proprietary Service Materials on the Allura System.  The technician's knowledge of the specific files to modify and specific modifications to make to those files to gain unauthorized access to the Philips Proprietary Service Materials indicates a high level of knowledge about Philips's proprietary systems.

55.     Philips learned that Lakewood purchased the tube from NAI.  In August 2016, Philips contacted NAI regarding the unauthorized access to Philips Proprietary Service Materials on the Allura System.  In September 2016, NAI responded by indicating that it did not render any physical servicing of the Allura

System in question, and indicating that the provider the Philips's FSE observed was most likely an employee of Transtate.

56.     On September 27, 2016, Philips wrote to Transtate at 1418 Ameron Drive, Charlotte, NC 28206, the address then listed on Transtate's website, demanding that it immediately cease and desist its unauthorized access to Philips Proprietary Service Materials, and demanding that Transtate redress the injury suffered by Philips as a result of Transtate's conduct.  After receiving no response to its September letter, on November 21, 2016, Philips again wrote to Transtate demanding that it promptly cease and desist all unauthorized access to and use of Philips Proprietary Service Materials.  Philips was informed by the Postal Service that the deliveries were not successful for the reason: "No authorized recipient available."

57.     At some point, Transtate changed its website to list both the Ameron Drive address and a new address of 7089 Weddington Road NW, Concord, NC 28027, and on October 6, 2016, Transtate changed its registered office to the Weddington Road address.  On December 9, 2016, Philips wrote to Transtate again, this time to both its Weddington Road and Ameron Drive addresses, reiterating its demands.  Transtate responded on December 16, 2016, confirming receipt of the letters.

58.    On January 13, 2017, Transtate responded through counsel.  Transtate did not deny that its employee gained access to the Allura System at Lakewood to perform calibration services without using a requisite Access Key.  Transtate's counsel, however, stated that his investigation revealed no violation of any protectable interest of Philips.

59.    Philips investigated whether other systems had been modified to provide unauthorized access to Transtate.  Philips's investigation identified many other systems on which, upon information and belief, Transtate used misappropriated trade secret information to circumvent access controls to gain unauthorized access to Philips Proprietary Service Materials.

### ~ Transtate's Actions at the Holmes Regional Hospital ~

60.    In or about July, 2016, Transtate committed acts at the Holmes Regional Hospital ("Holmes") in Melbourne, Florida, that resulted in Transtate providing maintenance and support services for Holmes that were achieved only because Transtate misappropriated trade secret information to actively circumvent and bypass Philips's access controls to gain unauthorized access to Philips's proprietary software.

61.    Specifically, in or about July 2016, a Transtate technician provided a maintenance service to an Allura System at Holmes.  On information and belief,

the Transtate technician modified a configuration file on the Allura System to circumvent access controls and gain unauthorized access to AIAT tools and to Philips Proprietary Service Materials.

62.     On information and belief, the Transtate technician then used the AIAT tools and Philips Proprietary Service Materials to provide maintenance services.

63.     On information and belief, Transtate has circumvented access controls to gain unauthorized access to AIAT tools and/or Philips Proprietary Service Materials on at least six Philips Systems at Holmes.

**~ Transtate's Actions At Piedmont Healthcare ~**

64.     Piedmont Healthcare ("Piedmont") operates an integrated healthcare system including seven hospitals in greater Atlanta, Georgia.

65.     In or around September 2016, Transtate committed acts at a Piedmont hospital in or around Atlanta, that resulted in Transtate providing maintenance and support services for Piedmont that were achieved only because Transtate misappropriated trade secret information to actively circumvent and bypass Philips's access controls in violation of federal and state laws to gain unauthorized access to Philips's proprietary software.

66. Specifically, on information and belief, Transtate has installed a "black box" connected to at least one Allura System at Piedmont that provides Transtate with remote access to the Allura System. On information and belief, Transtate has modified access controls on the Allura System to gain unauthorized access via the black box. In relation to that unauthorized access, Transtate provides services for Piedmont.

67. In or around September 2016, the services provided by Transtate to Piedmont included Bill Griswold providing Piedmont with a modified version of a database that controls image quality, radiation dose, and other functions on the Allura Systems.

### ~ Transtate's Actions Nationwide ~

68. While the conduct set forth above occurred at the Lakewood, Holmes, and Piedmont facilities, upon information and belief Transtate has engaged in the similar improper conduct to gain unauthorized access to Philips Systems at sites they service nationwide, including sites in at least the following locations: Jacksonville, Florida; Macon, Georgia; Cumming, Georgia; Austin, Texas; Wake Forest, North Carolina; Greensboro, North Carolina; and Charlotte, North Carolina.

69. On information and belief, at each location Transtate used misappropriated trade secret and proprietary information from Former Philips Employees to copy and modify Philips's proprietary software in order to gain unauthorized access to AIAT tools in lieu of registering for legitimate AIAT access.

70. Upon information and belief, the Transtate technicians who gained access to the Philips Systems had not registered with Philips for AIAT access prior to performing service activities.

71. Upon information and belief, Transtate's technician's modification of Philips's proprietary software to circumvent access controls also gave the Transtate technicians unauthorized access to Philips Proprietary Service Materials on Systems that they were not authorized to access.

72. Access to, and use of, Philips's proprietary data and Philips's trade secrets is of significant commercial value to those that gain improper access to it—like Transtate—because it permits the entity to improperly modify Philips Systems to circumvent access controls and provide maintenance and support services of a type and/or efficiency that—without their improper access—only Philips's service technicians could perform. Relatedly, protection of Philips's access control information and other such Philips's proprietary data and Philips's trade secrets is of significant commercial value to Philips with respect to Philips's marketing of

support, servicing, and maintenance services to hospitals, medical centers, and other Philips customers.

73.     Upon information and belief, Transtate's conduct—and the conduct of those working for Transtate—is not limited in time to the above-identified events and is not limited in geographic location to only the identified sites.  Upon information and belief, Transtate's conduct is, instead, representative of widespread and ongoing conduct.

## Count I:  Violations of the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030(a)

74.     Philips reasserts, re-alleges, and incorporates by reference the allegations in all other paragraphs of this Complaint as if fully set forth herein under Count I.

75.     Transtate has intentionally and/or knowingly accessed Philips Proprietary Service Materials on the Allure Systems at Lakewood, Holmes, Piedmont, and other locations either without authorization, or in excess of their authorization, and in excess of access that the Systems' owners had the rights and ability to confer upon Transtate.

76.     Transtate has accessed and obtained information from the Systems in violation of the CFAA.

77.    Transate has impaired the integrity of the Philips's proprietary software on the Systems and the integrity of the systems generally by modifying software to disable access controls, and thereby allowing unauthorized users to gain unrestricted access to the Systems.

78.    Transate has damaged the Systems and Philips's proprietary software on the Systems.

79.    The Systems at-issue are connected to the Internet and affect interstate commerce.  Thus, the Systems are protected computers.

80.    Transate knowingly modified and thereby circumvented the access controls to gain unauthorized access to Philips's proprietary software to provide maintenance or other services.  On information and belief, Transate held itself out as being authorized to perform the maintenance and other services and received payment for those services.  Transate has thereby knowingly, and with intent to defraud, accessed a protected computer without authorization, and by means of that conduct furthers the intended fraud and obtained value.

81.    Transate altered the software to bypass the access controls by knowingly causing the transmission of a program or command that compromised the integrity of the proprietary software by modifying or removing its access

controls. As a result of Transtate's conduct, Transtate intentionally caused damage without authorization to a protected computer.

82. By engaging in the conduct set forth in the preceding paragraphs of this Complaint, Transtate has caused Philips to incur losses in excess of $5,000.00 in value in a one-year period related to the investigation of and cost of responding to the conduct.

83. While the Systems at-issue are, in at least some cases, owned by hospitals that are not parties to this action, Philips has reserved and retained its rights to the Philips Proprietary Service Materials contained on those Systems.

84. By engaging in the conduct set forth in the preceding paragraphs of this Complaint, Transtate accessed the Systems without authorization or has exceeded its authorized levels of access to the Systems and Philips's proprietary software, including Proprietary Service Materials, thereby obtaining access to valuable information and proprietary tools and information, in violation of at least 18 U.S.C. §§ 1030(a)(2)(C), (a)(4), (a)(5)(A) and (a)(5)(C).

85. By engaging in the conduct set forth in the preceding paragraphs of this Complaint, Transtate has accessed without authorization, or exceeded its authorized levels of access to, the Systems and Philips's proprietary software, thereby obtaining access to valuable and proprietary tools and information, and

thereby causing damages to Philips that include business losses, and that further include the threat of continuing and ongoing harms relating to the same.

## Count II:  Violations of the Digital Millennium Copyright Act (DMCA), 17 U.S.C. § 1201

86.     Philips reasserts, re-alleges, and incorporates by reference the allegations in all other paragraphs of this Complaint as if fully set forth herein under Count II.

87.     Philips's medical imaging systems include Philips's copyrighted and proprietary software.

88.     Philips employs numerous technological measures including, but not limited to, its Access Key protection scheme and protocol, in order to protect and control access to and use of its copyrighted proprietary software and/or portions thereof.

89.     Transtate intentionally modified Philips's proprietary software to circumvent a technological measure that controls access to Philips's protected software.  Specifically, Transtate modified computer files in order to deactivate a requirement for an Access Key to access Philips's proprietary software.  Transtate was thus able to bypass the technological measure and gain unauthorized access to the proprietary software.

90.    Transate has intentionally and/or knowingly circumvented technological measures that effectively control access to a work or works protected under Title 17, in violation of 17 U.S.C. § 1201(a)(1)(A) of the Digital Millennium Copyright Act.

91.    Transate's unauthorized means of accessing the Systems has, and does, entail the unauthorized access, copying, and potential alteration of the contents of Philips's copyrighted proprietary software.

92.    Philips has been and will continue to be damaged in an amount not presently known with certainty, but that will be proven at trial.

93.    Philips is entitled to the range of relief provided by 17 U.S.C. § 1203, including but not limited to, injunctive relief, compensatory damages or statutory damages, punitive damages, and Philips's costs and attorneys' fees in amounts to be proven at trial.  Transate's conduct also has caused irreparable and incalculable harm and injuries to Philips, and, unless enjoined, will cause further irreparable and incalculable injury, for which Philips has no adequate remedy at law.

## Count III:  Violations of the Defend
## Trade Secrets Act (DTSA), 18 U.S.C. § 1836

94.    Philips reasserts, re-alleges, and incorporates by reference the allegations in all other paragraphs of this Complaint as if fully set forth herein under Count III.

95.     Philips owns and possesses certain confidential, proprietary, and trade secret information, including scientific, technical, and engineering information and financial, business, and economic information, as alleged above, in Philips's proprietary software for the Allura System and other Philips Systems, including its Field Service Framework access control software and the Philips Proprietary Service Materials on the Allura System.

96.     Philip's confidential, proprietary, and trade secret information relates to products used in, or intended for use in, interstate or foreign commerce.

97.     Philips's proprietary software and access control systems, including the Field Service Framework and Philips Proprietary Service Materials, contain and are trade secrets because Philips restricts access to them and Philips has engaged in reasonable measures to maintain their secrecy.  Such reasonable measures to protect its trade secrets include, for example, implementing systems of access registration, access control measures, and other safeguards associated with Philips's proprietary software, including in the form of physical and/or technological safeguards and also including in the form of contractual protections and written notices and warnings.

98.     Philips has expended significant money and effort in developing Philips's proprietary software and access control systems, and the information

would be difficult to properly acquire or duplicate by Transtate or other competitors of Philips.

99.     Philips's proprietary software and access control systems derive independent economic value to Philips by not being generally known, and not being readily ascertainable through proper means, by another person who could obtain economic value from the disclosure or use of the information.  Moreover, they are of significant commercial value to Philips, because among other things, Philips relies upon these trade secrets to achieve an advantage in the marketplace with respect to the quality, range, and efficiency of the repair and maintenance services that it is able to offer and with respect to pricing related thereto.  Further, Philips relies on the its trade secret proprietary software and access control systems to protect the public from potential unnecessary radiation exposure as a result of modification or customization of the systems by unauthorized or insufficiently trained users.

100.   Transtate misappropriated some or all of these trade secrets for its own unlawful use and/or benefit without express or implied consent by Philips.  At the time of its use of such trade secrets, Transtate knew or had reason to know that its knowledge of the trade secrets was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret, and that its knowledge of Philips's trade secrets was derived from or through a

person who owed a duty to Philips to maintain the secrecy of the trade secret or limit the use of the trade secret.

101.  Transtate's actions have been knowing, deliberate, willful, reckless, and in utter disregard of Philips's rights.

102.  As a result of Transtate's misappropriation of these trade secrets, Philips has suffered actual damages in an amount to be proven at trial.  At a minimum, Transtate has gained an improper competitive advantage over Philips that caused or may cause Philips to be underbid or to otherwise lose out on business that it would have otherwise obtained.

103.  Transtate's conduct, and ongoing and continuing use of the trade secrets and proprietary and confidential information of Philips, has caused, and will cause, Philips repeated and irreparable injury.  Philips's remedy at law is not, by itself, adequate to compensate for the injuries already inflicted and further threatened by Transtate.

104.  Philips has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorneys' fees.

105.  By engaging in the conduct set forth in the preceding paragraphs of this Complaint, Transtate has violated the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836.

## Count IV:  Misappropriation of Trade Secrets and
## Violation of the Georgia Trade Secrets Act, O.C.G.A § 10-1-760, *et seq.*

106.   Philips reasserts, re-alleges, and incorporates by reference the allegations in all other paragraphs of this Complaint as if fully set forth herein under Count IV.

107.   Philips owns and possesses certain confidential, proprietary, and trade secret information, including scientific, technical, and engineering information and financial, business, and economic information, as alleged above, in Philips's proprietary software for the Allura System, including its Field Service Framework access control software and the Philips Proprietary Service Materials on the Allura System.

108.   Philips's proprietary software and access control systems, including the Field Service Framework and Philips Proprietary Service Materials, contain and are trade secrets because Philips restricts access to them and Philips has engaged in reasonable measures to maintain their secrecy.  Such reasonable measures to protect its trade secrets include, for example, implementing systems of access registration, access control measures, and other safeguards associated with Philips's proprietary software, including in the form of physical and/or technological safeguards and also including in the form of contractual protections and written notices and warnings.

109. Philips has expended significant money and effort in developing Philips's proprietary software and access control systems, and the information would be difficult to properly acquire or duplicate by Transtate or other competitors of Philips.

110. Philips's proprietary software and access control systems derive independent economic value to Philips by not being generally known, and not being readily ascertainable through proper means, by another person who could obtain economic value from the disclosure or use of the information. Moreover, they are of significant commercial value to Philips, because among other things, Philips relies upon these trade secrets to achieve an advantage in the marketplace with respect to the quality, range, and efficiency of the repair and maintenance services that it is able to offer and with respect to pricing related thereto. Further, Philips relies on the its trade secret proprietary software and access control systems to protect the public from potential unnecessary radiation exposure as a result of modification or customization of the systems by unauthorized or insufficiently trained users.

111. Transtate misappropriated some or all of these trade secrets for its own unlawful use and/or benefit without express or implied consent by Philips. At the time of its use of such trade secrets, Transtate knew or had reason to know that its knowledge of the trade secrets was acquired under circumstances giving rise to

a duty to maintain the secrecy of the trade secret or limit the use of the trade secret, and that its knowledge of Philips's trade secrets was derived from or through a person who owed a duty to Philips to maintain the secrecy of the trade secret or limit the use of the trade secret.

112.    Transtate's actions have been knowing, deliberate, willful, reckless, and in utter disregard of Philips's rights.

113.    As a result of Transtate's misappropriation of these trade secrets, Philips has suffered actual damages in an amount to be proven at trial.   At a minimum, Transtate has gained an improper competitive advantage over Philips that caused or may cause Philips to be underbid or to otherwise lose out on business that it would have otherwise obtained.

114.    Transtate's conduct, and ongoing and continuing use of the trade secrets and proprietary and confidential information of Philips, has caused, and will cause, Philips repeated and irreparable injury.  Philips's remedy at law is not, by itself, adequate to compensate for the injuries already inflicted and further threatened by Transtate.

115.    Philips has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorneys' fees.

116.   By engaging in the conduct set forth in the preceding paragraphs of this Complaint, Transtate has misappropriated trade secrets and has violated state trade secrets acts, including the Georgia Trade Secrets Act, O.C.G.A § 10-1-760, *et seq*.

## Count V:  Unfair Competition

117.   Philips reasserts, re-alleges, and incorporates by reference the allegations in all other paragraphs of this Complaint as if fully set forth herein under Count V.

118.   Philips's ability to attract and retain customers for repair and maintenance of its products depending on the continued security and integrity, and the proprietary features of its proprietary systems and software, including the Philips Proprietary Service Materials.

119.   When entering into contracts with hospitals and health care providers, or other third-party service providers, for the repair and maintenance of Philips's Systems, Transtate, by relying on its improper and unauthorized access to Philips's proprietary software, misrepresents its rights to access/use such proprietary software and therefore, its expertise and capabilities to service the Systems. Through such conduct, Transtate has gained an improper competitive advantage over Philips that has caused or may cause Philips to be underbid or to otherwise lose out on business that it would have otherwise obtained.

120.   Further, a Transtate technician misrepresented his authorized capabilities to provide services on Philips's Systems when he told a Philips Field Service Engineer that he had an Access Key that would allow him to perform certain calibrations.

121.   Upon information and belief, Transtate misrepresented or implied to NAI that it was authorized to perform the services it was retained by NAI to perform on Philips's Systems.

122.   Relatedly, Transtate's actions have provided Transtate with competitive advantages with respect to the services that Transtate is able to offer and the pricing associated with those services.  These are advantages that Transtate would not have had but for its improper conduct in accessing and using Philips's proprietary software that it was not authorized to access.

123.   Further, Transtate's improper and unauthorized access to Philips's proprietary software is likely to create customer confusion regarding the services Transtate is authorized to perform.

124.   For the above mentioned reasons, Transtate has engaged in unfair competition.

125.   As a result of Transtate's unfair competition, Philips has suffered actual damages in an amount to be proven at trial.

## Count VI:  Copyright Infringement

126.   Philips reasserts, re-alleges, and incorporates by reference the allegations in all other paragraphs of this Complaint as if fully set forth herein under Count VI.

127.   Philips's proprietary software is copyrightable subject matter under the Copyright Act, 17 U.S.C. § 101, *et seq.*

128.   Philips has complied in all respects with the provisions of the Copyright Act, and has registered the copyright in the Philips's proprietary software for the Allura System with the United States Copyright Office.  Copies of the Certificates of Registration are attached hereto as Exhibit A, and are fully incorporated into this Complaint as if set forth in full herein.

129.   Philips is the developer and owner of all rights, title, and interest in and to the copyright on the Philips Proprietary Service Materials for the Allura System.

130.   Transtate engaged in copyright infringement by, without authorization, creating a copy of configuration files on the Allura System and by modifying the configuration files to create derivative works.

131.   Transate further engaged in copyright infringement by creating copies of Philips Proprietary Service Materials in the memory of the Allura Systems by its unauthorized use of the software.

132.   Transate's acts constitute direct and/or contributory infringement of Philips's copyrights, including infringement of Philips's copyrights on Philips's proprietary software for the Allura System.

133.   Transate engaged in copyright infringement by copying, reproducing, distributing, displaying, using, and/or creating unauthorized derivative works of Philips's proprietary software without authorization.

134.   Upon information and belief, these actions on Transate's part have been knowing, deliberate, willful, reckless, and in utter disregard of Philips's rights.

135.   Transate's copyright infringement has caused, and will continue to cause, Philips to suffer substantial injuries, loss, and damage to its proprietary and exclusive rights to, and copyright in, Philips's proprietary software and, further, has damaged Philips's business, reputation and goodwill, diverted its trade, and caused a loss of profits, all in amounts not yet ascertained.

136.   Transate's copyright infringement, and the threat of continuing infringement, has caused, and will continue to cause, Philips repeated and

irreparable injury. It is, at present, difficult to ascertain the amount of damages that would afford Philips adequate relief at law for Transtate's continuing acts. Philips's remedy at law is not, by itself, adequate to compensate it for the injuries already inflicted and further threatened by Transtate.

### Count VII: Attorney's Fees and Expenses of Litigation Under O.C.G.A. § 13-6-11

137. Philips reasserts, re-alleges, and incorporates by reference the allegations in all other paragraphs of this Complaint as if fully set forth herein under Count VII.

138. Transtate has acted in bad faith, been stubbornly litigious, and caused Philips unnecessary trouble and expense by intentionally misappropriating Philips's intellectual property, refusing to comply with Philips's cease and desist letters, and intentionally causing damages to Philips's business.

139. Accordingly, Philips is entitled to recover its attorney's fees and expenses of litigation from Transtate pursuant to O.C.G.A. § 13-6-11 in an amount to be proven at trial.

### Jury Trial Demanded

140. Philips hereby requests a jury trial on all issues and claims contained herein that are eligible for trial by jury.

# Prayer for Relief

WHEREFORE, Philips respectfully request that this Court:

A.     enter a permanent injunction consistent with Philips's request herein;

B.     enter a final order in Philips's favor, and holding Transtate liable, for all claims set forth herein;

C.     award monetary damages to Philips, including but not limited to compensatory damages and statutory, enhanced, and punitive damages, to the extent recoverable by law;

D.     award Philips its attorneys' fees and costs under O.C.G.A. § 13-6-11, and otherwise to the extent recoverable by law; and

E.     award Philips any other damages and/or relief deemed appropriate by the Court.

This 28th day of July, 2017.

By: /s/ *Dorothy H. Cornwell*
Dorothy H. Cornwell
Georgia State Bar No. 552635

Counsel for Plaintiffs

SMITH MOORE LEATHERWOOD LLP
Atlantic Center Plaza, Suite 2300
1180 West Peachtree Street
Atlanta, GA 30309
(404) 962-1000 Telephone
(404) 962-1200 Facsimile
*dorothy.cornwell@smithmoorelaw.com*

Kirsten R. Rydstrom
Pa. ID 76549 (pro hac vice motion to be filed)
REED SMITH LLP
225 Fifth Avenue
Pittsburgh, PA 15222
Tel.: (412) 288-3131
Fax: (412) 288-3063
Email: krydstrom@reedsmith.com

Gerard M. Donovan
DC Bar 997156 (pro hac vice motion to be filed)
REED SMITH LLP
1301 K Street, N.W., Suite 1000 – East Tower
Washington, DC 20005
Tel.: (202) 414-9224
Fax: (202) 414-9299
Email: gdonovan@reedsmith.com

Counsel for Plaintiffs

ATLANTA 1549322.1