**IN THE UNITED STATES DISTRICT COURT FOR**
**THE WESTERN DISTRICT OF NORTH CAROLINA**

|  |  |
|---|---|
| PHILIPS MEDICAL SYSTEMS NEDERLAND B.V.; PHILIPS NORTH AMERICA LLC; and PHILIPS INDIA LTD., Plaintiffs, v. TEC HOLDINGS, INC., F/K/A TRANSTATE EQUIPMENT COMPANY, INC., TRANSTATE EQUIPMENT COMPANY, INC., F/K/A TRANSTATE HOLDINGS, INC., and ROBERT A. ("ANDY") WHEELER, individually and in his capacity as executor and personal representative of the Estate of DANIEL WHEELER, Defendants. | **Civil Action No. 3:20-cv-00021-MOC-DCK** **JURY TRIAL DEMANDED** |

## DEFENDANT TEC HOLDINGS, INC.'S ANSWER, DEFENSES, AND COUNTERCLAIMS TO PLAINTIFFS' SECOND AMENDED COMPLAINT

COMES NOW Defendant TEC Holdings, Inc. ("TEC" or "Defendant") and submits its Answer, Defenses, and Counterclaims to the Second Amended Complaint filed by Plaintiffs Philips Medical Systems Nederland B.C., Philips North America LLC, and Philips Electronics India, LTD. (collectively "Plaintiffs" or "Philips"), showing the Court as follows:

## ANSWER

1.     TEC admits that Philips develops and sells, and in some instances supports, maintains, and services, certain imaging systems used at hospitals and medical centers. TEC denies the remaining allegations of Paragraph 1 of the Second Amended Complaint.

2.     TEC admits that it used to provide maintenance and support services for certain x-ray systems. TEC further admits that certain of TEC's former employees were also former employees of Philips. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 2 of the Second Amended Complaint

and, therefore, denies them.

3. TEC denies the allegations in Paragraph 3 of the Second Amended Complaint.

4. TEC denies the allegations in Paragraph 4 of the Second Amended Complaint.

5. TEC admits that Philips has asserted certain claims against it as set forth in the Second Amended Complaint. The remainder of Paragraph 5 contains alleged statements of law to which no response is required. To the extent a response is required, TEC denies the allegations in Paragraph 5 of the Second Amended Complaint.

6. TEC admits that Philips is seeking an injunction against it. The remainder of Paragraph 6 contains alleged statements of law to which no response is required. To the extent a response is required, TEC denies the allegations in Paragraph 6 of the Second Amended Complaint.

## Parties

7. TEC is without knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 7 of the Second Amended Complaint and, therefore, denies them.

8. TEC is without knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 8 of the Second Amended Complaint and, therefore, denies them.

9. TEC is without knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 9 of the Second Amended Complaint and, therefore, denies them.

10. TEC admits that Philips-named entities develop, manufacture and sell, and in some instances support, maintain, and service, certain Philips' medical imaging systems. TEC denies the

remaining allegations in Paragraph 10 of the Second Amended Complaint and, therefore, denies them.

11.     TEC admits that it serviced x-ray machines, but denies that it serviced the other imaging devices listed in Paragraph 11 of the Second Amended Complaint. TEC admits the remaining allegations of Paragraph 11 of the Second Amended Complaint.

12.     TEC is without knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 12 of the Second Amended Complaint and, therefore, denies them.

13.     TEC admits that it sold substantially all of its assets to co-defendant Transtate Equipment Company, Inc. ("Transtate") on or about March or April 2017. TEC denies the remaining allegations of Paragraph 13 of the Second Amended Complaint.

14.     TEC admits that Daniel Wheeeler was the President of TEC until November 2018. TEC is without knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 14 of the Second Amended Complaint and, therefore, denies them.

15.     TEC denies the allegations in Paragraph 15 of the Second Amended Complaint.

16.     TEC denies the allegations of Paragraph 16 of the Complaint.

17.     TEC admits that Andy Wheeler is the President of TEC. TEC is without knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 17 of the Second Amended Complaint and, therefore, denies them.

18.     TEC denies the allegations in Paragraph 18 of the Second Amended Complaint.

19.     TEC admits that Andy Wheeler has an ownership interest in TEC.

20.     TEC is without knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 20 of the Second Amended Complaint and, therefore, denies

them.

21.     TEC denies the allegations in Paragraph 21 of the Second Amended Complaint.

## Jurisdiction and Venue

22.     Paragraph 22 of the Second Amended Complaint contains an alleged statement of law to which no response is required. To the extent a response is required, TEC denies the allegations in Paragraph 22 of the Second Amended Complaint to the extent that they in any way deviate from the statutes cited in Paragraph 22.

23.     Paragraph 23 of the Second Amended Complaint contains an alleged statement of law to which no response is required. To the extent a response is required, TEC denies the allegations in Paragraph 23 of the Second Amended Complaint.

24.     TEC admits that the Court in the Western District of North Carolina has personal jurisdiction over it. TEC admits it that it formerly conducted business at a Piedmont Healthcare hospital. TEC denies the remaining the allegations of Paragraph 24 of the Second Amended Complaint.

25.     TEC admits that is has conducted business in Georgia, including at Emory Saint Joseph's Hospital in Atlanta, Georgia.  TEC denies the remaining allegations of Paragraph 25 of the Second Amended Complaint.

26.     TEC admits that it formerly conducted business in Georgia. TEC denies the remaining allegations of Paragraph 26 of the Second Amended Complaint.

27.     TEC admits that Dan Wheeler was previously an officer of TEC and that Andy Wheeler is currently an officer of TEC. The remaining allegations of Paragraph 27 of the Second Amended Complaint contain an alleged statement of law to which no response is required. To the extent a response is required, TEC denies the allegations in Paragraph 27 of the Second Amended

4

Complaint.

28.     TEC denies that the venue was proper in the Northern District of Georgia. The remaining allegations of Paragraph 28 of the Second Amended Complaint contain an alleged statement of law to which no response is required. To the extent a response is required, TEC denies the remaining allegations in Paragraph 28 of the Second Amended Complaint.

**Facts and Allegations**

29.     TEC incorporates by reference its responses to the preceding paragraphs of its Answer to the Second Amended Complaint as if fully set forth herein.

30.     TEC admits that Philips-named entities develop, manufacture and sell, and in certain instances support, maintain and service, certain medical imaging systems used at hospitals and medical centers. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 30 of the Second Amended Complaint and, therefore, denies them.

31.     TEC admits that Philips' products include the "Allura" line of x-ray machines, certain CT scanners, and certain nuclear medicine scanners. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 31 of the Second Amended Complaint and, therefore, denies them.

32.     TEC admits that the medical systems it is aware of are complex pieces of medical equipment. TEC denies the remaining allegations of Paragraph 32 of the Second Amended Complaint.

33.     TEC is without knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 33 of the Second Amended Complaint and, therefore, denies them.

34.     TEC admits that certain of Philips' x-ray systems, CT scanners, and nuclear medicine scanners include tools to allow performance of some assembly, installation, adjustment, and testing ("AIAT") services on those systems. TEC denies that these AIAT tools, as well as additionally necessary AIAT tools, were or are provided or made readily available to TEC or other third-party service providers as required by law. TEC denies the remaining allegations of Paragraph 34 of the Second Amended Complaint.

35.     TEC admits that certain of Philips' x-ray systems, certain CT scanners, and certain nuclear medicine scanners, include tools to allow performance of some AIAT services on Philips X-Ray systems. TEC denies that these AIAT tools, as well as additionally necessary AIAT tools, were or are provided or made readily available to TEC or other third-party service providers as required by law. TEC denies the remaining allegations of Paragraph 35 of the Second Amended Complaint.

36.     TEC denies the allegations of Paragraph 36 of the Second Amended Complaint.

37.     TEC denies the allegations of Paragraph 37 of the Second Amended Complaint.

38.     TEC denies the allegations of Paragraph 38 of the Second Amended Complaint.

39.     TEC denies the allegations of Paragraph 39 of the Second Amended Complaint.

40.     TEC denies the allegations of Paragraph 40 of the Second Amended Complaint.

41.     TEC denies the allegations of Paragraph 41 of the Second Amended Complaint.

42.     TEC admits that it previously employed certain people that also were former Philips employees. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 42 of the Second Amended Complaint and, therefore, denies them.

43.     TEC admits that the Field Service Framework includes multiple levels of access to

software on certain Philips systems, but denies that such software is proprietary. TEC admits that certain Philips systems utilize access key dongles. TEC denies the remaining allegations of Paragraph 43 of the Second Amended Complaint.

44.     TEC is without knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 44 of the Second Amended Complaint and, therefore, denies them.

45.     TEC admits that Philips provides limited access to non-Philips persons to perform services on Allura systems, but denies that Philips provides access to perform all AIAT services. TEC admits that Philips requires non-Philips persons to register with Philips for access to some software on the systems, and that Philips sometimes provides registered users with an access key for limited access to the system software, but denies that the access key provides access to all AIAT tools or software.  TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 45 of the Second Amended Complaint and, therefore, denies them.

46.     TEC denies that non-Philips persons have no right to access the so-called "Philips Proprietary Service Materials" on the systems unless Philips expressly grants them such right. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 46 of the Second Amended Complaint and, therefore, denies them.

47.     TEC admits that there are multiple levels of access to software that exist within Philips systems. TEC denies that Philips' access controls protect the public from potential unnecessary radiation exposure. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 47 of the Second Amended

Complaint and, therefore, denies them.

48.     TEC denies the allegations of Paragraph 48 of the Second Amended Complaint.

49.     TEC admits the allegations of Paragraph 49 of the Second Amended Complaint.

50.     TEC admits that it previously provided maintenance and service support for Philips Allura systems, as well as for other manufacturers' systems, but that it no longer does so. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 50 of the Second Amended Complaint and, therefore, denies them.

51.     TEC admits that it hired and employed former Philips employees, but avers that it no longer employs any former Philips employees. TEC denies the remaining allegations of Paragraph 51 of the Second Amended Complaint.

52.     TEC admits that it hired and previously employed William Griswold, Dale Darrow, and certain other former Philips employees. Except as expressly admitted, TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations with respect to Transtate in Paragraph 52 of the Second Amended Complaint and, therefore, denies them.

53.     TEC is without knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 53 of the Second Amended Complaint and, therefore, denies them.

54.     TEC is without knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 54 of the Second Amended Complaint and, therefore, denies them.

55.     TEC admits that it is not a party to any agreements between Former Philips Employees and Philips.

56. TEC admits that it is not a party to any agreements between Former Philips Employees and Philips. To the extent any further response is required, TEC denies the allegations of Paragraph 56 of the Second Amended Complaint.

57. TEC is without knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 57 of the Second Amended Complaint and, therefore, denies them.

58. TEC denies the allegations of Paragraph 58 of the Second Amended Complaint.

59. TEC denies the allegations of Paragraph 59 of the Second Amended Complaint.

60. TEC denies the allegations of Paragraph 60 of the Second Amended Complaint.

61. TEC denies the allegations of Paragraph 61 of the Second Amended Complaint.

62. TEC denies the allegations of Paragraph 62 of the Second Amended Complaint.

63. TEC denies the allegations of Paragraph 63 of the Second Amended Complaint.

64. TEC denies the allegations of Paragraph 64 of the Second Amended Complaint.

65. TEC denies the allegations of Paragraph 65 of the Second Amended Complaint.

66. TEC denies the allegations of Paragraph 66 of the Second Amended Complaint.

67. TEC denies the allegations of Paragraph 67 of the Second Amended Complaint.

68. TEC denies the allegations of Paragraph 68 of the Second Amended Complaint.

69. TEC denies the allegations of Paragraph 69 of the Second Amended Complaint.

70. TEC denies the allegations of Paragraph 70 of the Second Amended Complaint.

71. TEC denies the allegations of Paragraph 71 of the Second Amended Complaint.

72. TEC denies the allegations of Paragraph 72 of the Second Amended Complaint.

73. TEC denies the allegations of Paragraph 73 of the Second Amended Complaint.

74. TEC denies the allegations of Paragraph 74 of the Second Amended Complaint.

75.     TEC denies the allegations of Paragraph 75 of the Second Amended Complaint.

76.     TEC denies the allegations of Paragraph 76 of the Second Amended Complaint.

77.     TEC denies the allegations of Paragraph 77 of the Second Amended Complaint.

78.     TEC denies the allegations of Paragraph 78 of the Second Amended Complaint.

79.     TEC denies the allegations of Paragraph 79 of the Second Amended Complaint.

80.     TEC denies the allegations of Paragraph 80 of the Second Amended Complaint.

81.     TEC denies the allegations of Paragraph 81 of the Second Amended Complaint.

82.     TEC denies the allegations of Paragraph 82 of the Second Amended Complaint.

83.     TEC denies the allegations of Paragraph 83 of the Second Amended Complaint.

84.     TEC denies the allegations of Paragraph 84 of the Second Amended Complaint.

85.     TEC denies the allegations of Paragraph 85 of the Second Amended Complaint.

86.     TEC denies the allegations of Paragraph 86 of the Second Amended Complaint.

87.     TEC denies the allegations of Paragraph 87 of the Second Amended Complaint.

88.     TEC denies the allegations of Paragraph 88 of the Second Amended Complaint.

89.     TEC denies the allegations of Paragraph 89 of the Second Amended Complaint.

90.     TEC denies the allegations of Paragraph 90 of the Second Amended Complaint.

91.     TEC denies the allegations of Paragraph 91 of the Second Amended Complaint.

92.     TEC denies the allegations of Paragraph 92 of the Second Amended Complaint.

93.     TEC denies the allegations of Paragraph 93 of the Second Amended Complaint.

94.     TEC admits that it performed maintenance and support services on an Allura system at the Lakewood Regional Medical Center ("Lakewood") in approximately July 2015. TEC denies the remaining allegations of Paragraph 94 of the Second Amended Complaint.

95.     TEC admits that Lakewood purchased an x-ray tube from NAI and that TEC

performed an x-ray tube installation at Lakewood as a subcontractor for NAI. TEC further avers that it was authorized to perform the x-ray tube installation at Lakewood. TEC denies the remaining allegations of Paragraph 95 of the Second Amended Complaint.

96. TEC admits that it replaced an x-ray tube on an Allura system at Lakewood in approximately July 2015. TEC further avers that it was authorized to perform the x-ray tube installation at Lakewood. TEC denies the remaining allegations of Paragraph 96 of the Second Amended Complaint.

97. TEC admits that it replaced an x-ray tube on an Allura system at Lakewood in approximately July 2015. TEC further avers that it was authorized to perform the x-ray tube installation at Lakewood. TEC denies the remaining allegations of Paragraph 97 of the Second Amended Complaint.

98. TEC denies the allegations of Paragraph 98 of the Second Amended Complaint.

99. TEC denies the allegations of Paragraph 99 of the Second Amended Complaint.

100. TEC denies the allegations of Paragraph 100 of the Second Amended Complaint.

101. TEC denies the allegations of Paragraph 101 of the Second Amended Complaint. TEC further avers that it was authorized to perform the x-ray tube installation at Lakewood.

102. TEC is without knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 102 of the Second Amended Complaint and, therefore, denies them.

103. TEC is without knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 103 of the Second Amended Complaint and, therefore, denies them.

104. TEC is without knowledge or information sufficient to form a belief regarding the

truth of the allegations in Paragraph 104 of the Second Amended Complaint and, therefore, denies them.

105.    TEC is without knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 105 of the Second Amended Complaint and, therefore, denies them.

106.    TEC denies the allegations in Paragraph 106 of the Second Amended Complaint. TEC further avers that it was authorized to perform the x-ray tube installation at Lakewood.

107.    TEC is without knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 107 of the Second Amended Complaint and, therefore, denies them.

108.    TEC admits that it previously listed its address on its website as 1418 Ameron Drive, Charlotte, NC 28206. The contents of the letters described in Paragraph 108 of the Second Amended Complaint speak for themselves. To the extent the allegations in Paragraph 108 are inconsistent with the contents of the letters, TEC denies them. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 108 of the Second Amended Complaint and, therefore, denies them. TEC further avers that it did not receive copies of the September 27, 2016 and November 21, 2016 letters until approximately mid-December 2016.

109.    TEC admits that it previously listed its address of 1418 Ameron Drive, Charlotte, NC 28206 on its website and later added the 7089 Weddington Road NW, Concord, NC 28027 address to that website as well. TEC admits that it changed its registered office to the Weddington Road address in approximately October 2016. The contents of the letters described in Paragraph 109 of the Second Amended Complaint speak for themselves. To the extent the allegations in

Paragraph 109 are inconsistent with the contents of the letters, TEC denies them. TEC admits that it first responded to Philips's letters on or about December 16, 2016, approximately one week after receiving them.

110.    TEC admits that it sent a second response to Philips, through counsel, on or about January 13, 2017. The content of the letter described in Paragraph 110 of the Second Amended Complaint speaks for itself. To the extent the allegations in Paragraph 110 are inconsistent with the content of the letter, TEC denies them. TEC further admits that it stated in its letter that it had not violated any protectable interest of Philips. TEC further avers that it was authorized to perform the x-ray tube installation at Lakewood.

111.    TEC denies the allegations of Paragraph 111 of the Second Amended Complaint. TEC avers that it was authorized to perform all maintenance and support services that it performed on its customers' systems that were manufactured by Philips.

112.    TEC admits that it performed maintenance and support services at Holmes Regional Hospital in Florida ("Holmes") in approximately July 2016. TEC denies the remaining allegations of Paragraph 112 of the Second Amended Complaint. TEC further avers that it was authorized to perform all maintenance and support services that it performed at Holmes.

113.    TEC admits that it performed maintenance and support services for an Allura system at Holmes in approximately July 2016. Except as expressly admitted herein, TEC denies the remaining allegations of Paragraph 113 of the Second Amended Complaint. TEC further avers that it was authorized to perform all maintenance and support services that it performed at Holmes.

114.    TEC denies the allegations of Paragraph 114 of the Second Amended Complaint.

115.    TEC denies the allegations of Paragraph 115 of the Second Amended Complaint.

116.    TEC admits that Piedmont Healthcare ("Piedmont") operates a hospital in the

greater Atlanta, Georgia area. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 116 of the Second Amended Complaint and, therefore, denies them.

117. TEC admits that it performed maintenance and support services for Piedmont in approximately September 2016. TEC denies the remaining allegations of Paragraph 117 of the Second Amended Complaint. TEC further avers that it was authorized to perform all maintenance and support services that it performed for Piedmont.

118. TEC admits that it performed maintenance and support services for Piedmont. TEC denies the remaining allegations of Paragraph 118 of the Second Amended Complaint. TEC further avers that it was authorized to perform all maintenance and support services that it performed for Piedmont.

119. TEC admits that in 2016, at the request of Piedmont, Bill Griswold made modifications to a database used with Allura systems, which was provided to TEC by Piedmont. TEC denies the remaining allegations of Paragraph 119 of the Second Amended Complaint. TEC further avers that it was authorized to perform all maintenance and support services that it performed for Piedmont.

120. TEC denies the allegations of Paragraph 120 of the Second Amended Complaint.

121. TEC admits that it performed maintenance and support services at sites throughout the United States, including sites in Jacksonville, Macon, Cumming, Austin, Wake Forest, Greensboro, and Charlotte, but denies that it engaged in any improper conduct to gain unauthorized access to Philips systems. TEC denies the remaining allegations of Paragraph 121 of the Second Amended Complaint. TEC further avers that it was authorized to perform all maintenance and support services that it performed at its customers' facilities throughout the United States.

122. TEC denies the allegations of Paragraph 122 of the Second Amended Complaint.

123. TEC denies the allegations of Paragraph 123 of the Second Amended Complaint.

124. TEC denies the allegations of Paragraph 124 of the Second Amended Complaint.

125. TEC denies the allegations of Paragraph 125 of the Second Amended Complaint.

126. TEC admits that it had customers in addition to those specifically identified in the Second Amended Complaint. TEC denies the remaining allegations of Paragraph 126 of the Second Amended Complaint.

127. TEC denies the allegations of Paragraph 127 of the Second Amended Complaint.

128. TEC denies the allegations of Paragraph 128 of the Second Amended Complaint.

129. TEC denies the allegations of Paragraph 129 of the Second Amended Complaint.

130. TEC denies the allegations of Paragraph 130 of the Second Amended Complaint.

131. TEC is without knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 131 of the Second Amended Complaint and, therefore, denies them.

132. TEC denies that co-defendant Transtate is a "mere continuation" of TEC. TEC denies that it misappropriated any trade secret or proprietary information and further denies that it ever circumvented access controls or gained unauthorized access to any Proprietary Service Materials on systems TEC was not authorized to access. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 132 of the Second Amended Complaint and, therefore, denies them.

133. TEC admits that it had customers in Atlanta, Georgia. TEC denies ever using a so-called "exploit process" as defined in Paragraph 132 of the Second Amended Complaint. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining

allegations in Paragraph 133 of the Second Amended Complaint and, therefore, denies them.

134. TEC admits that it had customers in Palm Springs, California and Raleigh, North Carolina. TEC denies ever using a so-called "exploit process" as defined in Paragraph 132 of the Second Amended Complaint. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 134 of the Second Amended Complaint and, therefore, denies them.

135. TEC is without knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 135 of the Second Amended Complaint and, therefore, denies them.

136. TEC is without knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 136 of the Second Amended Complaint and, therefore, denies them.

137. TEC is without knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 137 of the Second Amended Complaint and, therefore, denies them.

138. TEC is without knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 138 of the Second Amended Complaint and, therefore, denies them.

139. TEC is without knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 139 of the Second Amended Complaint and, therefore, denies them.

140. TEC is without knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 140 of the Second Amended Complaint and, therefore, denies

them.

141.    TEC denies the allegations of Paragraph 141 of the Second Amended Complaint.

142.    TEC is without knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 142 of the Second Amended Complaint and, therefore, denies them.

### Count I: Alleged Violations of the Computer Fraud and
### Abuse Act (CFAA), 18 U.S.C. § 1030(a) (Transtate I and II)

143.    TEC incorporates by reference its responses to all other paragraphs of the Second Amended Complaint as if fully set forth herein.

144.    TEC denies the allegations of Paragraph 144 of the Second Amended Complaint.

145.    TEC denies the allegations of Paragraph 145 of the Second Amended Complaint.

146.    TEC denies the allegations of Paragraph 146 of the Second Amended Complaint.

147.    TEC denies the allegations of Paragraph 147 of the Second Amended Complaint.

148.    TEC denies the allegations of Paragraph 148 of the Second Amended Complaint.

149.    TEC denies the allegations of Paragraph 149 of the Second Amended Complaint.

150.    TEC denies the allegations of Paragraph 150 of the Second Amended Complaint.

151.    TEC denies the allegations of Paragraph 151 of the Second Amended Complaint.

152.    TEC admits that the systems at issue are owned by hospitals that are not parties to this action. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 152 of the Second Amended Complaint and, therefore, denies them.

153.    TEC denies the allegations of Paragraph 153 of the Second Amended Complaint.

154.    TEC is without knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 154 of the Second Amended Complaint and, therefore, denies

them.

155.     TEC is without knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 155 of the Second Amended Complaint and, therefore, denies them.

156.     TEC is without knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 156 of the Second Amended Complaint and, therefore, denies them.

157.     TEC is without knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 157 of the Second Amended Complaint and, therefore, denies them.

158.     TEC denies the allegations of Paragraph 158 of the Second Amended Complaint.

159.     TEC is without knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 159 of the Second Amended Complaint and, therefore, denies them.

160.     TEC is without knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 160 of the Second Amended Complaint and, therefore, denies them.

161.     TEC is without knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 161 of the Second Amended Complaint and, therefore, denies them.

162.     TEC admits that the systems at issue are owned by hospitals that are not parties to this action. TEC denies the remaining allegations of Paragraph 162 of the Second Amended Complaint.

163. TEC denies the allegations of Paragraph 163 of the Second Amended Complaint.

## Count II: Alleged Violations of the
## Computer Fraud and Abuse Act (CFAA),
## 18 U.S.C. § 1030(a)(6) (Transtate II)

164. This count is not directed at TEC. To the extent a response is required, TEC incorporates by reference its responses to all other paragraphs of the Second Amended Complaint as if fully set forth herein

165. This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 165 of the Second Amended Complaint.

166. This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 166 of the Second Amended Complaint.

167. This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 167 of the Second Amended Complaint.

168. This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 168 of the Second Amended Complaint.

169. This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 169 of the Second Amended Complaint.

170. This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 170 of the Second Amended Complaint.

171. This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 171 of the Second Amended Complaint. .

172. This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 172 of the Second Amended Complaint.

173. This count is not directed at TEC. To the extent a response is required, TEC denies

the allegations of Paragraph 173 of the Second Amended Complaint.

174.    This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 174 of the Second Amended Complaint.

### Count III: Alleged Violations of the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030(a) (Daniel Wheeler)

175.    This count is not directed at TEC. To the extent a response is required, TEC incorporates by reference its responses to all other paragraphs of the Second Amended Complaint as if fully set forth herein.

176.    This count is not directed at TEC. To the extent a response is required, TEC admits that Daniel Wheeler was the President of TEC until November 2018. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 176 of the Second Amended Complaint and, therefore, denies them.

177.    This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 177 of the Second Amended Complaint.

178.    This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 178 of the Second Amended Complaint.

179.    This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 179 of the Second Amended Complaint.

180.    This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 180 of the Second Amended Complaint.

181.    This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 181 of the Second Amended Complaint.

182.    This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 182 of the Second Amended Complaint.

183.     This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 183 of the Second Amended Complaint.

## Count IV: Alleged Violations of the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030(a) (Robert A. ("Andy") Wheeler)

184.     This count is not directed at TEC. To the extent a response is required, TEC incorporates by reference its responses to all other paragraphs of the Second Amended Complaint as if fully set forth herein.

185.     This count is not directed at TEC. To the extent a response is required, TEC admits that Andy Wheeler is the President of TEC. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 185 of the Second Amended Complaint and, therefore, denies them.

186.     This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 186 of the Second Amended Complaint.

187.     This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 187 of the Second Amended Complaint.

188.     This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 188 of the Second Amended Complaint.

189.     This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 189 of the Second Amended Complaint.

190.     This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 190 of the Second Amended Complaint.

191.     This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 191 of the Second Amended Complaint.

192.     This count is not directed at TEC. To the extent a response is required, TEC denies

the allegations of Paragraph 192 of the Second Amended Complaint.

## Count V: Alleged Violations of the Digital Millennium Copyright Act (DMCA), 17 U.S.C. § 1201 (Transtate I and II)

193.     TEC incorporates by reference its responses to all other paragraphs of the Second Amended Complaint as if fully set forth herein.

194.     TEC denies the allegations of Paragraph 194 of the Second Amended Complaint.

195.     TEC denies the allegations of Paragraph 195 of the Second Amended Complaint.

196.     TEC denies the allegations of Paragraph 196 of the Second Amended Complaint.

197.     TEC denies the allegations of Paragraph 197 of the Second Amended Complaint.

198.     TEC denies the allegations of Paragraph 198 of the Second Amended Complaint.

199.     TEC denies the allegations of Paragraph 199 of the Second Amended Complaint with respect to the alleged actions of TEC.  TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 199 of the Second Amended Complaint and, therefore, denies them.

200.     TEC denies the allegations of Paragraph 200 of the Second Amended Complaint with respect to the alleged actions of TEC. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 200 of the Second Amended Complaint and, therefore, denies them.

201.     TEC denies the allegations of Paragraph 201 of the Second Amended Complaint.

202.     TEC denies the allegations of Paragraph 202 of the Second Amended Complaint with respect to the alleged actions of TEC.  TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 202 of the Second Amended Complaint and, therefore, denies them.

203.     TEC denies the allegations of Paragraph 203 of the Second Amended Complaint.

204.     TEC denies the allegations of Paragraph 204 of the Second Amended Complaint with respect to the alleged actions of TEC.  TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 204 of the Second Amended Complaint and, therefore, denies them.

205.     TEC denies the allegations of Paragraph 205 of the Second Amended Complaint with respect to the alleged actions of TEC. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 205 of the Second Amended Complaint and, therefore, denies them.

206.     TEC denies the allegations of Paragraph 206 of the Second Amended Complaint with respect to the alleged actions of TEC. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 206 of the Second Amended Complaint and, therefore, denies them.

207.     TEC denies the allegations of Paragraph 207 of the Second Amended Complaint.

208.     TEC denies the allegations of Paragraph 208 of the Second Amended Complaint.

**Count VI: Alleged Violations of the Digital Millennium Copyright Act
(DMCA), 17 U.S.C. § 1202 (Transtate I and II)**

209.     TEC incorporates by reference its responses to all other paragraphs of the Second Amended Complaint as if fully set forth herein.

210.     TEC denies the allegations of Paragraph 210 of the Second Amended Complaint.

211.     TEC admits that Philips grants access to certain electronic documentation. TEC denies the remaining allegations of Paragraph 211 of the Second Amended Complaint.

212.     TEC admits that Philips grants access to certain electronic documentation and files, including, but not limited to, through InCenter. TEC denies the remaining allegations of Paragraph 212 of the Second Amended Complaint.

213. TEC admits that Philips grants access to certain electronic documentation and files, including, but not limited to, through InCenter. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 213 of the Second Amended Complaint and, therefore, denies them.

214. TEC is without knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 214 of the Second Amended Complaint and, therefore, denies them

215. TEC denies the allegations of Paragraph 215 of the Second Amended Complaint.

216. TEC denies the allegations of Paragraph 216 of the Second Amended Complaint with respect to the alleged actions of TEC. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 216 of the Second Amended Complaint and, therefore, denies them.

217. TEC denies the allegations of Paragraph 217 of the Second Amended Complaint with respect to the alleged actions of TEC. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 217 of the Second Amended Complaint and, therefore, denies them.

218. TEC denies the allegations of Paragraph 218 of the Second Amended Complaint with respect to the alleged actions of TEC. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 218 of the Second Amended Complaint and, therefore, denies them.

219. TEC denies the allegations of Paragraph 219 of the Second Amended Complaint with respect to the alleged actions of TEC. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 219 of the Second

Amended Complaint and, therefore, denies them.

220. TEC denies the allegations of Paragraph 220 of the Second Amended Complaint with respect to the alleged actions of TEC. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 220 of the Second Amended Complaint and, therefore, denies them.

221. TEC denies the allegations of Paragraph 221 of the Second Amended Complaint with respect to the alleged actions of TEC. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 221 of the Second Amended Complaint and, therefore, denies them.

222. TEC denies the allegations of Paragraph 222 of the Second Amended Complaint.

223. TEC denies the allegations of Paragraph 223 of the Second Amended Complaint.

## Count VII: Violations of the Digital Millennium Copyright Act (DMCA), 17 U.S.C. § 1201 and 1202 (Daniel Wheeler)

224. This count is not directed at TEC. To the extent a response is required, TEC incorporates by reference its responses to all other paragraphs of the Second Amended Complaint as if fully set forth herein.

225. This count is not directed at TEC. To the extent a response is required, TEC admits that Daniel Wheeler was the President of TEC until November 2018. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 225 of the Second Amended Complaint and, therefore, denies them.

226. This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 226 of the Second Amended Complaint.

227. This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 227 of the Second Amended Complaint.

228.    This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 228 of the Second Amended Complaint.

229.    This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 229 of the Second Amended Complaint.

230.    This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 230 of the Second Amended Complaint.

231.    This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 231 of the Second Amended Complaint.

232.    This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 232 of the Second Amended Complaint.

233.    This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 233 of the Second Amended Complaint.

234.    This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 234 of the Second Amended Complaint.

235.    This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 235 of the Second Amended Complaint.

236.    This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 236 of the Second Amended Complaint.

237.    This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 237 of the Second Amended Complaint.

238.    This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 238 of the Second Amended Complaint.

## Count VIII: Alleged Violations of the Digital Millennium Copyright Act (DMCA), 17 U.S.C. § 1201 and 1202 (Robert A. Wheeler)

239.     This count is not directed at TEC. To the extent a response is required, TEC incorporates by reference its responses to all other paragraphs of the Second Amended Complaint as if fully set forth herein.

240.     This count is not directed at TEC. To the extent a response is required, TEC admits that Andy Wheeler is the President of TEC. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 240 of the Second Amended Complaint and, therefore, denies them.

241.     This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 241 of the Second Amended Complaint.

242.     This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 242 of the Second Amended Complaint.

243.     This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 243 of the Second Amended Complaint.

244.     This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 244 of the Second Amended Complaint.

245.     This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 245 of the Second Amended Complaint.

246.     This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 246 of the Second Amended Complaint.

247.     This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 247 of the Second Amended Complaint.

248.     This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 248 of the Second Amended Complaint.

249. This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 249 of the Second Amended Complaint.

250. This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 250 of the Second Amended Complaint.

251. This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 251 of the Second Amended Complaint.

252. This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 252 of the Second Amended Complaint.

253. This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 253 of the Second Amended Complaint.

### Count IX: Alleged Violations of the Defend Trade Secrets Act (DTSA) 18 U.S.C. § 1836 (Transtate I and II)

254. TEC incorporates by reference its responses to all other paragraphs of the Second Amended Complaint as if fully set forth herein.

255. TEC denies the allegations of Paragraph 255 of the Second Amended Complaint.

256. TEC denies the allegations of Paragraph 256 of the Second Amended Complaint.

257. TEC denies the allegations of Paragraph 257 of the Second Amended Complaint.

258. TEC denies the allegations of Paragraph 258 of the Second Amended Complaint.

259. TEC denies the allegations of Paragraph 259 of the Second Amended Complaint.

260. TEC denies the allegations of Paragraph 260 of the Second Amended Complaint.

261. TEC denies the allegations of Paragraph 261 of the Second Amended Complaint with respect to the alleged actions of TEC. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 261 of the Second Amended Complaint and, therefore, denies them.

262.    TEC denies the allegations of Paragraph 262 of the Second Amended Complaint with respect to the alleged actions of TEC. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 262 of the Second Amended Complaint and, therefore, denies them.

263.    TEC denies the allegations of Paragraph 263 of the Second Amended Complaint.

264.    TEC denies the allegations of Paragraph 264 of the Second Amended Complaint.

265.    TEC denies the allegations of Paragraph 265 of the Second Amended Complaint.

266.    TEC denies the allegations of Paragraph 266 of the Second Amended Complaint.

**Count X: Alleged Violations of the Defend**
**Trade Secrets Act (DTSA), 18 U.S.C. § 1936 (Daniel Wheeler)**

267.    This count is not directed at TEC. To the extent a response is required, TEC incorporates by reference its responses to all other paragraphs of the Second Amended Complaint as if fully set forth herein.

268.    This count is not directed at TEC. To the extent a response is required, TEC admits that Daniel Wheeler was the President of TEC until November 2018. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 268 of the Second Amended Complaint and, therefore, denies them.

269.    This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 269 of the Second Amended Complaint.

270.    This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 270 of the Second Amended Complaint.

271.    This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 271 of the Second Amended Complaint.

272.    This count is not directed at TEC. To the extent a response is required, TEC denies

29

the allegations of Paragraph 272 of the Second Amended Complaint.

273.     This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 273 of the Second Amended Complaint.

274.     This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 274 of the Second Amended Complaint.

275.     This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 275 of the Second Amended Complaint.

276.     This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 276 of the Second Amended Complaint.

277.     This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 277 of the Second Amended Complaint.

278.     This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 278 of the Second Amended Complaint.

**Count XI: Alleged Violations of the Defend Trade Secrets Act (DTSA)**
**18 U.S.C. § 1836 (Robert A. Wheeler)**

279.     This count is not directed at TEC. To the extent a response is required, TEC incorporates by reference its responses to all other paragraphs of the Second Amended Complaint as if fully set forth herein.

280.     This count is not directed at TEC. To the extent a response is required, TEC admits that Andy Wheeler is the President of TEC. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 280 of the Second Amended Complaint and, therefore, denies them.

281.     This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 281 of the Second Amended Complaint.

282. This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 282 of the Second Amended Complaint.

283. This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 283 of the Second Amended Complaint.

284. This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 284 of the Second Amended Complaint.

285. This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 285 of the Second Amended Complaint.

286. This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 286 of the Second Amended Complaint.

287. This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 287 of the Second Amended Complaint.

288. This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 288 of the Second Amended Complaint.

289. This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 289 of the Second Amended Complaint.

290. This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 290 of the Second Amended Complaint.

## Count XII: Alleged Misappropriation of Trade Secrets and Alleged Violation of the Georgia Trade Secrets Act, O.C.G.A. § 10-1-760, *et seq.* (Transtate I and II)

291. TEC incorporates by reference its responses all other paragraphs of the Second Amended Complaint as if fully set forth herein.

292. TEC denies the allegations of Paragraph 292 of the Second Amended Complaint.

293.     TEC denies the allegations of Paragraph 293 of the Second Amended Complaint.

294.     TEC denies the allegations of Paragraph 294 of the Second Amended Complaint.

295.     TEC denies the allegations of Paragraph 295 of the Second Amended Complaint.

296.     TEC denies the allegations of Paragraph 296 of the Second Amended Complaint.

297.     TEC denies the allegations of Paragraph 297 of the Second Amended Complaint with respect to the alleged actions of TEC. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 297 of the Second Amended Complaint and, therefore, denies them.

298.     TEC denies the allegations of Paragraph 298 of the Second Amended Complaint with respect to the alleged actions of TEC. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 298 of the Second Amended Complaint with and, therefore, denies them.

299.     TEC denies the allegations of Paragraph 299 of the Second Amended Complaint.

300.     TEC denies the allegations of Paragraph 300 of the Second Amended Complaint.

301.     TEC denies the allegations of Paragraph 301 of the Second Amended Complaint.

302.     TEC denies the allegations of Paragraph 302 of the Second Amended Complaint.

**Count XIII: Alleged Misappropriation of Trade Secrets and
Violation of the Georgia Trade Secrets Act, O.C.G.A. § 10-1-760, *et seq.*
(Daniel Wheeler and Robert A. Wheeler)**

303.     This count is not directed at TEC. To the extent a response is required, TEC incorporates by reference its responses to all other paragraphs of the Second Amended Complaint as if fully set forth herein.

304.     This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 304 of the Second Amended Complaint.

## Count XIV: Alleged Copyright Infringement (Transtate I and II)

305.    TEC incorporates by reference its responses to all other paragraphs of the Second Amended Complaint as if fully set forth herein.

306.    TEC denies the allegations of Paragraph 306 of the Second Amended Complaint.

307.    The contents of the documents attached as Exhibit A to the Second Amended Complaint speak for themselves. TEC denies the allegations of Paragraph 307 of the Second Amended Complaint to the extent they are inconsistent with the contents of these documents. TEC denies the remaining allegations of Paragraph 307 of the Second Amended Complaint.

308.    TEC denies the allegations of Paragraph 308 of the Second Amended Complaint.

309.    TEC denies the allegations of Paragraph 309 of the Second Amended Complaint with respect to the alleged actions of TEC. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 309 of the Second Amended Complaint and, therefore, denies them.

310.    TEC denies the allegations of Paragraph 310 of the Second Amended Complaint with respect to the alleged actions of TEC. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 310 of the Second Amended Complaint and, therefore, denies them.

311.    TEC denies the allegations of Paragraph 311 of the Second Amended Complaint with respect to the alleged actions of TEC. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 311 of the Second Amended Complaint and, therefore, denies them.

312.    TEC denies the allegations of Paragraph 312 of the Second Amended Complaint.

313.    TEC denies the allegations of Paragraph 313 of the Second Amended Complaint.

314. TEC denies the allegations of Paragraph 314 of the Second Amended Complaint.

315. TEC denies the allegations of Paragraph 315 of the Second Amended Complaint.

316. TEC denies the allegations of Paragraph 316 of the Second Amended Complaint.

## Count XV: Alleged Copyright Infringement (Daniel Wheeler)

317. This count is not directed at TEC. To the extent a response is required, TEC incorporates by reference its responses to all other paragraphs of the Second Amended Complaint as if fully set forth herein.

318. This count is not directed at TEC. To the extent a response is required, TEC admits that Daniel Wheeler was the President of TEC until November 2018. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 318 of the Second Amended Complaint and, therefore, denies them.

319. This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 319 of the Second Amended Complaint.

320. This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 320 of the Second Amended Complaint.

321. This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 321 of the Second Amended Complaint.

322. This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 322 of the Second Amended Complaint.

323. This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 323 of the Second Amended Complaint.

324. This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 324 of the Second Amended Complaint.

325.     This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 325 of the Second Amended Complaint.

326.     This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 326 of the Second Amended Complaint.

327.     This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 327 of the Second Amended Complaint.

328.     This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 328 of the Second Amended Complaint.

329.     This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 329 of the Second Amended Complaint.

330.     This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 330 of the Second Amended Complaint.

331.     This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 331 of the Second Amended Complaint.

332.     This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 332 of the Second Amended Complaint.

333.     This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 333 of the Second Amended Complaint.

### Count XVI: Alleged Copyright Infringement (Robert A. Wheeler)

334.     This count is not directed at TEC. To the extent a response is required, TEC incorporates by reference its responses to all other paragraphs of the Second Amended Complaint as if fully set forth herein.

335.     This count is not directed at TEC. To the extent a response is required, TEC

35

admits that Andy Wheeler is the President of TEC. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 335 of the Second Amended Complaint and, therefore, denies them.

336. This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 336 of the Second Amended Complaint.

337. This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 337 of the Second Amended Complaint.

338. This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 338 of the Second Amended Complaint.

339. This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 339 of the Second Amended Complaint.

340. This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 340 of the Second Amended Complaint.

341. This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 341 of the Second Amended Complaint.

342. This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 342 of the Second Amended Complaint.

343. This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 343 of the Second Amended Complaint.

344. This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 344 of the Second Amended Complaint.

345. This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 345 of the Second Amended Complaint.

346.    This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 346 of the Second Amended Complaint.

347.    This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 347 of the Second Amended Complaint.

348.    This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 348 of the Second Amended Complaint.

349.    This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 349 of the Second Amended Complaint.

## Count XII: Alleged Tortious Interference with Contractual Relations
## (Transtate I and II)

350.    TEC incorporates by reference its responses to all other paragraphs of the Second Amended Complaint as if fully set forth herein.

351.    TEC is without knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 351 of the Second Amended Complaint and, therefore, denies them.

352.    TEC is without knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 352 of the Second Amended Complaint and, therefore, denies them.

353.    TEC is without knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 353 of the Second Amended Complaint and, therefore, denies them.

354.    TEC is without knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 354 of the Second Amended Complaint and, therefore, denies them.

355.    TEC denies the allegations of Paragraph 355 of the Second Amended Complaint with respect to the alleged actions of TEC. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 355 of the Second Amended Complaint and, therefore, denies them.

356.    TEC denies the allegations of Paragraph 356 of the Second Amended Complaint with respect to the alleged actions of TEC. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 356 of the Second Amended Complaint and, therefore, denies them.

357.    TEC denies the allegations of Paragraph 357 of the Second Amended Complaint with respect to the alleged actions of TEC. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 357 of the Second Amended Complaint and, therefore, denies them.

358.    TEC denies the allegations of Paragraph 358 of the Second Amended Complaint with respect to the alleged actions of TEC. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 358 of the Second Amended Complaint and, therefore, denies them.

359.    TEC denies the allegations of Paragraph 359 of the Second Amended Complaint with respect to the alleged actions of TEC. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 359 of the Second Amended Complaint and, therefore, denies them.

360.    TEC denies the allegations of Paragraph 360 of the Second Amended Complaint with respect to the alleged actions of TEC. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 360 of the Second

Amended Complaint and, therefore, denies them.

361.    TEC denies the allegations of Paragraph 361 of the Second Amended Complaint with respect to the alleged actions of TEC. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 361 of the Second Amended Complaint and, therefore, denies them.

362.    TEC denies the allegations of Paragraph 362 of the Second Amended Complaint with respect to the alleged actions of TEC. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 362 of the Second Amended Complaint and, therefore, denies them.

363.    TEC denies the allegations of Paragraph 363 of the Second Amended Complaint with respect to the alleged actions of TEC. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 363 of the Second Amended Complaint and, therefore, denies them.

364.    TEC denies the allegations of Paragraph 364 of the Second Amended Complaint with respect to the alleged actions of TEC. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 364 of the Second Amended Complaint and, therefore, denies them.

365.    TEC denies the allegations of Paragraph 365 of the Second Amended Complaint.

366.    TEC denies the allegations of Paragraph 366 of the Second Amended Complaint.

367.    TEC denies the allegations of Paragraph 367 of the Second Amended Complaint with respect to the alleged actions of TEC. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 367 of the Second Amended Complaint and, therefore, denies them.

368.     TEC denies the allegations of Paragraph 368 of the Second Amended Complaint with respect to the alleged actions of TEC. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 368 of the Second Amended Complaint and, therefore, denies them.

369.     TEC denies the allegations of Paragraph 369 of the Second Amended Complaint.

## Count XVIII: Alleged Tortious Interference with Contractual Relations
### (Daniel Wheeler)

370.     This count is not directed at TEC. To the extent a response is required, TEC incorporates by reference its responses to all other paragraphs of the Second Amended Complaint as if fully set forth herein.

371.     This count is not directed at TEC. To the extent a response is required, TEC admits that Daniel Wheeler was the President of TEC until November 2018. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 371 of the Second Amended Complaint and, therefore, denies them.

372.     This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 372 of the Second Amended Complaint.

373.     This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 373 of the Second Amended Complaint.

374.     This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 374 of the Second Amended Complaint.

375.     This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 375 of the Second Amended Complaint.

376.     This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 376 of the Second Amended Complaint.

377.    This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 377 of the Second Amended Complaint.

378.    This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 378 of the Second Amended Complaint.

379.    This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 379 of the Second Amended Complaint.

## Count XIX: Alleged Tortious Interference with Contractual Relations
### (Robert A. "("Andy") Wheeler

380.    This count is not directed at TEC. To the extent a response is required, TEC incorporates by reference its responses to all other paragraphs of the Second Amended Complaint as if fully set forth herein.

381.     This count is not directed at TEC. To the extent a response is required, TEC admits that Andy Wheeler is the President of TEC. TEC is without knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 381 of the Second Amended Complaint and, therefore, denies them.

382.    This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 382 of the Second Amended Complaint.

383.    This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 383 of the Second Amended Complaint.

384.    This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 384 of the Second Amended Complaint.

385.    This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 385 of the Second Amended Complaint.

386.    This count is not directed at TEC. To the extent a response is required, TEC denies

the allegations of Paragraph 386 of the Second Amended Complaint.

387.     This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 387 of the Second Amended Complaint.

388.     This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 388 of the Second Amended Complaint.

389.     This count is not directed at TEC. To the extent a response is required, TEC denies the allegations of Paragraph 389 of the Second Amended Complaint.

## COUNT XX: Attorney's Fees and Expenses of Litigation Under O.C.G.A. § 13-6-11 (All Defendants)

390.     TEC incorporates by reference its responses to all other paragraphs of the Second Amended Complaint as if fully set forth herein.

391.     TEC denies the allegations of Paragraph 391 of the Second Amended Complaint.

392.     TEC denies the allegations of Paragraph 392 of the Second Amended Complaint.

## Jury Trial Demanded

393.     TEC admits that Plaintiffs demand a trial by jury. To the extent this allegation may be deemed to contain factual averments requiring an answer, TEC denies all such allegations.

EXCEPT AS EXPRESSLY ADMITTED, TEC DENIES EACH AND EVERY ALLEGATION IN THE SECOND AMENDED COMPLAINT.

## DEFENSES

## First Defense – Failure to State a Claim

The Second Amended Complaint fails to state a claim upon which relief can be granted, including for the reasons set forth in Defendant's Motion to Dismiss. *See* Doc. No. 164 and related

42

briefing.

## Second Defense - Authorization

Philips' claims are barred because Defendant was authorized to access the systems at issue in this case. In each case where Defendant provided maintenance and support services to a hospital or other customer that owned an x-ray machine or other equipment manufactured by Philips, the owner of the machine granted Defendant express or implied authorization to perform the requested service activities. Philips also provided authorization, express or implied, of the allegedly wrongful actions of which Philips now complains. For example, Philips has provided "keys" to systems that allow Defendant to perform service operations on those systems at the request of the owners of those systems.

## Third Defense – Failure to Mitigate

Philips' claims are barred, and any damage award is fully offset, because of Philips' failure to take reasonable steps to mitigate its alleged damages or otherwise protect itself from avoidable consequences. For example, Philips could have enacted reasonable security measures to protect information that it now claims is trade secret or proprietary from free access by owners and servicers of systems, but failed to do so. Philips also failed to engage with Defendant in any constructive dialog regarding any alleged conduct prior to filing this lawsuit.

## Fourth Defense - Acquiescence

Philips' claims are barred because Philips acquiesced in the actions and conduct of Defendant. To the extent Defendant used any information or program in performing service and maintenance activities requested and authorized by its customers, Philips was aware, or reasonably should have been aware, of these activities through the monitoring of its software. Further, Philips was aware that Defendant's field service engineers obtain licenses and access keys from Philips

prior to Defendant ceasing to do servicing business in March 2017, as well as permission from the owners of the machines to perform service and maintenance on systems manufactured by Philips. Philips' actions and inactions constituted an assurance that Philips would not assert its alleged rights against Defendant, and Philips' subsequent delay in asserting these alleged rights after Defendant first received assurances was inexcusable and caused undue prejudice to Defendant in the form of Defendant continuing to service systems manufactured by Philips, which Philips only now claims violated its alleged rights.

**Fifth Defense – Waiver, Estoppel, Laches**

Philips' claims are barred by the doctrines of waiver, estoppel, and laches. Philips provided Defendant with multiple licenses and access keys prior to Defendant ceasing to servicing systems in March 2017 in order that Defendant could provide maintenance and support services to hospitals and other health care providers who owned or own a system manufactured by Philips.

**Sixth Defense – Good Faith**

Philips' claims are barred because Defendant at all times acted in good faith. Defendant obtained multiple licenses from Philips to use information and materials in connection with the servicing of x-ray machines, including through an access key. Accordingly, Defendant was authorized to service its customers' x-ray machines and other medical equipment including through the use of that information. Thus, Philips' remedies, if any, are limited by Defendants' innocent intent and good faith actions.

**Seventh Defense – No Damages**

Philips' claims are barred because Philips suffered no damages from any alleged acts or omissions by Defendant in the Complaint.

44

## Eighth Defense – Unjust Enrichment/Multiple Recoveries

Philips' claims are barred in-whole or in-part because Philips would be unjustly enriched if it was allowed to recover any portion of any damages alleged in the Complaint. Similarly, any recovery by Philips for its claims is barred in-whole or in-part because it would result in multiple recoveries by Philips for the same injuries alleged to be caused by multiple Defendants, among the various claims in the Complaint, and/or by any recovery in this action or other related case.

## Ninth Defense – No Rights to Computer System

Philips' claims are barred because Philips does not own the computer systems at issue in this case or otherwise retain rights to the computer software located on those systems. Defendant's hospital and other health care provider customers own the x-ray machines and other equipment manufactured by Philips that Defendant serviced, and these owners purchased this equipment without Philips retaining any rights to the machines.

## Tenth Defense – Copyright Preemption

Philips' non-copyright claims are barred because of copyright preemption, in that the actions of which Philips complains are qualitatively no different from actions covered exclusively by the Copyright Act. For example, certain of Philips' trade secrets claims are based on the mere use of Philips' allegedly trade secret software. Such alleged plain use of an allegedly copyrighted piece of software is not qualitatively different from a claim under the Copyright Act, *i.e.*, it is an equivalent to one of the exclusive rights protected by the Copyright Act.

## Eleventh Defense – Copyright Invalidity

Philips' copyright claims are barred due to the invalidity of Philips' purported copyrights at issue in this action. Philips' copyrighted materials are not original, are in the public domain, and/or lack copyrightable subject matter. Philips provided copyright registration certificates that

45

are dated July 17, 2017, for software that was allegedly completed in 2013. These registrations contain no exclusions for common frameworks that are used to develop software on the Microsoft Windows platforms—the platform that the allegedly copyrightable software runs on—or other frameworks that would be common for software development during that time period. Similarly, Philips did not add any exclusions in its copyright registrations for "lock out codes" or configuration files, which are not copyrightable.

## Twelfth Defense – Fair Use

Philips' copyright claims are barred due to Defendant's fair use of the works at issue, as well as the fact that Plaintiffs' alleged works at issue are not protectable by copyright because they are functional, scenes a faire, and/or are algorithms, formatting, functions, logic, or system design. Further, any alleged reproduction would be *de minimus.* For example, Plaintiffs have alleged that they believe Defendants' service protocols involve creation of copies of configuration files that are not protectable under copyright law.

## Thirteenth Defense – Essential Step

Philips' copyright claims are barred because any use of the Philips software at issue is permissible as an "essential step" under 17 U.S.C. § 117(a)(1). The owners of copies of the software at issue, *e.g.* hospitals, medical facilities, or Defendant, do not infringe on Philips alleged copyrights when they use the software an essential step in the utilization of those programs on a system.

## Fourteenth Defense – Limitation of Copyrights

Philips' copyright claims are barred due to the limitations of exclusive rights to such claims under the Copyright Act, including but not limited to the applicable limitations on the reproduction of computer programs. In each case where Defendant provided maintenance and support services

46

to a hospital or other customer that owned a system manufactured by Philips, the owner granted Defendant authorization to perform the requested service activities and any copies of any allegedly protectable software would have been made as a result of activating the system to perform that maintenance or repair.

### Fifteenth Defense – First Sale Doctrine

Philips' copyright claims are barred due to the first sale doctrine. Owners of systems including Defendant, Defendant's customers, hospitals and other medical facilities, purchased the systems without any licenses or restrictions, including all copies of all software available on such systems. Consequently, these owners of systems may dispose of any copies of any software found on the systems as they see fit. For example, TEC purchased a used system without any licenses or restrictions and believes some of its former customers made similar purchases. TEC also believes its customers have made similar purchases.

### Sixteenth Defense – Copyright Misuse

Philips' copyright and DMCA claims are barred because of Philips' copyright misuse. As set forth in Defendant's counterclaim, Philips has engaged in abuse or improper conduct attempting to enforce its alleged copyrights, including, but not limited to, attempting to expand its copyright protection beyond what applicable law permits, violating antitrust laws, and otherwise attempting to use its alleged copyrights in a manner violative of public policy. Philips further misuses its alleged copyrights for the improper purpose of unfairly and illegally harming legitimate competition.

### Seventeenth Defense – Previous Payment

Philips' claims are barred because Defendant previously paid for the use of the software found on Philips' systems about which Philips now complains. Defendant obtained and held one

or more licenses from Philips to use information and materials in connection with the servicing of systems, including through access keys. Defendant paid for these licenses and/or access keys. Further, owners of the systems similarly have purchased the systems and other licenses from Philips, including access keys, that permit owners and Defendant (on their behalf) to use service tools found on the medical equipment.

### Eighteenth Defense - License

Philips' claims are barred, in-whole or in-part, by license, express or implied, granted or authorized to be granted by Philips or operation of law. Defendant has obtained and held one or more licenses from Philips to use information and materials in connection with the servicing of x-ray machines and other equipment, including through an IST key, which permits it to perform maintenance and repairs on systems owned by its customers. Similarly, Philips' claims are barred in-whole or in-part by their consent, express or implied.

### Nineteenth Defense – No Injunctive Relief

Philips' claims for injunctive relief are barred because the relief requested is not in the public interest. As described in Defendants' Counterclaims, Philips' unfair and deceptive, as well as anticompetitive, business practices endanger the health and safety of patients needing the critical diagnostic capabilities of these x-ray machines. Philips' business practices often delay the provision of these medical services by preventing more timely, competent service and maintenance by ISOs like Defendant, as well as increase the cost of the provision of these health care services.

Philips' claims for injunctive relief also are barred because they are overly broad and not reasonably tailored to restrain the wrongful conduct alleged. To the extent Philips may prove that Defendant violated any applicable law in providing maintenance and service support to customers' systems, which Defendant denies, the relief Philips requests is over-reaching in that it would

prevent Defendant from lawful maintenance activities for hospital customers.

Further, Philips' claims for injunctive relief are barred because Philips cannot demonstrate irreparable harm and it possesses an adequate remedy at law. To the extent Philips may prove that Defendant violated any applicable law in providing maintenance and service support to customers' x-ray machines or other equipment, which Defendant denies, any such resulting damages are quantifiable and reducible to a monetary judgment, and, thus, Philips is not entitled to injunctive relief.

### Twentieth Defense – No Proximate Cause

Philips is barred in-whole or in-part from recovering on the claims asserted against Defendant because any injuries or damages alleged by Philips were not the legal, direct, or proximate result of any acts or omissions on the part of Defendant.

### Twenty-First Defense – Tortious Interference Defenses

The alleged tortious interference claims that Philips has asserted fail because there is no underlying breach and the purported contracts are not binding, fail for lack of consideration, violate public policy, are unconscionable, or are otherwise unenforceable, void, and/or voidable. Nor has Philips suffered any damages from any alleged breach of contract. Philips' claims also are barred in-whole or in-part by the economic loss rule and/or the applicable statute of limitations. Moreover, any alleged actions of the Defendant are justified or privileged and/or for the purpose of legitimate and/or lawful competition. Further, Defendant were unaware of the allegedly breached contracts and their terms and/or had no intent to interfere. And the alleged actions of the Defendant were not improper or accomplished by wrongful means.

### Twenty-Second Defense – Statutes of Limitation

Philips' claims are barred in whole or in part by the applicable statutes of limitation. Each

of Philips' claims is subject to an applicable statute of limitation. For example, Philips' DTSA claim is barred to the extent it is premised on the acquisition or use of trade secrets before the DTSA's effective date, May 11, 2016.  *See* Doc. No. 42, at pp. 19-20.

<b><u>Twenty-Third Defense – Anticompetitive Conduct</u></b>

Philips's attempts to prevent access to the software at issue in this case was and is done  to unlawfully restrain and impede competition and to monopolize and attempt to monopolize in violation of federal and state law and public policy. As set forth in greater detail in Defendants' Counterclaims, Philips has violated the Sherman Antitrust Act in monopolizing and attempting to monopolize the market for servicing x-ray machines manufactured by Philips. Philips' exclusionary and illegal conduct has been undertaken for the purposes of unlawfully acquiring and maintaining a monopoly in the aftermarket for the post-warranty servicing of Philips' manufactured medical imaging devices, such as cath labs, CT scanners, and nuclear medicine scanners. Philips has engaged in exclusionary conduct purposely intended to suppress and eliminate competition from TEC and other ISOs and maintain its monopoly position for aftermarket services for its Philips systems.

<b><u>Twenty-Fourth Defense – Allegedly Trade Secret Information is Known, Readily Ascertainable, or Not Subject to Reasonable Measures</u></b>

Philips' claims are barred in whole or in part because some or all of the matters alleged by Philips to be a trade secret is information that is widely known in the industry, is in the public domain, or, has already been published or otherwise disclosed by Philips or other third parties and is therefore not protectable as a trade secret. For example, upon information and belief, Philips' alleged trade secrets consist of no more than industry standard security settings and other access controls that are widely known in the industry and that do not reflect any independent development. Further, Philips has not taken reasonable measures to keep secret any information allegedly

misappropriated by defendants and the alleged information does not derive independent economic value from not being generally known to or reasonably ascertainable through proper means  Other alleged trade secrets are manuals and information that have been widely disseminated by Philips among customers, ISOs, and other third-parties with no restrictions on access or use.

### Twenty-Fifth Defense – Allegedly Trade Secret Information is Discoverable

Philips' claims are barred because some or all of the matters alleged by Philips to be a trade secret is information well within the skill of an experienced software developer; therefore, such matter is not protectable as a trade secret. Upon information and belief, Philips's alleged trade secrets consist of no more than industry standard security settings and other access controls that are widely known in the industry and that do not reflect any independent development and can easily be ascertained by an experienced software developer.

### Twenty-Sixth – No Damages to Computer Systems

Philips' claims are barred because Defendant did not damage any computer system at issue in this case. The maintenance and support services provided by Defendant for customers' x- ray machines or other equipment did not cause any damage to any computer system associated with the machines and, in fact, improved the delivery of diagnostic imaging health care services. No Philips' computer software or hardware was damaged by Defendant's actions and, thus, Philips' CFAA claim is barred.

### Twenty-Seventh Defense – Authorized by Statute

Philips' claims are barred because Defendant's alleged actions were authorized by statute and/or regulation, *see*, *e.g.*, 21 C.F.R. § 1020.30, which mandates that independent service organizations ("ISOs") like Defendant are entitled to access and use AIAT-related information and materials. Defendant believes that all services it has provided to its customers are AIAT-related

services and based on AIAT information and materials, and that it has not performed services for its customers that are outside the scope of AIAT services or based upon Philips' proprietary or trade secret information.

### Twenty-Eighth Defense - Illegality

Philips' claims are barred by the illegality of Philips' actions. Philips was required to share and allow the use materials and information to service customers' x-ray machines. Philips' wrongful withholding and limiting of these materials was and is illegal. Additional factual information related to this defense is set forth in TEC's Counterclaims, which are incorporated by reference here. Defendant believes that all services it has provided to its customers are authorized services and based on information and materials in the public domain, expressly made available by a customer, and/or that were required to be made available under Philips' AIAT obligations, and that it has not performed any services for its customers that are outside the scope of permissible services or based upon Philips' proprietary or trade secret information.

Defendant's investigation into Philips's second amended claims and discovery in this matter are ongoing. Defendant reserves the right to seek leave to amend or add to its defenses after a reasonable opportunity for appropriate discovery, and as allowed by the Court.

### COUNTERCLAIMS

For its Counterclaims against Plaintiffs/Counterclaim Defendants Philips Medical systems Nederland B.V., Philips North America LLC, and Philips India Ltd. (collectively, "Philips"), Defendant/Counterclaim-Plaintiff TEC Equipment Company, Inc. ("TEC") alleges as follows:

## INTRODUCTION

1.     TEC's claims stem from Philips' exclusionary and illegal conduct undertaken for the purposes of acquiring and maintaining a monopoly in the aftermarket for the post-warranty servicing of Philips manufactured medical imaging devices, such as cath labs, which are owned by hospitals and medical centers throughout the nation,

2.     In such service market, Philips directly competed and competes with independent service organizations ("ISOs"), including TEC, in providing essential as well as federally-mandated repair and maintenance service for hospitals and medical centers who own and operate Philips manufactured medical imaging devices.

3.     The availability of ISOs to service and repair medical devices is critical to the functioning of the U.S. healthcare system.  For example, certain medical equipment, such as medical imaging devices, have long lifespans, are used repeatedly on multiple patients, and necessitate preventative maintenance and repair during their service life.  For these devices, proper servicing is critical to the continued safe and effective use of these products.  The availability of timely, cost effective, quality maintenance, and repair of medical devices is critical both to the successful functioning of the U.S. healthcare system and to the continued quality, safety, and effectiveness of the marketed medical devices in the United States.  As such, healthcare risks may arise when, among other things, comprehensive service manuals, parts, and training are unavailable to, or restricted from, the parties performing the servicing or the medical customers requiring such service and maintenance.

4.     In order to compete with Philips in the servicing aftermarket for Philips' medical imaging devices, ISOs must have timely and reliable access to related markets in which Philips holds monopoly power: (a) replacement parts, tools, documentation, and software required for

servicing Philips medical imaging devices; and (b) training necessary for essential servicing of Philips medical imaging devices (collectively, "parts and training markets").

5. Philips currently enjoys monopoly power in the parts and training markets for servicing Philips medical imaging devices, controlling essentially 100 percent of these markets, and likewise enjoyed monopoly power when TEC was operating as an ISO.

6. Philips has implemented policies and practices restricting ISOs' access to the parts and training markets, effectively crippling ISOs' ability to offer essential and federally-mandated servicing for Philips imaging devices and otherwise preventing ISOs from being able to fairly compete with Philips in the servicing aftermarket. Absent fair competition by ISOs, Philips has been able to charge supracompetitive prices for aftermarket servicing of Philips' medical imaging devices.

7. For example, as detailed further below, Philips has wrongly:

- Withheld essential information, tools, and access required to perform essential services;

- Refused to provide training necessary to perform essential services;

- Erected barriers to timely access or procure essential parts and information, including software;

- Trumped up and misdiagnosed customer problems to sell parts and services;

- Put in place contractual terms to limit customer access to ISOs and essential materials; and

- Pursued baseless claims against competitors in the service aftermarket for the improper purpose of impeding competition in the service aftermarket for Philips medical imaging devices.

8. Philips' deliberate acts and practices hindered, and sometimes crippled, TEC's ability to timely and effectively service Philips' manufactured medical imaging devices at hospital and medical centers throughout the nation, including North Carolina. For example, Philips has,

among other things, erected obstructions or made impossible the obtaining of necessary device servicing manuals, technical specifications, quality replacement parts, and access to OEM training. These and other concerns impacted the ability of TEC—and other ISOs—to perform high quality, safe, and effective medical imaging device servicing in a timely manner (and at times, to perform it at all), which may lead to adverse clinical events, among other things.

9.      Philips' practices are designed to hinder, and have hindered, legitimate competition in the servicing of its medical imaging systems.  The impediments and delays imposed on ISOs such as TEC are onerous and unnecessary and put patient safety at risk, particularly in smaller hospitals and medical centers that do not have redundant resources.

10.     Such hindering of competition ultimately results in higher health care costs because Philips' efforts prevent TEC and other ISOs from providing timely, quality, and cost effective service to their customers. Philips has engaged in unfair, deceptive, exclusionary, and anticompetitive conduct with respect to the servicing aftermarket for Philips manufactured medical imaging devices, such as x-ray machines, used at hospitals and medical centers throughout the nation, including North Carolina.

11.     The overall effect of Philips' unfair, deceptive, and anticompetitive conduct is to cause antitrust injury in the service aftermarket for Philips manufactured medical imaging devices, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and in violation of North Carolina law.

12.     TEC has been injured by Philips' illegal actions.

13.     Philips' actions also violate the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq*. ("UDTPA").

14.     To remedy this harm and threatened harm to patient safety and competition in the relevant service market, including the antitrust injury to its own business and property, TEC seeks,

*inter alia,* treble damages and declaratory relief, pursuant to Sections 4 and 16 of the Sherman Act, 15 U.S.C. §§ 15, 26. In addition, TEC seeks recovery from the Counterclaim Defendants under applicable state law as a result of the conduct alleged in more detail below.

## THE PARTIES

15.     TEC Holdings, Inc. ("TEC") is a North Carolina corporation with its principal place of business in Concord, North Carolina.

16.     Transtate Equipment Company, Inc. ("Transtate"), is a Delaware corporation with a principal office in Deerfield, Illinois. Transtate's principal operations, including its main office and warehouse, are located in Concord, North Carolina.

17.     Prior to an asset sale in March 2017, TEC was an ISO that provided maintenance services for certain x-ray-based medical imaging systems known as catheterization angiography laboratories or "cath labs" including those manufactured by Philips that are known by such names as Allura.

18.     Upon information and belief, Philips Medical Systems Nederland B.V. is a Netherlands corporation with offices at Veenpluis 4-6, 5684 PC Best, Netherlands.

19.     Upon information and belief, Philips North America LLC is a Delaware limited liability company, formerly known and doing business as Philips Electronics North America Corporation (a Delaware corporation), with a principal place of business in Andover, Massachusetts.

20.     Upon information and belief, Philips India Ltd., formerly known and doing business as Philips Electronics India Ltd., is a foreign corporation with a principal place of business in Bangalore, India.

21.     Philips has alleged in this case that the "named plaintiffs—Philips—are collectively in the business of developing, manufacturing, selling, supporting, maintaining, and servicing Philips' medical imaging systems, including the proprietary hardware and software and related trade secrets that are necessary—and/or may be used—to operate, service, and repair such systems."

22.     Philips has alleged in this case that the "Systems include, but are not limited to, imaging devices such as x-ray machines, CT and PET scanners, MR scanners, and nuclear medicine scanners" and that the "foregoing Systems include, but are not limited to: a series of x-ray machines known as the 'Allura' models; a series of CT and/or PET scanners known as the 'Brilliance,' 'Ingenuity,' 'Vereos,' 'IQon,' 'iCT,' 'Big Bore,' and 'MX16' models; a series of MR scanners known as the 'Ingenia' models; and a series of nuclear medicine and/or other scanners known as the 'BrightView' models."

23.     TEC previously performed service and maintenance operations on certain radiation emitting devices manufactured by Philips, including cath labs ("Philips Manufactured Systems").

24.     The Counterclaim Defendants have colluded to commit the acts alleged herein together as agents and affiliates, by working in concert, to harm TEC, and competition generally, in the relevant service market.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction over the subject matter of these Counterclaims pursuant to 15 U.S.C. §§ 15, 26 and 28 U.S.C. §§ 1331, 1337, 1367.

26.     Philips is in the business of selling maintenance and support services for Philips Manufactured Systems.

27.     At all times relevant to this Counterclaim Complaint, Philips has sold a substantial amount of maintenance and support services for Philips Manufactured Systems in interstate commerce in numerous states around the United States, including North Carolina. Philips' conduct has affected a substantial amount of interstate trade and commerce in the United States with respect to the sale of maintenance and support services for Philips Manufactured Systems in the United States, including North Carolina.

28.     Venue is proper in this Court because events relevant to the claims and counterclaims in this action occurred within this judicial district.

29.     This Court has personal jurisdiction over each Counterclaim Defendant. Counterclaim Defendants have transacted business, maintained substantial contacts, and committed overt acts in furtherance of the illegal exclusionary conduct throughout the United States, including in this District. Counterclaim Defendants exclusionary conduct has been directed at, and has had the intended effect of, causing injury to persons residing in, located in, and doing business throughout the United States, including in this District.

## BACKGROUND

30.     The Philips Manufactured Systems are complex, expensive equipment, that includes hardware, software, and computer systems, which all require frequent maintenance, testing, and calibration. The Philips Manufactured Systems provide critical (and often life-saving) imaging information for doctors treating seriously ill patients, and are in high demand. Hospitals and medical centers operate Philips Manufactured Systems at all hours and need them to be available at a moment's notice. TEC provided maintenance and support services for Philips Manufactured Systems from approximately 2008 through March 31, 2017.

31. Modern medical imaging devices are complex machines that use computers and electronics to control nearly every function. As a result, diagnosing and repairing medical imaging devices has become a complex and high-tech operation. It is critical that technicians have timely access to the parts, tools, information, and training to effectively carry out necessary repair and servicing work.

32. Modern medical imaging devices have both a lock-in and a potential lock-out effect. The computers—and the manufacturer-specific information necessary to diagnose and repair modern medical imaging devices—lock in downstream consumers and service providers to the parts, tools, information, and training required for a given manufacturer's device.

33. A given manufacturer—such as Philips—also has the opportunity to lock out ISOs from providing service that competes with service provided by Philips for servicing Philips medical imaging devices by withholding crucial parts, tools, information, and training required for necessary servicing, or blocking—whether by technological or contractual means—access necessary to perform essential services by ISOs. Philips is able to perform and does perform these lock outs even on systems that are purchased by third-parties and in which Philips retains no rights.

34. Recognizing the important need for radiation emitting devices, including Philips Manufactured Systems, to remain safe and operational, the Food and Drug Administration ("FDA") has promulgated federal regulations that require original equipment manufacturers ("OEMs") like Philips to provide information regarding the assembly, installation, adjustment, and testing ("AIAT") for certified components of Philips Manufactured Systems to those who own or are contracted to perform essential service on the Philips Manufactured Systems, including ISOs like TEC. *See* 21 C.F.R. § 1020.30(g).

35.     In addition to information that Philips self-defines as AIAT-related information (which does not cover the full scope of the information required to be provided under the statute and regulation described herein) there are other information and services necessary to ensure the proper functioning, calibration, and maintenance of Philips Manufactured Systems ("Necessary Information"). Necessary Information includes, for example, device specifications, software, and other materials, tools, and information needed by a servicer to ensure that the work being performed returns the device to its proper working state and is safe for healthcare providers to use.

36.     Necessary Information (including, but not limited to, AIAT-related information as self-defined by Philips) is also needed and required to protect public health and safety from unnecessary radiation hazards from x-ray emitting devices, such as the devices implicated in this case.

37.     Upon information and belief, Philips also expresses to purchasers of Philips Manufactured Systems that those systems may be maintained by the purchasers without Philips' involvement or may be serviced by third-parties after those systems are out of warranty. Upon further information and belief, Philips never informs the purchasers of systems that Philips will not allow those purchasers of the system to maintain those systems without Philips' involvement or that that Philips will withhold information necessary to service those systems from the purchasers or other third-parties.

38.     TEC was formerly an ISO with a team of service engineers for providing maintenance and support services to hospitals and medical centers across the country.  In the face of this direct competition from TEC and other ISOs, Philips has engaged in purposeful and exclusionary conduct and has used its dominant market position and monopoly power to hinder,

restrain, and harm competition from TEC and other ISOs and to unlawfully maintain its monopoly power and exclude competition for aftermarket services on its Philips Manufactured Systems.

39.     As TEC and other ISOs attempted to gain ground in the service industry, Philips engaged in exclusionary tactics to avoid losing this lucrative stream of income.  In response to this competitive pressure, it has imposed unreasonable and anticompetitive barriers in the industry that attempt to prevent ISOs like TEC, and even the owners of Philips Manufactured Systems themselves, from using information necessary for the servicing and maintenance of this equipment, even if ISOs like TEC are somehow able to acquire it.

40.     These barriers were and are imposed not in the interest of patient safety—in fact, Philips' actions directly compromise patient safety—but are instead intended only to suppress competition for Philips' share of the service market.  In addition to the direct and substantial harm to competition, when ISOs like TEC are unable to acquire and use necessary technical information and provide necessary support to service and maintain Philips Manufactured Systems, patients are the ones who suffer.

41.     While Philips is free to compete for service contracts with entities that purchase Philips Manufactured Systems, it must do so fairly and lawfully.  But as described below, Philips has instead engaged in exclusionary conduct purposely intended to suppress and eliminate competition from TEC and other ISOs and maintain its monopoly position for aftermarket services for its Philips Manufactured Systems, and has engaged in unfair and deceptive acts and practices designed to suppress the ability of ISOs including TEC to provide services to hospitals and medical centers.  Such exclusionary, anticompetitive and unfair and deceptive behavior falls well outside the bounds of permissible conduct under the antitrust laws. Further, Philips' conduct violates the

North Carolina Unfair and Deceptive Trade Practices Act in ways separate and apart from Philips' violations of antitrust law, as well as tortuously interfered with TEC's contractual relationships.

42.     OEMs, like Philips, also have banded together to attempt to erect hurdles to ISO survival to capture additional revenue and, ultimately, raise healthcare costs.  For example, OEM members of the Medical Imaging Technology Alliance ("MITA")—including Philips—seek to define onerous requirements for servicing of medical imaging equipment that would effectively destroy ISO participation in the service market.  Such goals under the guise of patient safety are inconsistent with Philips' refusal to make readily available and easily accessible the means necessary to access information, tools, parts, and other necessary service (*e.g.,* manuals, training, and service keys).  Indeed, some of the purported problems that Philips and other members of MITA seek to address are purported health and safety issues that are in fact caused by a failure of OEMs such as Philips to make available all necessary information for the provision of maintenance and support services for this medical imaging equipment.

43.     On the other hand, the International Association of Medical Equipment Remarketers and Servicers, Inc. ("IAMERS"), a diagnostic imaging trade association, has provided testimony on behalf of ISOs opposing MITA's efforts.  Written testimony provided by IAMERS before the subcommittee on health on "Examining Improvements to the Regulation of Medical Technologies" dated May 2, 2017 provided background information pertinent to the present dispute:

- ISOs "offer quality services at lower cost than the [OEMs]."

- ISOs "are much valued nowhere more than in rural America."  For example, in at least "West Virginia, Kentucky, Alabama, and many other rural areas of the country, ISOs are an essential component in the healthcare system."

- "ISOs are also hired by OEMs to service, install, and move the OEM's systems that are now considered legacy and no longer within the expertise of the OEM. OEMs hire ISOs because the ISOs perform their work with skill and dedication to patient safety."

- "To offer a brief cost contrast: the cost of a service call by an [ISO] is typically in the range of $150-250 per hour. The cost of a service call by an OEM is reportedly in the range of $500-$600 per hour with a 4- hour minimum requirement."

- "Plainly ISOs offer competitive choices from hospitals who are keenly aware that capital equipment costs often 45% of their budget."

- "Time after time ISOs provide appropriate high quality maintenance services and do so at lower cost to the healthcare provider, thus easing their budgetary restrictions."

- "OEMs have advocated for the further regulation of ISOs with the possible intent of making it even more challenging for the ISO segment of the market to exist and be able to offer competitive services as a cost-effective alternative to the OEM."

- "[M]any hospitals are spending 8 to 10 times over what they spent annually 10 years ago on medical capital equipment. These hospitals welcome competition and service from [ISOs]."

## FEDERAL LAW AND REGULATION

44. The services formerly provided by TEC and still provided by other ISOs are anticipated and regulated by federal law. Specifically, an OEM like Philips is required to provide the necessary AIAT instructions and information to allow ISOs to service Philips Systems. *See* 21 C.F.R. § 1020.30(g).

45. That federal regulation provides in part:

*Information to be provided to assemblers.* Manufacturers of components listed in paragraph (a)(1) of this section shall provide to assemblers subject to paragraph (d) of this section and, upon request, to others at a cost not to exceed the cost of publication and distribution, instructions for assembly, installation, adjustment, and testing of such components adequate to assure that the products will comply with applicable provisions of this section and 1020.31, 1020.32, and 1020.33, when assembled, installed, adjusted, and tested as directed. Such instructions shall include specifications of other components compatible with that to be installed when compliance of the system or subsystem depends on their compatibility. Such specifications may describe pertinent physical characteristics of the components and/or may list by manufacturer model number the components which are compatible. . . .

46.     An x-ray system is an assemblage of components for the controlled production of x-rays.

47.     Manufacturers of diagnostic x-ray systems are subject to information disclosure obligations so that assemblers or other interested parties may obtain information regarding the assembly, installation, adjustment, and testing (AIAT) of an x-ray system to ensure it meets federal performance standards.

48.     The information helps ensure compliance with performance standards that are intended to reduce unnecessary x-ray exposure to the patient and operator.  As such, federal regulations regarding the disclosure of AIAT information protects the public health by preventing unnecessary exposure to x-rays from diagnostic x-ray systems.

49.     This disclosure obligation became effective on August 1, 1974.  Since that time, AIAT documentation has evolved from written manuals to computer software programs.

50.     Philips is a manufacturer "of components listed in paragraph (a)(1)" of 21 C.F.R. § 1020.30 and TEC was an "assembler" under 21 C.F.R. § 1020.30(g).

51.     AIAT instructions should provide the assembler with all of the information necessary to ensure the products will comply with applicable performance standards when assembled, installed, adjusted, and tested.

52.     Component manufacturers should also provide AIAT instructions that describe how to install the assembled components so that the unit meets applicable performance standards.  For example, in order to install components properly as part of a system, the assembler needs to fix and align the relationship between the x-ray source and the related components of the diagnostic system. This activity involves adjustment and testing to ensure compliance with performance standards.

53.     The disclosure obligation applies to each individually certified component produced by a manufacturer and is independent of the manufacturer's decision to deliver a fully assembled x-ray system.  It also includes specifications for other components that are compatible with the certified component to be installed when compliance of the component or system depends on such compatibility.  The manufacturer should provide the information upon request.

54.     Manufacturers should provide all informational materials needed for assembly, installation, adjustment, and testing, regardless of the format in which those materials exist or if it is bundled with non-AIAT information or software.

55.     Where AIAT information is bundled with other software, manufacturers are not relieved of their responsibilities to provide AIAT documentation or the AIAT software.

56.     The regulations further provide in part at 21 C.F.R. § 1020.30(h):

> *Information to be provided to users.* Manufacturers of x-ray equipment shall provide to purchasers and, upon request, to others at a cost not to exceed the cost of publication and distribution, manuals or instruction sheets which shall include the following technical and safety information:
>
>      (1) All x-ray equipment. For x-ray equipment to which this section and 1020.31, 1020.32, and 1020.33 are applicable, there shall be provided:
>
>      (i) Adequate instructions concerning any radiological safety procedures and precautions which may be necessary because of unique features of the equipment; and
>
>      (ii) A schedule of the maintenance necessary to keep the equipment in compliance with this section and 1020.31, 1020.32, and 1020.33.

57.     The regulations further provide that "[t]he owner of a diagnostic x-ray system who uses the system in a professional or commercial capacity may modify the system, provided the modification does not result in the failure of the system or component to comply with the applicable requirements of this section or of 1020.31, 1020.32, or 1020.33."  21 C.F.R. § 1020.30(q)(2).

## PHILIPS' FAILS TO COMPLY WITH ITS LEGAL OBLIGATIONS AND COMMITS OTHER UNFAIR AND DECEPTIVE ACTS AND PRACTICES

58.     In order for purchasers of Philips Manufactured Systems to be able to service and maintain those systems, Philips is required to disclose certain information related to accessories and functions, additional documentation related to the equipment, and enhanced software programs to third parties, where such information is necessary for the proper servicing of the equipment even if proprietary.

59.     Such information is usually contained in the software that is pre-installed on a machine when it is sold to a customer, and some OEMs make this information readily available. For example, some OEMs place no restrictions on the use of Necessary Information whatsoever. Other OEMs operate 24-hour hotlines that allow ISOs to receive Necessary Information promptly upon request.

60.     Philips, however, has engaged in a consistent and purposeful pattern and practice of improperly restricting the access to and use of this information, with the specific intent and design to suppress and hinder competition to capture for itself the service aftermarket for Philips Manufactured Systems.

61.     For example, Philips employs a complicated and unnecessary pre-approval system that impedes the ability of ISOs to service Philips Manufactured Systems. First, before servicing a Philips machine, an ISO must file an application with Philips to use Philips-defined AIAT information, which is only a subset of Necessary Information, and download a particular piece of software made available exclusively by Philips. Many owners of Philips Manufactured Systems are unaware that Philips even requires this registration—despite being required to provide all Necessary Information by law—because of Philips' efforts to hide the existence of this process.

62.     Upon submission of the application described above—a process that frequently fails due to poorly functioning and out-of-date infrastructure in Philips's submission system—an ISO or Philips Manufactured System owner must wait for Philips to provide it with a "request response." Despite the fact that these requests are related to the service of Philips Manufactured Systems that are integral to patients' healthcare and safety, Philips sometimes takes as long as a week to provide any response to a request.

63.     Once Philips provides a response, it requires the ISO or Philips Manufactured System owner to log into another Philips system using a temporary login. This login must be completed within four (4) hours of the time listed on the response email, or the temporary login expires. Given Philips' global operations, this sometimes results in authorization emails that are delivered in the middle of the night and, therefore, expire before an ISO or Philips Manufactured System owner is even aware that the original email has been sent. Once the temporary login described above expires, the ISO or Philips Manufactured Systems owner must resubmit its request and it is forced to wait additional time before patient-critical systems can be serviced.

64.     If an ISO or Philips Manufactured System owner is able to successfully login to Philips' registration system in the limited time frame described above, it must then purchase either a smart card reader or a smart card that contains an access key that Philips requires for access to some limited information. These items are frequently out of stock for purchase and even when adequate stock exists Philips unfairly and anticompetitively restricts their sale and/or delays the shipment of them to ISOs. Philips has refused to sell more than one key at a time to TEC and has had them backordered, thereby delaying services provided by TEC and adversely affecting hospital services.

65.     Despite Philips' obligation to provide all Necessary Information to owners of Philips Manufactured Systems and third-party servicers of those systems, such as TEC, Philips unfairly profits from its complicated and onerous processes for third parties and in-house servicers by selling hardware keys for amounts vastly inflated from any reasonable cost as described above. Philips charges ISOs including TEC exorbitant fees as high as $1,500 for a single access key, despite the actual cost of the key being only approximately $2. Philips sometimes charges Philips Manufactured System owners and other OEMs much less for the same access key. Similarly, Philips has sold USB smart card readers to TEC for up to $170 each, despite that, upon information and belief, them costing Philips no more than $16 each.

66.     In addition to the numerous hurdles Philips requires ISOs and Philips Manufactured System owners to jump over in order to secure an access key, Philips also constructs barriers to using the access key, including requiring holders of an access key to connect that key to a Philips server at least every thirty (30) days to ensure its continued function. Philips also requires that each individual Philips Manufactured System be "enabled" to accept an access key. This request for enablement is another manual process that—under Philips' onerous guidelines—requires Philips to send an engineer to the specific site where the Philips system is located and can take days or weeks for Philips to complete. And even when access has finally been enabled, Philips frequently makes changes to the system that disables the device from accepting an ISO and device owner key and the delay in their ability to provide service begins again. Finally, Philips has also taken the position that *each* individual service engineer is required to have his or her own access key, and that ISOs and Philips Manufactured Systems owners cannot use a single key to service multiple Philips Manufactured Systems, resulting in higher costs for ISOs and Philips Manufactured System owners.

67.     Unfortunately, merely having an access key does not mean that the ISO can actually provide maintenance and support services to the Philips Manufactured Systems owned by hospital and medical center customers.  Rather, as Philips readily admits in its Second Amended Complaint, the access key provides only limited use to the user.  Indeed, the access key does not allow service engineers to use all of the Necessary Information to provide required and allowed service and maintenance.

68.     Upon information and belief, Philips improperly prevents access to Necessary Information using a piece of software framework known as the Field Service Framework ("FSF").  By way of example, under the FSF "System" menu for Philips Manufactured System software, Philips has improperly prevented TEC and other ISOs from using Necessary Information related to the Export, Installation, and Image Processor functions of Philips Manufactured Systems.  This conduct by Philips is intended and designed to harm and suppress competition from TEC and other ISOs and maintain its monopoly position for aftermarket service on its Philips Manufactured Systems.

69.     Other examples of Philips using the FSF to prevent access to Necessary Information includes, but is not limited to, restricting access to the following:

- Recreate image store;
- Configure DAP measuring;
- Configure networking;
- FlexVision;
- LCD monitor adjustment;
- Table potentiometer;
- Manual defects/defect pixels finder;
- Database consistency repair;
- Survey_all; and
- View technical event log.

70.     Upon information and belief, Philips never informs purchasers of Philips Manufactured Systems that it will withhold Necessary Information or otherwise attempt to prevent

the purchasers of Philips Manufactured Systems from accessing Necessary Information, including, but not limited to the Export, Installation, and Image Processor functions of Philips Manufactured Systems.

71.     Philips similarly has also improperly prevented purchasers of Philips Manufactured Systems and ISOs from accessing the Necessary Information related to "Configuration," "Adjustment," "Customization," "Performance," "Diagnostics," and "Survey" functions.

72.     Even if documentation provided with a Philips Manufactured System states that a purchaser of that system should have access to certain Necessary Information, Philips improperly prevents that system purchaser from accessing the information. For example, Philip prevents access and/or denies permission to perform certain procedures for XtraVision (3DRA) and Interventional Workspot (IWS) despite being necessary assembly and calibration procedures that ensure the machine is operating properly.

73.     Philips' denial of access to Necessary Information forces owners of Philips Manufactured Systems to make service calls to Philips (instead of servicing the system themselves, or hiring more cost-effective ISOs including TEC). This requirement to call Philips instead of using more cost effective options results in higher overall healthcare costs and adversely effects patient safety without providing any legitimate purpose or benefit.

74.     Another example of critical tasks that cannot be provided without the Necessary Information is that for certain 3DRA workstations, full access and calibration cannot be completed using Philips-issued usernames/passwords. Similarly, for certain IWS, the required USB IST hardware key for access to the service menus for configuration and calibration cannot be performed.

75.     Upon information and belief, InCenter is an electronic repository for certain Philips documents. Third-party servicers, such as TEC, have access to certain materials and information

in InCenter, but not all Necessary Information. To access InCenter, Philips may provide log in credentials to people that request them at its discretion. Similarly, Philips may provide IST certificates to requesters, including TEC and other third parties at its discretion. Upon information and belief, Philips' policies and procedure with respect to providing the above-described access has varied widely over time.

76. Despite Philips indicating to TEC and other ISOs that they can access at least some Necessary Information via InCenter, InCenter is frequently unavailable or otherwise has issues and errors that prevent access to the information including, but not limited to, the Necessary Information that InCenter allegedly contains and is purportedly available to ISOs.

77. In those situations where InCenter does appear to allow access to some Necessary Information, the documents or other materials downloaded from InCenter may themselves be corrupted or have errors. Consequently, purchasers of Philips Manufactured Systems, TEC, and other ISOs cannot depend on InCenter for access to all Necessary Information

78. If a Philips Manufactured System purchaser or ISO is actually able to gain access to Necessary Information, Philips may later claim that such Necessary Information should not have been provided. Philips makes these claims even though Philips Manufactured System purchasers and ISOs are frequently able to be access, view, print, or save locally the Necessary Information without any encryption and without a contractual obligation to keep the information confidential.

79. Given the unreliability of InCenter, it is common for Philips engineers, engineers from third-parties (such as TEC), and other persons in the industry to regularly share and distribute certain Necessary Information without restriction.

80. Philips contends that it has the sole right and authority to decide what, if any, Necessary Information may be accessed, and that Philips may make changes to the scope of

accessible Necessary Information at any time, including after the Necessary Information has been acquired or distributed. In fact, Philips frequently makes unilateral changes to the access of Necessary Information on both global and individual levels.

81. Upon information and belief, Philips further contends that all service instructions, service methods, service documents, diagnostics, performance tests, calibrations, diagnostics, error logs, and other materials are proprietary to Philips and should not be provided as Necessary Information, even to purchasers of Philips Manufactured Systems.

82. Upon information and belief, Zeppelin is a Philips repository for software, including certain Necessary Information in the form of software tools necessary for ISO servicing of Philips Manufactured Systems. In the past, as a part of IST registration, ISOs could indicate the systems being worked on and Zeppelin or Philips may send physical media packs of CDs with requested software tools to the address provided.

83. Thus, Philips has provided software and other tools for medical imaging servicing, including to TEC and other third parties. For example, Philips has provided without restriction Philips' log viewer software, such as "Philips Log Viewer Software" and "CAT" viewer program, among other software. Often, these software tools work with a user's access key credentials, or without the use of any necessary credentials. In the current litigation, however, Philips now has alleged baseless trade secret and other claims concerning these same software and other tools.

84. Further, system log files are owned and/or, at a minimum co-authored by TEC customers and are required to facilitate necessary servicing of Philips Manufactured Systems.

85. Certain other software, however, such as Grid Switch Supervisor ("GSS") software purportedly available from Philips' Zeppelin and required for providing service and maintenance on Philips Manufactured System, is not actually available to ISOs, including TEC.

86.     Philips has effectively and improperly crippled necessary calibration procedures. By way of further example, certain critical components cannot be properly calibrated; detector calibration sequence does not pick out all artifacts on screen; Philips blocks access to network IP address for computer to transfer patient images and system does not allow archiving; the Xper management tool cannot be configured with, for example, node changes; database repair/consistency testing; and FlexVision system configuration.

87.     Even after Philips distributes or makes available certain limited Necessary Information in electronic form, Philips implements arbitrary expiration rules so the materials become unusable after a short period of time.  The expiration rules frustrate the legitimate use of such materials and add unnecessary delays to the service market.

88.     Even when someone has certain credentials from Philips, Philips arbitrarily changes what information that person may access with no notice or explanation, often downgrading the user and making certain service operations impossible to complete.  For example, Philips has arbitrarily changed access such that TEC employees could not access documents and programs that they previously were able to use, preventing the complete installation of various components or necessary adjustments and tests from being performed.

89.     Philips unilaterally—and without notice—changes what Necessary Information is available. Indeed, Philips also inconsistently and confusingly labels available materials, thereby failing to provide reasonable notice as to how it expects materials to be handled or maintained. Upon information and belief, Philips does not follow its own policies for the treatment of such materials.

90.     When Philips itself decides to stop servicing Philips Manufactured Systems (for example, due to End of Life (EOL) or End of Service (EOS)), Philips routinely fails to provide

Necessary Information for such devices, thereby forcing hospital and medical center customers to purchase new machines because they become unserviceable by Philips and ISOs. Similarly, Philips stops supplying any mechanisms (such as access keys) to allow any software access to these systems.

91.     Upon information and belief, Philips also has accelerated system obsolescence and related support services to force hospitals and medical centers to purchase new equipment or other services from Philips to increase margins and prevent ISOs from servicing older systems for customers. Similarly, for these purposes Philips plans for EOS periods to be as short as possible after the EOL date for a system.

92.     Further, Philips has deceived customers by retroactively shortening EOL/EOS for its systems after being purchased by customers. For example, upon information and belief, Philips has retroactively changed its EOL policy from the last date of production of a product family plus 10 years to the delivery of a given system plus 10 years. Philips considers EOL important for the replacement business and such anti-competitive policy changes accelerate customer replacements and suppresses ISO servicing.

93.     Philips' customer service is also ineffective and not responsive in resolving issues with representatives from ISOs, such as TEC, causing service delays and system downtime for hospitals and medical centers, which adversely affects patient throughput, safety, and satisfaction. Upon information and belief, Philips' delays are intentional and for the purpose of delaying patient care to increase market share, revenue, and profit for Philips and decrease market share, revenue, and profit for ISOs, such as TEC.

94.     Further, certain Allura systems use parallel hardware keys that Philips' helpdesk informed TEC are no longer available, thereby hindering ISO servicing of such systems and adversely affecting hospital services.

95.     By failing to provide all Necessary Information, Philips denied TEC and other ISOs use of that information while improperly treating it as allegedly proprietary or trade secret information. The specific makeup of the affected Necessary Information varies depending on the particular version of a Philips Manufactured System and/or the version of the software being run on the Philips Manufactured System being serviced.  Regardless of the versions, however, Philips has failed to comply with its obligations to provide all Necessary Information, and has engaged in unlawful exclusionary conduct that substantially harmed competition for aftermarket service from TEC and other ISOs.

96.     For example, Philips has repeatedly made Necessary Information needed to service cath labs inaccessible by failing to set what, upon information and belief, Philips refers to as the Service Organization Identifier ("SOID"). To make this process more cumbersome and time consuming Philips requires that one of its employees must set the SOID value in person, not the system's owner or an ISO. Historically, however, Philips has failed to do so or substantially delayed doing so, sometimes for months, after being contacted by TEC or a Philips Manufactured System owner.

97.     Upon information and belief, Philips also improperly changes SOID settings to prevent access to Necessary Information and to otherwise frustrate ISO servicing and patient safety.  Philips' actions materially delay and/or prevent TEC and other ISO personnel from performing essential service, frustrating hospital and medical center customers.  Upon information and belief, at least some hospital and medical center customers have hired Philips to perform

aftermarket servicing, rather than ISO personnel, as a result of such delays and/or to avoid such frustrations, unfairly causing loss of work and revenue to TEC and others.

98. Further, upon information and belief, each time a Philips Manufactured System's software is upgraded the SOID has to be reprogrammed on the system, requiring another site visit by Philips personnel and causing further ISO servicing delays and adversely affecting hospital services.

99. Philips generally installs its medical equipment at customer sites through its own personnel or third-party installers. Once installed, Philips leaves behind "book boxes" with the machines at customer sites, which include user manuals and service manuals containing some information Philips claims to be its trade secrets, in order to facilitate service and maintenance during the life of the machines. Such manuals are purchased with the machine and are freely available to hospital and ISO personnel that service the particular machines.

100. When it performed service, TEC was authorized by the system owner to use on-site materials and software when servicing customer-owned Philips manufactured medical imaging devices.

101. Further, these book boxes remain with the Philips Manufactured Systems and are sold with used medical equipment, such that purchasers of used equipment, including hospitals, TEC and other ISOs, may freely acquire copies of the book boxes without restrictions. Upon information and belief, Philips does not ask a customer to return a book box if the equipment is eventually sold or a Philips service contract is terminated.

102. There is no reasonable basis to conclude that the book box materials that Philips abandons at customer facilities constitute confidential or trade secret information. Philips has, therefore, wrongly and knowingly asserted trade secret and other claims against TEC that have no

reasonable basis because any documents or information contained in the book boxes cannot constitute confidential or trade secret information.

103.    Philips also has disseminated at least some Necessary Information without restrictions with its parts sold to customers and third parties.  Likewise, there is no reasonable basis to conclude that such documents constitute confidential or trade secret information.  Thus, such documents and information cannot constitute confidential or trade secret information and Philips claims encompassing them have no legal basis.

104.    In addition to Philips' improper assertion of trade secret protection over certain Necessary Information, Philips has baselessly asserted claims under the Computer Fraud and Abuse Act ("CFAA") and Digital Millennium Copyright Act ("DMCA") based on allegations of improper access related to performance of services by ISOs, such as TEC.

105.    Philips also improperly fails to provide Necessary Information needed to perform preventative maintenance required to keep imaging devices safely operating, including certain instructions need to perform that maintenance. This information, which is critical to cost-efficient health care and patient safety, should be available to its owners of Philips Manufactured Systems and personnel that service Philips manufactured imaging devices, such as TEC.

106.    Philips further wrongly designates information and documents as confidential and trade secret information.  For example, mandatory field change orders ("FCO") must be filed with the FDA, but Philips unfairly maintains that such FCOs are confidential and trade secret and do not have to be disclosed to customers and ISOs.

107.    Philips also maintains a list of all preventative maintenance to be performed to keep imaging devices safely operating, but improperly designates certain of the preventive maintenance instructions confidential and trade secret.  Thus, as described further below, Philips improperly

restricts access to information that should be available to its customers and personnel that service Philips manufactured imaging devices, such as TEC.

108.     Regardless of the label provided by Philips to the Necessary Information, all of the maintenance and support services performed by TEC with respect to Philips Systems on behalf of customers were based on information and materials that the customers and ISOs are entitled to possess and use.

109.     Philips also has taken the position that only trained and qualified individuals should be performing work on the systems.  Philips, however, does not tell the customer that Philips will refuse to provide training, materials, or any other method that would allow any individual—other than a Philips employee—from becoming trained and qualified, if they are not already qualified, especially when Philips takes the position that third parties may not use Philips' training materials to train others.  In fact, system owners and ISOs (including TEC) have reached out to Philips to request documentation and training for certain systems and Philips has denied those system owners and ISOs (including TEC) access to that training and documentation.

110.     Even though Philips refuses to provide repair training to a customer or ISO without them first purchasing an expensive Philips Manufactured System and entering into a costly service contract with Philips, it also refuses to enter into such service contracts with certain owners of Philips Manufactured Systems. For example, TEC owned certain Philips Manufactured Systems and requested information about purchasing a service agreement from Philips to allow TEC to access and receive training and other Necessary Information. Philips, however, refused to enter into such an agreement with TEC because TEC competed with Philips in the service aftermarket.

111.     Further, Philips purposely delays providing time-critical and potentially life-saving services to customers who do business with ISOs including TEC, *i.e.*, customers that do not have

a service contract with Philips. Specifically, Philips has instructed its field service engineers to unnecessarily delay making service calls to customers who do not have a Philips service contract, essentially forcing customers to enter into Philips service contracts when they would prefer to receive services from an ISO.

112. Thus, independent service engineers (including those employed by TEC) were and are unable to use vital and required service information, and Philips' conduct has harmed competition by preventing TEC and continuing to prevent other ISOs from being able to perform and complete service calls in one or more visits. Other system manufacturers do not have similar limitations.

113. Philips also periodically disables previously granted use of certain Necessary Information on Philips Manufactured Systems via a number of different methods, including through software updates, restoration of old backups of system files, and even via direct action by Philips' field service engineers. These actions all require an ISO or Philips Manufactured System - owner to again request that Philips enable the use of even a subset of Necessary Information and, correspondingly, wait days or weeks for that process to be completed. Philips' conduct has the direct effect of harming competition from ISOs like TEC because it prevents ISOs from timely servicing Philips Manufactured Systems.

114. Other manufacturers of similar medical imaging systems do not employ the same burdensome "authorization" procedures that Philips does. In fact, some system manufacturers either provide Necessary Information nearly instantly via a telephone system or do not require authorization to access Necessary Information at all. In other words, Philips' alleged "authorization" procedures are outside the standard of the rest of the industry and are designed to

anti-competitively delay and dissuade the servicing of Philips manufactured systems by anyone other than Philips.

115.    Philips also provides service to and performs maintenance on systems manufactured by other OEMs, and upon information and belief, Philips uses the Necessary Information made readily available by other OEMs in these service and maintenance activities, despite restricting the use of similar information with respect to Philips Manufactured Systems, as described herein.

116.    Because in many instances systems cannot be in operation by a hospital or other customer while waiting for Philips to allow the use of even a subset of Necessary Information related to that system or while maintenance services are being performed on the system, patients at the hospitals and medical centers are forced to make other arrangements to receive vital imaging services as a direct result of Philips' efforts to delay Philips Manufactured System service.

117.    TEC's success as an ISO, as well as the success of other ISOs, was dependent upon the ability to quickly and efficiently respond to service requests from customers, and Philips' artificial and contrived delays (and refusal to allow the use of all Necessary Information) impaired the ability of TEC and continues to impair the ability of ISOs to provide their services and, therefore, directly harms competition from ISOs and their ability to compete with Philips. These delays also impeded TEC and continue to impede ISOs from fulfilling the critical function of making sure that Philips Manufactured Systems function properly and are available for much-needed patient use with the least possible downtime.

118.    Hospitals and medical centers want to have the opportunity to work with, and welcome the competition to Philips presented by, TEC and other ISOs. TEC previously provided maintenance services to hospitals and medical centers nationwide.

119.    Since at least the time TEC began to do business in approximately 2008, and through the time when TEC ceased doing servicing business on March 31, 2017, and continuing through the present, Philips has prevented TEC and other ISOs from using Necessary Information on Philips-manufactured medical devices in North Carolina, as well as throughout the United States, as described herein.

120.    Upon information and belief, Philips agents or employees have even gone so far as to instruct hospitals and medical centers not to use TEC's services and have falsely told customers that TEC is not able to provide maintenance services or is otherwise incapable of providing routine service and preventative maintenance on Philips Manufactured Systems.  These actions and communications have caused at least one customer to discontinue its use of, or refuse to do business with, TEC as a service provider.

121.    Upon information and belief, Philips monitored x-ray systems at customer sites, including accessing log files for customers' machines not under warranty or subject to a service agreement, to determine who TEC's customers were and where and when TEC provided service to them.

122.    Based on Philips' wrongful conduct, TEC encountered resistance in the industry to market and provide its services because customers identified TEC as a high risk provider or a provider that cannot effectively meet demands.

123.    Such actions constitute, in part, unfair and deceptive trade practices because slanderous or libelous business dealings violate reasonable industry standards.

124.    Further, Philips' actions in withholding information and materials, as described herein, are an activity in or affecting commerce in the state of North Carolina, as Philips operates in North Carolina, TEC operated its business from North Carolina, and TEC formerly provided

and Philips provides maintenance services for Philips Manufactured Systems to North Carolina hospitals and medical centers, as well as throughout the country.

125.     Further, Philips' refusal to allow the use of necessary service and maintenance information and materials has caused direct and substantial harm to competition from ISOs for aftermarket service of Philips Manufactured Systems and has proximately caused injury to TEC and other ISOs, in the form of lost customers and higher operating costs.  Philips' likely  caused TEC to lose customers who saw no choice but to contract with Philips for maintenance services in light of the unfair and substantial barriers to access that Philips places upon TEC and other ISOs.

126.     Further, Philips caused injury to competition from ISOs and harmed TEC, regardless of Philips' market position or overall market share, because Philips leveraged its role as the original manufacturer of the Philips Manufactured Systems to commit exclusionary, unfair, and deceptive acts against TEC and other ISOs and to unfairly compete with TEC and other ISOs.

127.     As described herein, Philips has improperly restricted the use of Necessary Information by TEC and other ISOs through, *e.g.*, Philips' convoluted and unnecessary procedures related to obtaining, using, and maintaining a Philips access key and restricting access to training, documentation, software, and tools necessary for the proper maintenance of Philips Manufactured Systems.

128.     Regardless of the label provided by Philips for documents, software, and tools, or its unnecessary and unduly burdensome access key requirement, all of the services TEC performed with respect to Philips Manufactured Systems were authorized by the system's owner (and often Philips' own conduct) and were done to properly and safely maintain the systems.

129.     As an ISO, TEC competed with Philips in the service aftermarket, specifically for owners of Philips Manufactured Systems that were no longer under warranty.

130. There are barriers to entry into the service aftermarket, including barriers caused by Philips' exclusionary conduct and barriers to creating and maintaining an appropriately skilled work force.

131. For example, Philips purposely delays providing time-critical and potentially life-saving services to customers who do business with ISOs, *i.e.*, customers that do not have a service contract with Philips. Specifically, Philips has instructed its field service engineers to unnecessarily delay making service calls to customers who do not have a Philips service contract, essentially forcing customers to enter into Philips service contracts when they would prefer to receive services from an ISO.

132. Other barriers to entry include Philips' market power associated with its differentiated brand name and its ability to deny and delay ISOs like TEC from using the purported necessary instructions and permissions to provide servicing and maintenance of Philips Manufactured Systems.

133. Recognizing the competitive threat posed by TEC and other ISOs, and fearing the loss of business in the service aftermarket, Philips has engaged in unfair, deceptive, anticompetitive and exclusionary conduct with the specific intent of unlawfully acquiring and maintaining its monopoly share of the service aftermarket. This directly and substantially harms competition in the service aftermarket and maintains Philips' monopoly share of that market, providing Philips with the power to raise prices above competitive levels and to exclude competition from ISOs.

134. Consequently, many purchasers of Philips Manufactured Systems, who would otherwise prefer to receive service on some other basis, *e.g.,* through a service contract with TEC or other ISO, are effectively constrained to use Philips for post-warranty maintenance services,

even though Philips ostensibly permits purchasers to use ISOs for such services. Philips' exclusionary conduct does not just harm TEC, but directly and substantially impedes, hinders, and injures competition from ISOs in the service aftermarket and causes increased healthcare costs to consumers in North Carolina and throughout the United States.

135. Unfettered and open competition from TEC and other ISOs would have the benefit of increasing price competition and providing other benefits to purchasers of Philips Manufactured Systems in the service aftermarket. As a result of this competition, the costs for maintenance services in the service aftermarket tend to be lower in geographic areas in which TEC had and other ISOs have a substantial presence. Thus, competition from TEC and other ISOs has the substantial benefit of increasing price competition in the service aftermarket. Philips' improper and unfair efforts to exclude TEC and other ISOs from the service aftermarket substantially harms competition by eliminating or reducing price competition in the service aftermarket.

136. Given the complexity of the Philips Manufactured Systems, it is difficult for customers who purchase them to estimate long-term maintenance costs. This difficulty is caused, in part, by Philips' failure to inform purchasers of Philips Manufactured Systems about the alternatives for servicing those systems outside of Philips' s own high -priced service plans.

137. Philips Manufactured Systems are complex durable equipment with a high purchase price and a long lifespan. Upon information and belief, the cost of a new Philips Manufactured System ranges from $750,000 to over $2,000,000. The average Philips Manufactured System  a useful economic life of approximately 7-15 years, with many systems remaining in service for 10 years or more.

138.     Consequently, purchasers of Philips Manufactured Systems are effectively locked into their purchase and are prevented due to the high capital costs from switching to competing brands of systems in response to Philips' exclusionary conduct.

139.     Philips is liable to TEC for its actual damages, treble damages, and attorneys' fees, in an amount to be proven at trial.

140.     The conduct alleged above has had, or will continue to have, the purpose and effect of excluding competition from the service aftermarket, raising prices to purchasers of maintenance services for Philips Manufactured Systems, eliminating customer choice, reducing the value to customers of their Philips Manufactured Systems, and reducing patient safety.

## PHILIPS UNFAIRLY RESTRICTS CUSTOMERS CHOICES AND IMPROPERLY PREVENTS ACCESS TO PHILIPS SYSTEMS

141.     Upon information and belief, the agreements that Philips has with its hospital and medical center customers related to the Philips Manufactured Systems that they purchase includes improper restrictions that affect the relevant market and the ability for such customers to obtain essential servicing from ISOs.

142.     For example, as pled in the Second Amended Complaint, "[w]hen Philips sells Systems to a customer, the agreement with the customer permits Philips to deliver to the customer Proprietary Service Materials. The Proprietary Service Materials provide authorized users with proprietary tools that assist with the maintenance and servicing, diagnostic, calibration, and other functionalities of systems. The agreement establishes that the presence of Proprietary Service Materials will not give the customer any right or title to such property or any license or other rights to access or use such property. The agreement further establishes that the customer will use all reasonable efforts to prevent any access or use of such property by any unauthorized party."

143.     In addition, upon information and belief, Philips requires that its service customers only install parts obtained from Philips and they may not install parts provided by the customer or any third party.

144.     Moreover, upon information and belief, Philips contractually restricts access and reverse engineering necessary to perform essential maintenance and repair on Philips Manufactured Systems owned by hospitals and medical centers.

145.     Such restrictions unnecessarily and unreasonably restrict downstream repair markets, increase the healthcare costs for consumers in North Carolina and throughout the United States, and are illegal.  They are therefore against public policy.

146.     Upon information and belief, Philips has remote access to—and has remotely accessed—Philips Manufactured Systems at customer facilities, without permission or authorization.  As such, Philips is able to modify or download information, including logging information, stored on Philips Manufactured Systems owned by hospitals and medical centers that have service contracts with ISOs, such as TEC.

147.     Upon information and belief, Philips, including its "Remote Monitoring Team," wrongfully and remotely monitors Philips Manufactured Systems in the field to identify non-Philips service.  Such activities include improperly accessing customer log files to support its claims in this case.  Such log files are not owned or authored by Philips.

148.     Upon information and belief, Philips also informs customers that it will not service machines that were not sold to them directly by Philips.

### ANTICOMPETITIVE AND EXCLUSIONARY ACTS IN THE PARTS AND TRAINING MARKETS

149.     Philips does not sell parts for the Philips Manufactured Systems directly to ISOs, including TEC.

150.    Instead, Philips' wholly-owned AllParts Medical LLC ("AllParts") is the exclusive dealer and distributor of Philips parts for its imaging devices.  *See* http://allpartsmedical.com/. AllParts is thus the only source for *new* parts for the Philips  Manufactured Systems available to medical facilities and ISOs including TEC.

151.    AllParts was established in 2006 and acquired by Philips in 2011.  The acquisition purportedly supported "Philips' commitment to provide the imaging market with high-quality service parts, training programs and technical support."

https://www.itnonline.com/content/philips-acquires-allparts-medical-expands-imaging-equipment-services.  AllParts purportedly "provides replacement parts, technical training and support in X-ray based imaging equipment such as general X-ray, cardiovascular X-ray and X-ray computed tomography (CT)."  *Id.*

152.    AllParts provides OEM replacement parts and training, including for the Philips Manufactured Systems.  AllParts does not keep a full inventory of necessary Philips parts, making it difficult for TEC and other ISOs to compete with Philips in the servicing aftermarket.

153.    For example, a collimator alignment tool that is required to service a Philips Manufactured System is not available to order.

154.    For no legitimate reason, AllParts makes ordering of essential parts for Philips Manufactured Systems contingent on provision of a serial number or system code.  For example, recently, Philips began putting such restrictions on the purchase of test equipment needed to service Philips Manufactured Systems, such as EDL kits.  As such, parts can only be effectively ordered for active systems.

155.    AllParts—as the sole supplier of new parts for ISOs in the service market—also fails to keep adequate inventory on hand such that items are backordered, delivery is delayed, and service frustrated.

156.    TEC was an AllParts customer, and Transtate is one of AllParts' biggest customers.

157.    Upon information and belief, Philips also requires any training it has provided to be confidential, without regard to whether Necessary Information is encompassed in the training.

158.    Customers have complained that even where they attended training classes involving AIAT procedures, Philips uses only certain Necessary Information that Philips then insists cannot be used by ISOs without permission. Philips further refuses to give such permission to any ISOs, including TEC.

159.    By way of further example, Philips is the only source for training on certain of its cath lab systems, but only provides such training to customers that purchase these systems.  Philips refused to train and provide access to TEC personnel, despite TEC's requests to attend Philips' regularly scheduled trainings and pay Philips for such training.  Philips also refused to make available to TEC written materials essential for ISOs, such as TEC, to have in servicing such systems.

160.    As a result, TEC was unable to perform certain maintenance services on certain cath lab systems in response to requests from customers and potential customers.  By refusing to provide such training and materials to TEC, Philips prevented hospitals and medical centers from seeking service from ISOs like TEC, and they had to either obtain service from Philips or continue to employ staff trained on the system.  Philips' actions had the intended purpose of restraining competition. There can be no legitimate justification for Philips' actions, which were anticompetitive and exclusionary.  Indeed, excluding TEC and other ISOs from competing in the

service aftermarket for these systems had and has the effect and potential effect of raising service costs.

161.  Philips also refused to enter into a service agreement with TEC to provide TEC access to additional Necessary Information and tools, while doing so with certain other third parties.  Such a refusal to deal was exclusionary, harmed TEC, and served no legitimate purpose.

162.  Thus, on multiple occasions, Philips has continued an ongoing policy of denying access to Philips in-person training courses for Philips Systems to TEC, Transtate, and other ISOs. As a result, ISOs have been effectively denied the purported necessary training for servicing certain Philips Systems.

163.  Service manuals that are provided with certain Philips Manufactured Systems state that certain of the procedures "may only be carried out by a service engineer who is trained and qualified."

164.  TEC personnel were trained and qualified, but Philips manuals specify procedures that, according to Philips, TEC personnel, ISOs, or anyone other than Philips are not permitted to perform.

165.  Similarly, "[o]nly qualified and authorized technicians may maintain" the equipment.  "Qualified" means "those legally permitted to maintain this type of medical electrical equipment in the jurisdiction in which the equipment is being used" and "authorized" means "those authorized by the user of the equipment."

166.  Philips states in certain Philips Manuals that "[i]ncorrect replacements and/or adjustments may lead to unacceptable risks for patient and operator."

167. Even so, Philips denied relevant training to TEC and denies relevant training to other ISOs who are entitled to service Philips Manufactured Systems for hospitals and other medical provider customers.

168. Through these policies, Philips was and is using its monopoly power in the parts market and training market to push TEC and other ISOs out of the servicing aftermarket, where it seeks to acquire and maintain monopoly power.

169. The parts market encompasses the parts, tools, service manuals, and specifications necessary to service Philips Manufactured Systems, which are not interchangeable with those of other brands of medical imaging systems. Thus, if the servicing of a Philips Manufactured Systems requires replacing a part, it must be replaced by a Philips part.

170. Accordingly, the parts market is composed only of Philips parts. Philips controls nearly 100 percent and enjoys monopoly power in the parts market.

171. Philips has the power to control prices or exclude competition in the parts market because Philips controls nearly 100 percent of the supply of Philips parts in the relevant market, and there are no reliable substitutes.

172. There are high barriers to entry for potential entrants to the parts market. Philips enjoys economies of scale and scope, exclusive dealing arrangements with suppliers, and Philips patents on parts. Additionally, manufacturing of Philips parts requires high technical expertise and a long lead-time to develop. Accordingly, ISOs are unable to enter the market due to these high barriers to entry.

173. Philips' policies and practices in the parts market are inconsistent with profit-maximizing absent desired effects in other markets. Philips' refusal to deal with ISOs, such as TEC, in the sale of its monopoly parts illustrates Philips' intent to exclude ISOs, such as TEC, from the

servicing aftermarket. Such refusal to deal is without legal justification, and done to illegally leverage Philips' monopoly in the parts market into the servicing aftermarket by raising its rivals' costs. This evidences Philips' intent to forego short-term profits in order to gain a long-term monopoly in the servicing aftermarket.

174. The training market encompasses Philips' sale of its training courses necessary for servicing Philips Manufactured Systems.

175. Due to the unique nature of Philips Manufactured Systems, training for servicing of Philips Manufactured Systems is not interchangeable with training for servicing other brands of medical imaging devices.

176. Accordingly, the training market is composed only of training for service of Philips Manufactured Systems. Philips has nearly 100 percent control of the training market.

177. Philips has the power to control prices or exclude competition in the training market because Philips controls nearly 100 percent of the supply of Philips training courses in the relevant market and there are no reliable substitutes. Philips also uses its control of the training market to pressure sales of additional medical equipment and service contracts, in that training is not available without these purchases and, even then, ISOs including TEC are excluded.

178. There are high barriers to entry for potential entrants to the training market. As the manufacturer of Philips Manufactured Systems, Philips enjoys a substantial advantage in its knowledge of its own machines. The informational inequality between Philips and its actual or potential competitors would require a substantial investment in time and money to overcome. Accordingly, ISOs cannot realistically enter the training market.

179. The product market at issue is the post-warranty servicing aftermarket for Philips Manufactured Systems, which encompasses the sale of servicing for Philips Manufactured Systems.

Sellers in this market include Philips and ISOs, such as TEC. The market does not include in-house servicing that hospitals and other operators may provide on their own machines because those entities do not compete with Philips and ISOs to provide service to other hospitals and operators. Due to the high costs and expertise required for in-house servicing, the majority of hospitals and other operators purchase servicing from Philips or ISOs.

180.     In order to provide servicing for Philips Manufactured Systems over their life span, Philips and ISOs must have timely and reliable access to Philips parts and employ technicians who have been specifically trained to service these machines. ISOs without access to Philips parts or Philips training cannot offer servicing of Philips Manufactured Systems.

181.     During its operation as an ISO, TEC made specific requests of Philips to provide training to TEC employees, but Philips denied TEC access to such training. Upon information and belief, Philips also has denied purchasers of Philips Manufactured Systems and other ISOs access to training necessary to service certain systems.

182.     Philips effectively controls 100% of the market for Philips aftermarket service because Philips completely controls access to the unique parts, information, and tools required to perform such service. This includes the Necessary Information because Philips controls its access and dissemination, including the timing of such access and dissemination, to ISOs, such as TEC. Indeed, Philips systematically delays in providing such access and erects unnecessary, onerous, and burdensome procedures to obtain such information and access as described herein to restrain legitimate competition.

183.     The servicing aftermarket for Philips Manufactured Systems is highly profitable. Budget constraints have forced users of medical imaging devices increasingly to maintain existing machines, rather than replace them. As a result, the servicing aftermarket has expanded in size.

184.     The servicing aftermarket, parts market, and training market for Philips Manufactured Systems are each a national market.  Philips Manufactured System owners turn to providers nationwide for timely service that Philips and ISOs provide.

185.     In May 2015, in a case involving similar anticompetitive practices by OEM GE, a group of 14 ISOs brought an antitrust suit against GE alleging violations of Section 2 of the Sherman Act based on GE's exclusionary conduct in the relevant market for GE parts and GE training in order to monopolize the market for servicing GE case anesthesia machines.  *Red Lion Med. Safety Inc. v. General Electric Co.,* C.A. No. 15-308 (E.D. Tex.).  There, the jury found GE violated Section 2 of the Sherman Act through its exclusionary practices—that is, its refusal to sell GE parts and GE training to ISOs in order to monopolize the market for the servicing of GE gas anesthesia machines.  The District Court denied GE's post-trial motions seeking to set aside these findings as to unlawful monopolization.

186.     There are no legitimate economic or business justifications for Philips' policies and practices at issue.

## PHILIPS' LITIGATION CAMPAIGN AGAINST LEGITIMATE COMPETITION

187.     Philips has engaged in an abusive litigation campaign against its current and former ISO competitors including TEC for the purpose of injuring its market rivals without regard to the merits.  Thus, Philips' litigation is motivated by business goals that are anti-competitive.

188.     Philips has obtained monopoly power by wrongfully withholding critical information, parts, and training from competitors, including TEC, in the relevant service aftermarket for Philips Manufactured Systems.  Philips has abused that monopoly power by, among other things, fabricated claims that such information is protected intellectual property and baselessly

demanding excessive "damages," including punitive damages and injunctive relief, and attempted to justify its actions on baseless grounds.

189.    For example, by baselessly asserting "trade secret" protection over AIAT and other unprotected information that should be available to the industry, Philips has made litigation targets of every player in the aftermarket servicing of Philips Manufactured Systems.  Indeed, the Georgia court that presided over this case before transferring it to this district dismissed Philips' trade secret claims based on its "proprietary service manuals" ("PSMs").  Philips, however, sought, and was granted, leave to amend its claims to re-plead alleged trade secret claims based on purported "confidential business information and customer locations."  Doc. No. 135 at 17.

190.    Since then, Philips has pursued its purported trade secret claims based on the very materials that were excluded by the Georgia court.  Such actions show Philips' bad faith.

191.    Indeed, Philips' allegations in this case are inconsistent with federal regulations and with its own practices, including the unfettered dissemination of its supposed trade secrets to its customers.

192.    Philips has filed two additional related cases, pending in this Court, related to the same alleged conduct and overlapping claims against TEC employees.  *See also Philips, et al. v. Dorow and Griswold,* C.A. No. 19-272 (W.D.N.C.); *Philips, et al. v. Zimmerman,* C.A. No. 18-1836 (W.D.N.C.).   And Philips has brought similar cases against other competitors in the industry:  *Philips Med. Sys. Puerto Rico, Inc., et al v. Alpha Biomedical and Diagnostic Corp.,* Case No: 3:19-cv-01488-CCC (D.P.R.); *Philips Med Sys. (Cleveland), Inc. et al v. Buan et al.,* Case No: 1:19-cv-02648 (N.D. Ill.); *Philips N. Am. LLC et al v. 626 Holdings, Inc. et al.,* Case No: 9:19-cv-81263 RS (S.D. Fla.); *Philips N. Am LLC et al. v. Summit Imaging Inc., et al.,* Case No. 19-1745 (W.D. Wash.); *Philips, et al. v. Zetta Med. Techs. LLC, et al,* C.A. No. 17-3425

(N.D. Ill.); *Philips v. GIS Partners Corp., et al,* No. 15-2702 (D.P.R.).

193.    Philips' trade secret allegations against TEC and others encompass trade secret claims premised on allegedly proprietary service manuals ("PSMs") that implicate AIAT and other unprotected materials.   Philips' trade secret allegations also encompass trade secret claims premised on diagnostic manuals and related tools and software that implicate AIAT and other unprotected materials.   Thus, Philips' trade secret and access restriction claims against TEC and others baselessly seek to restrict access to information and materials that are not confidential and/or not trade secret and are already widely available to the industry.   Philips seeks to unfairly and deceptively limit access, information, training, tools, and other materials necessary to perform required maintenance and service to Philips imaging devices contrary to applicable laws, regulations, and legitimate industry practice.

194.    Philips knew or should have known its allegations and litigation campaign is frivolous and malicious.

195.    Such a litigation campaign is part of Philips' overall anticompetitive scheme that produces anticompetitive harm, including by causing injury to TEC such as having to defend this and related lawsuits brought against its employees.

196.    For example, Philips' pursues baseless claims because AIAT and other unprotected information and software cannot be protected by trade secret, as Philips is well aware. Philips is further aware that if information cannot be protected by trade secret law, it does not matter how such information may have been obtained.   Further, because the information and software necessary to service and maintain Philips Manufactured Systems should be made available to ISOs, including TEC, any purported circumvention cannot be without authorization.   Indeed, any use

such materials with the Philips Manufactured System at hospitals or medical centers is both licensed to the owners and authorized to be serviced by third parties.

197.     Philips has engaged in such conduct for the purpose of extracting unjustified monies from its competitors and for the purpose of harming its competition in the relevant service market.

## COUNT I – MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ANTITRUST ACT (15 U.S.C. § 2)

198.     TEC repeats and realleges the preceding paragraphs of its Counterclaims as if fully set forth herein.

199.     TEC brings this counterclaim against Philips under Section 2 of the Sherman Antitrust Act for its unlawful monopolization of the aftermarket for servicing of Philips Manufactured Systems.  The relevant market is the aftermarket service market for Philips medical imaging devices in the United States.

200.     Purchasers of Philips Manufactured Systems require maintenance services.  The provision of maintenance services for Philips Manufactured Systems within the United States that are out of warranty constitutes a relevant market (the "service aftermarket").  Maintenance services to customers who have already purchased a Philips Manufactured System are not interchangeable with other aftermarket services.  The high capital costs, expected duration, and high switching costs associated with a Philips Manufactured System locks in a customer to the maintenance needed for that particular system.  In addition, ISOs must use Philips software and specialized parts and there is a lack of availability for alternative or interchangeable parts and software.

201.     ISOs that service Philips equipment need Philips-specific parts, tools, information, and training to effectively carry out necessary repair and servicing work on Philips medical imaging devices.  Non-Philips-specific parts, tools, information, and training are neither technical nor economic substitutes.  Accordingly, a small but significant and non-transitory increase in the price

of aftermarket services for Philips medical imaging devices would not lead Philips medical device customers to switch to non-Philips medical imaging devices.

202.    Price increases for aftermarket services for Philips medical imaging devices are not restrained by aftermarket services for other types of medical imaging devices, in part, because a significant portion of the consumers in the primary market are locked into Philips devices and the associated aftermarket services, respectively.  In other words, over the life of the Philips device, buyers of Philips devices are not able to switch to alternative medical imaging devices in response to supra-competitive prices in the relevant aftermarket.

203.    This lock-in effect is the product of both limited life-cycle cost information available to consumers in the primary market and ISOs in the relevant aftermarket and, also, of Philips' exclusionary conduct with respect to the aftermarket.  By failing to provide the necessary aftermarket information, Philips has not provided the required parts, tools, information, and training necessary to TEC and other ISOs while also providing misinformation to consumers in the primary market that there would be sufficient competition in the relevant aftermarket to restrain prices during the life of the Philips medical imaging devices.

204.    By its acts, practices, and conduct, Philips has unlawfully monopolized the relevant market for sale of servicing for Philips Manufactured Systems in the aftermarket.

205.    Philips has monopoly power in the relevant market—it is the sole supplier in the market of essential parts and training, and has the power to charge supra-competitive prices. Indeed, Philips enjoys a dominant share that is approximately (and likely in excess of) 70% of the service aftermarket. Philips has monopoly power to raise prices above competitive levels and to exclude competition by restricting the entry of new competitors or by driving existing competitors out of the service aftermarket.

206. Philips has used its monopoly power in the relevant markets for Philips parts and Philips training to unlawfully acquire and maintain monopoly power and monopoly pricing in the relevant marketing for servicing of Philips Manufactured Systems. Instead of offering access to all of the necessary parts, tools, information, and training, Philips made demands to TEC that were exclusionary, anticompetitive, unfair, unreasonable, and contrary to its legal obligations.

207. Philips imposes contractual restrictions on its customers in order to hamper the service aftermarket, including preventing access or reverse engineering required to perform necessary repair and servicing of Philips Manufactured Systems.

208. Philips imposes unjustified burdens on the ISO industry, including TEC, by prosecuting sham litigation for the purpose of suppressing legitimate competition in the service aftermarket.

209. Philips exclusionary and anticompetitive conduct has resulted in artificially high or otherwise supracompetitive prices charged by Philips for servicing of Philips Manufactured Systems. Hospitals and medical centers pay more for servicing Philips Manufactured Systems than they otherwise would have paid in a competitive marketplace.

210. As a direct and proximate result of Philips' unlawful monopolization and exclusionary conduct, TEC has suffered actual injury and damages to its business and property in the form of the loss of customers and former potential customers, as well as the loss of business reputation and goodwill.

211. In addition to the harm to TEC, consumers of Philips medical imaging devices are injured and threatened with further injury from Philips' unlawful monopolization because it has the effect of raising the cost of aftermarket service for Philips medical imaging devices. The

unlawful conduct of Philips relating to federally-mandated aftermarket services reduces and impedes competition.

212.     These injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Philips' conduct unlawful.

213.     Accordingly, TEC seeks damages, to be trebled pursuant to federal antitrust law, and costs of suit, including reasonable attorneys' fees.

## COUNT II - ATTEMPTED MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ANTITRUST ACT (15 U.S.C. § 2)

214.     TEC repeats and re-alleges the preceding paragraphs of its Counterclaims as if fully set forth herein.

215.     Philips specifically intended to monopolize the market for servicing of Philips Manufactured Systems.

216.     Philips' anticompetitive and exclusionary conduct, which restrained trade and competition in the aftermarket for servicing Philips Manufactured Systems, constitutes an improper attempt to use its monopoly power in the relevant markets for Philips Parts and Philips Training for the specific purpose of attempting to monopolize the aftermarket for servicing of Philips Manufactured Systems.

217.     In furtherance of this attempt, Philips has engaged in anticompetitive and exclusionary conduct, as alleged herein, to stifle competition in the aftermarket for servicing of Philips Manufactured Systems.

218.     If Philips has not already acquired monopoly power in the service aftermarket, then there is a dangerous probability of its achieving monopoly power as a result of the anticompetitive and exclusionary conduct described above.

219.    Philips engaged in the exclusionary conduct alleged above with specific intent to monopolize the service aftermarket.

220.    Philips' anticompetitive and exclusionary conduct has decreased price competition in the aftermarket for servicing Philips Manufactured Systems and deprived purchasers of free choice.  Philips profited, and continues to profit, from its unlawful conduct to the detriment of purchasers.

221.    As a result of Philips' exclusionary conduct, and specific intent to monopolize, Philips has substantially harmed competition and caused antitrust injury, and TEC has suffered damages to its business or property.

222.    There are no legitimate business or pro-competitive justifications for Philips' conduct, and any purported legitimate business justifications are mere pretexts.  Even if any justifications exist, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

223.    If not enjoined, Philips will continue to engage in anticompetitive and exclusionary conduct that will further injure TEC, other ISOs, and competition.

224.    As a direct, substantial, proximate and immediate result of Philips' attempt to monopolize the aftermarket for servicing of Philips Manufactured Systems, TEC has been injured in its business and trade in an amount to be established at trial.

### COUNT III – VIOLATION OF NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT (N.C. Gen. Stat. § 75-1.1, *et seq.*)

225.    TEC repeats and re-alleges the preceding paragraphs of its Counterclaims as if fully set forth herein.

226.     Philips' actions as described above constitute unfair or deceptive acts or practices and/or an unfair method of competition in violation of N.C. Gen. Stat. § 75-1.1, *et seq*.

227.     The UDTPA provides that "[i]f any person shall be injured or the business of any person . . . injured by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter, such person . . . so injured shall have a right of action on account of such injury done, and if damages are assessed in such case judgment shall be rendered in favor of the plaintiff and against the defendant for treble the amount fixed by the verdicts." N.C. Gen. Stat. § 75-16.

228.     Philips' conduct as described herein including, but not limited to, denial of access to necessary service and maintenance-related information, refusal to provide essential parts and training, failing to properly inform purchasers of Philips Manufactured Systems that Philips will not provide information necessary to service those systems to the purchaser or third-parties, and making false statements about TEC's capabilities, are unfair and deceptive practices within the meaning of N.C. Gen. Stat. § 75-1.1, *et seq*.

229.     It is bad faith for Philips to, among other things, prevent timely and effective ISO servicing by withholding Necessary Information, including, but not limited to, access, information and parts required for federally-mandated AIAT service (*e.g.*, access keys, manuals, software, training, part, and service keys); and assert trade secret protection over materials that should be and/or have been made available without restriction to TEC and other third parties in the service aftermarket for Philips medical imaging devices.

230.     For example, TEC relied on the availability of many book boxes, including user manuals and service manuals and other materials made available by Philips, only to now, through its later actions including this litigation, learn that Philips has changed course and seeks to limit or

prohibit such use and access of materials and tools already made available without restriction. Such actions and representations amount to an unfair and deceptive trade practice.

231.    TEC detrimentally relied on the unrestricted availability of the materials made available through InCenter without further restriction that were accessible using Philips-issued log in credentials and/or access keys.  Once accessed, those documents were unrestricted and were able to be printed or locally saved without encryption or restriction.  Given Philips' pivot to now claiming trade secret protection over materials made available using credentials that Philips issued, such representations amount to an unfair and deceptive trade practice.

232.    Philips also engaged in unfair and deceptive trade practices by preventing the servicing of Philips Manufactured Systems by failing or delaying to set, refusing to set, or modifying cath lab SOIDs, which leads to loss of business.

233.    By way of further example, Philips also engaged in unfair and deceptive trade practices by informing customers that the servicing of certain Philips Manufactured Systems was to be performed only by authorized or certified personnel but refusing to provide requested training and information to TEC related to these systems, and by failing to properly inform purchasers of Philips Manufactured Systems that Philips will not provide information necessary to service those systems to the purchaser or third-parties.

234.    As described above, these practices and actions, among others, are immoral, unethical, oppressive, unscrupulous, substantially injurious to consumers, and have a tendency to deceive.   There is no valid business justification for Philips' extensive misconduct that substantially affects commerce in the market for aftermarket maintenance services for Philips manufactured imaging devices.

235.    Such actions by Philips were and in or affecting commerce, and proximately caused actual injury to TEC, a company with operations in North Carolina.  For example, Philips' actions impacted TEC's ability to provide essential maintenance service to customers, including where there is a critical health and safety need, and otherwise maximize its revenue generation.

236.    Philips' improper conduct described above gives it an unfair competitive advantage in the service aftermarket and makes it substantially more difficult for TEC and other ISOs to compete effectively in the service aftermarket.

237.    There is no valid business justification for Philips's conduct.  For example, the Necessary Information and other unprotected service and maintenance information is not trade secret or proprietary information entitled to protection.

238.    As a result of Philips' conduct, TEC suffered damage and loss of business.

239.    TEC is entitled to damages, including treble damages, in an amount to be proven at trial, as well as TEC's reasonable attorneys' fees and costs.

240.    Philips' unfair and deceptive acts or practices have damaged TEC and constitute a violation of N.C. Gen. Stat. § 75-1.1, *et seq*., as a result of which TEC seeks an award of compensatory damages in excess of $75,000, treble damages, and costs and attorneys' fees pursuant to, without limitation, N.C. Gen. Stat. §§ 75-16 and 75-16.1, *et seq*., and other applicable law.

## COUNT IV – TORTIOUS INTERFERENCE WITH CONTRACT

241.    TEC repeats and re-alleges the preceding paragraphs of its Counterclaims as if fully set forth herein.

242.    TEC had service contracts with its customers to service Philips imaging devices owned by the customers.

243. Pursuant to the service contracts, the owners contract with TEC to provide servicing to Philips Manufactured Systems.

244. Philips is a stranger to the service contracts between TEC and its customers.

245. Philips is aware of the identity of TEC's service customers that own Philips manufactured imaging devices.

246. Without justification or privilege, upon information and belief, Philips intentionally contacted TEC's customers and induced certain TEC customers not to perform the service contracts, which damaged TEC.

247. Philips has acted intentionally and with malice to injure TEC by inducing TEC's customers not to perform the service contracts.

248. TEC is entitled to an award of damages, including punitive damages, and reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Defendant TEC Equipment Company, Inc. prays that this Court:

1. Dismiss each of Plaintiffs' claims with prejudice;

2. Enter judgment in TEC's favor and against Plaintiffs on all of Plaintiffs' claims such that Plaintiffs have and recover nothing from TEC;

3. Deny Plaintiffs' request for injunctive relief;

4. Enter judgment in favor of TEC and against Philips on all of TEC's counterclaims;

5. Award TEC its actual damages in an amount to be determined at trial;

6. Adjudge and decree that Plaintiffs' conduct as alleged and described herein is unlawful and in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

7. Permanently enjoin and restrain Philips, its subsidiaries, affiliates, successors, transferees, assignees and their respective officers, directors, partners, agents, and employees and all

104

other persons acting or claiming to act on their behalf, from continuing the anticompetitive, exclusionary, and wrongful conduct alleged herein, pursuant to 15 U.S.C. § 26;

8.  Award TEC treble damages, pursuant to N.C. Gen. Stat. § 75-16;

9.  Award TEC its attorneys' fees, pursuant to N.C. Gen. Stat. § 75-16.1, and as otherwise allowed by law;

10. Award TEC treble damages, pursuant to 15 U.S.C. § 15;

11. Award TEC prejudgment interest and its attorneys' fees and other costs of litigation, pursuant to 15 U.S.C. § 15;

12. Award TEC punitive damages pursuant to N.C. Gen. Stat. § 1D-1, *et seq*.;

13. Tax the costs of this action against Plaintiffs as allowed by applicable law; and

14. Grant such other and further relief as this Court in its judgment deems just and proper.

### REQUEST FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, TEC requests a trial by jury on all triable issues.

Respectfully Submitted, this the 30th day of April, 2020.

*/s/ J. Christopher Jackson*
J. Christopher Jackson
N.C. State Bar No. 26916
cjackson@morningstarlagroup.com
John T. Kivus
N.C. State Bar No. 42977
jkivus@morningstarlawgroup.com
**MORNINGSTAR LAW GROUP**
421 Fayetteville Street, Suite 530
Raleigh, NC 27601
Telephone: (919) 829-4974
Facsimile: (919) 882-8890

Harrison M. Gates
N.C. State Bar No. 43793
hgates@morningstarlawgroup.com
**MORNINGSTAR LAW GROUP**
112 W. Main Street, Second Floor
Durham, NC 27701
Telephone:  (919) 590-0364
Facsimile:  (919) 882-8890

*Attorneys for Defendant TEC Holdings, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on April 30, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record in this matter.

/s/ J. Christopher Jackson
J. Christopher Jackson
N.C. State Bar No. 26916

*Attorneys for Defendant TEC Holdings, Inc.*