## IN THE UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF NORTH CAROLINA

PHILIPS MEDICAL SYSTEMS NEDERLAND B.V.; PHILIPS NORTH AMERICA LLC; and PHILIPS INDIA LTD.,

                    Plaintiffs,

      v.

TEC HOLDINGS, INC., F/K/A TRANSTATE EQUIPMENT COMPANY, INC., TRANSTATE EQUIPMENT COMPANY, INC., F/K/A TRANSTATE HOLDINGS, INC., and ROBERT A. ("ANDY") WHEELER, individually and in his capacity as executor and personal representative of the Estate of DANIEL WHEELER,

                    Defendants.

**Civil Action No.
3:20-cv-00021-MOC-DCK**

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Public Redacted Version. Redactions have been made to seal information Plaintiff contends is confidential. Defendants do not waive the right to contest that the redacted information is confidential.

White Redactions = Redactions proposed by Defendants
Red Redactions = Redactions requested by Plaintiffs

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

STATEMENT OF MATERIAL FACTS ............................................................................ 2

    I.    Philips Views ISOs As a Competitive Threat.......................................................... 2

    II.    Philips Has Engaged in Conduct Injuring Defendants, Competition, and Patients.................................................................................................................... 2

        A.    Customers Cannot—and Do Not—Easily Switch OEM Imaging Systems ...................................................................................................... 4

        B.    Philips Controls the Parts Market ............................................................... 5

    III.    Availability of and Access to Philips' CSIP Materials is a Significant Problem................................................................................................................... 6

    IV.    Philips also Uses TPMs to Hinder ISOs' Ability to Properly Service Its Machines................................................................................................................. 8

    V.    Defendants' Access to and Service of Philips' Products Is Authorized ................ 9

        A.    Philips' Interference With Third-Party Repairs........................................ 10

        B.    Philips Deceived Customers and Disparaged ISO Services. .................... 10

ARGUMENT ..................................................................................................................... 11

    I.    PHILIPS' AGGREGATE CONDUCT SHOWS ANTICOMPETITIVE INTENT. ............................................................................................................... 11

    II.    FACTUAL DISPUTES EXIST ON DEFENDANTS COUNTERCLAIMS. .......................................................................................... 12

        A.    Genuine Disputes of Fact Exist as to Whether Philips' Unfair, Deceptive, and Anticompetitive Conduct Violated the NCUDTPA. ....... 12

            1.    Philips' Conduct Was Egregious. ................................................. 13

            2.    Philips Inequitably Asserted Its OEM Power to Deceive Customers. ...................................................................................... 14

        B.    A Genuine Dispute Material of Fact Exists as to Defendants' Counterclaims under Section 2 of the Sherman Act. .............................. 16

            1.    Material Factual Disputes Exists on Relevant Market................. 17

                a.    The Parties Dispute Market Definition. ........................... 17

i

b. The Parties Dispute Whether Philips Has Monopoly or Market Power in the Relevant Markets. ....................... 18

c. Post-Warranty Service Aftermarket ("Service Market"). ............................................................. 19

d. Customers Are "Locked In" to Philips' Systems.............. 20

e. Consumers Cannot Acquire Information on Lifecycle Maintenance and Service Costs. ....................... 21

f. Philips' Actions Prevent Customers from Assessing TCO.................................................................. 22

g. Philips Has Monopoly Power in the Parts Market............ 23

h. Philips has Market Power in the Training Market. ........... 24

2. Fact Issues Exist Regarding the Injury Caused By Philips........... 24

3. Fact Issues Exist as to Whether Philips Denied Essential Facilities. ................................................................. 27

a. The Parties Dispute Whether Philips Had a Duty to Deal With Defendants in the Used and New Parts Market. ............................................................. 28

b. Fact Issues Exist As to Whether Philips Denied Access to Essential Facilities. ............................................ 29

C. There Is a Genuine Dispute of Material Fact on Transtate's Tortious Interference Claims. ................................................. 30

III. DEFENDANTS' COUNTERCLAIMS AND DEFENSES ARE NOT PRECLUDED. ................................................................. 30

A. Defendants Claims Exceed Philips' Failure to Provide AIAT Information ......................................................... 30

IV. PHILIPS IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS CLAIMS. ................................................................. 32

A. Philips Cannot Show that Defendants Violated § 1201 of the DMCA. ................................................................. 32

1. Philips Has Not Shown the Copyright Act Protects Any Work at Issue. ........................................................... 32

2. Philips Did Not "Effectively Control" Access............................. 33

B.    Defendants Have Not Violated the CFAA....................................................... 35

       1.    Defendants' Access Was Authorized.............................................. 35

       2.    Philips Cannot Prove CFAA "Damages" or "Loss."..................... 38

CONCLUSION............................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.J. Buck & Son, Inc. v. Merck & Co.*,
    No. CIV. A. HAR 94-2721, 1995 WL 131148 (D. Md. Feb. 7, 1995)....................................26

*Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*,
    910 F.2d 139 (4th Cir. 1990) ........................................................................................26

*Ameritox, Ltd. v. Millennium Lab'ys, Inc.*,
    No. 8:11-CV-775-T-24-TBM, 2014 WL 12795383 (M.D. Fla. May 6, 2014) ......................15

*AtPac, Inc. v. Aptitude Solutions., Inc.*,
    730 F. Supp. 2d 1174 (E.D. Cal. 2010)..........................................................................36, 37

*Bell Atl. Corp. v. AT&T Corp.*,
    339 F.3d 294 (5th Cir. 2003) ........................................................................................16

*Brodksy, v. Apple, Inc.*,
    445 F. Supp. 3d 110 (N.C. Cal. 2020) ..........................................................................36

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993)......................................................................................................25

*Brown Jordan Int'l, Inc. v. Carmicle*,
    846 F.3d 1167 (11th Cir. 2017) ....................................................................................38

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962)......................................................................................................17

*Chessie Logistics Co. LLC v. Krinos Holdings, Inc.*,
    No. 13 C 8864, 2016 WL 7034101 (N.D. Ill. Dec. 2, 2016) ..................................31

*City of Mishawaka, Ind. v. American Elec. Power Co.*,
    616 F.2d 976 (7th Cir. 1980), *cert. denied*, 449 U.S. 1096 (1981)........................11

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962)......................................................................................................11

*Dickson v. Microsoft Corp.*,
    309 F.3d 193 (4th Cir. 2002) ........................................................................................16

*Dig. Drilling Sata Sys., LLC v. Petrolink Servs.*,
    965 F.3d 365 (5th Cir. 2020) ..............................................................................33, 34, 35

iv

*DocMagic, Inc. v. Ellie Mae, Inc.*,
745 F. Supp. 2d 1119 (N.D. Cal. 2010) .............................................................27

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
637 F.3d 435 (4th Cir. 2011) ...........................................................................16

*Eastman Kodak Co. v. Image Technical Servs., Inc.*,
504 U.S. 451 (1992) ....................................................................16, 20, 29, 30

*Epic Sys. Corp. v. Tata Consultancy Servs.*,
2015 U.S. Dist. LEXIS 155713 (W.D. Wis. Nov. 18, 2015) ................................38

*F.D.I.C. v. Stovall*,
No. 2:14-CV-00029-WCO, 2014 WL 8251465 (N.D. Ga. Oct. 2, 2014) .............31

*F.T.C. v. Indiana Fed'n of Dentists*,
476 U.S. 447 (1986) .........................................................................................23

*Facebook, Inc. v. Power Ventures, Inc.*,
844 F.3d 1058 (9th Cir. 2016) .........................................................................37

*General United Co. v. Am. Honda Motor Co.*,
618 F. Supp. 1452 (W.D.N.C. 1985) .................................................................12

*Harley Auto. Group, Inc. v. AP Supply, Inc.*,
2013 U.S. Dist. LEXIS 179626 ...................................................................38, 39

*Hyundai Motor Am., Inc. v. Direct Techs. Int'l, Inc.*,
No. 3:17-CV-732-MOC-DSC, 2018 WL 4110544 (W.D.N.C. Aug. 29, 2018) ......12

*In re Aggrenox Antitrust Litig.*,
199 F. Supp. 3d 662 (D. Conn. 2016) ...............................................................19

*In re Brand Name Prescription Drugs Antitrust Litig.*,
123 F.3d 599 (7th Cir. 1997), *cert. denied,* 118 S. Ct. 1178 (1998) .......................18

*In re Doubleclick Privacy Litig.*,
154 F. Supp. 2d 497 (S.D.N.Y. 2001) ...............................................................39

*In re Gabapentin Patent Litig.*,
649 F. Supp. 2d 340 (D.N.J. 2009) ...................................................................11

*Instant Tech., LLC v. Defazio*,
40 F. Supp. 3d 989 (N.D. Ill. 2014) ..................................................................38

*J. Truett Payne Co., v. Chrysler Motors Corp.*,
451 U.S. 557 (1981) .........................................................................................25

v

*Jaro Transp. Servs., Inc. v. Grandy*,
    No. 403-CV-01227, 2006 WL 2553424 (N.D. Ohio Sept. 5, 2006)......................................15

*Jarosch v. Am. Family Mut. Ins. Co.*,
    837 F. Supp. 2d 980 (E.D. Wis. 2011)............................................................................38, 39

*JCW Software, LLC v. Embroidme.com, Inc.*,
    No. 10-80472-CIV, 2012 WL 13015051 (S.D. Fla. May 29, 2012)................................34, 36

*L.C. Williams Oil Co. v. Exxon Corp.*,
    625 F. Supp. 477 (M.D.N.C. 1985) ..........................................................................11, 12, 15

*Legacy Data Access, LLC v. MediQuant, Inc.*,
    No. 3:15-cv-00584, 2017 WL 6001637 (W.D.N.C. Dec. 4, 2017)........................................30

*LendingTree, LLC v. Zillow, Inc.*,
    No. 3:10-CV-439-FDW-DCK, 2011 WL 13222698 (W.D.N.C. Nov. 4, 2011) ....................19

*LePage's Inc. v. 3M*,
    324 F.3d 141 (3d Cir. 2003).................................................................................................11

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    387 F.3d 522 (6th Cir. 2004) ...................................................................................33, 34, 35

*Loren Data Corp. v. GXS, Inc.*,
    501 F. App'x 275 (4th Cir. 2012) .......................................................................................27

*Lotus Develop. Corp. v. Borland Int'l., Inc.*,
    49 F.3d 807 (1st Cir. 1995), *aff'd*, 516 U.S. 233 (1996).......................................................33

*McInerney v. Pinehurst Area Realty, Inc.*,
    590 S.E.2d 313 (N.C. App. 2004) .......................................................................................12

*McLendon v. Carnival Corp.*,
    No. 20-cv-24939, 2021 WL 848945 (S.D. Fla. Mar. 5, 2021) ..............................................31

*Mintz v. Mark Bartelstein & Assocs.*,
    906 F. Supp. 2d 1107 (C.D. Cal. 2012) ...........................................................................38, 39

*Nexus Techs., Inc. v. Unlimited Power, Ltd.*,
    No. 1:19-CV-00009-MR, 2020 WL 6940505 (W.D.N.C. Nov. 25, 2020)............................12

*Oce N. Am., Inc. v. MCS Servs.*,
    748 F. Supp. 2d 481 (D. Md. 2010).....................................................................................37

*Ohio v. American Express Co.*,
    138 S. Ct. 2274 (2018).........................................................................................................18

*Petrie v. Virginia Bd. of Med.*,
   648 F. App'x 352 (4th Cir. 2016) ........................................................................27

*Powderly v. Blue Cross & Blue Shield of N. Carolina*,
   No. 3:08-CV-00109-W, 2008 WL 4129767 (W.D.N.C. Sept. 4, 2008) ................................19

*Psychas v. Dist. DOT*,
   2019 U.S. Dist. LEXIS 163397 (D.D.C. Sept. 24, 2019) ......................................36

*R. J. Reynolds Tobacco Co. v. Philip Morris, Inc.*,
   199 F. Supp. 2d 362 (M.D.N.C. 2002) ...............................................................15

*Red Arrow v. Pine Lake Preparatory, Inc. Bd. of Directors*,
   741 S.E.2d 511 (N.C. App. 2013) ......................................................................30

*Red Lion Med. Safety, Inc. v. Ohmeda, Inc.*,
   63 F. Supp. 2d 1218 (E.D. Cal. 1999) ...............................................16, 18, 27, 28

*SecureInfo Corp. v. Telos Corp.*,
   387 F. Supp. 2d 593 (E.D. Va. 2005) ................................................................37

*Swift & Co. v. United States*,
   196 U.S. 375 (1905) ..........................................................................................11

*TaiDoc Tech. Corp. v. OK Biotech Co.*,
   No. 12 CVS 20909, 2016 WL 1221425 (N.C. Super. Mar. 28, 2016) ...................30

*Tyco Int'l (U.S.), Inc. v. Does*,
   2003 U.S. Dist. LEXIS (S.D.N.Y. July 11, 2003) ..........................................38, 39

*United States v. American Tobacco Co.*,
   221 U.S. 106 (1911) ..........................................................................................11

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) ..........................................................................18

*United States v. Phillips*,
   477 F.3d 215 (5th Cir. 2007) ..........................................................................36

*Van Buren v. United States*,
   141 S. Ct. 1648 (2021) ..........................................................................36, 37, 39

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004) ..........................................................................................27

*Virtual Maint., Inc. v. Prime Computer, Inc.*,
   11 F.3d 660 (6th Cir. 1993) ..........................................................................18

vii

*Volk v. Zeanah*,
  2010 U.S. Dist. LEXIS 5621 (S.D. Ga. Jan. 25, 2010).....................................................38, 39

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012), *cert. denied*, 133 S. Ct. 2025 (2013)..................................11, 16

**Statutes**

17 United States Code
  § 1203...................................................................................................................................31
  § 102(b)............................................................................................................................32, 33
  § 103(b).................................................................................................................................33

18 United States Code
  § 1030(a), (e)(1), (8) & (11), (g)...............................................................................36, 38, 39

Digital Millennium Copyright Act
  § 1201............................................................................................................................32, 33, 35

Sherman Act
  § 2....................................................................................................................................16, 27

**Rules and Regulations**

21 Code of Federal Regulations
  § 1020.30(g), (h) ......................................................................................................................8

# INTRODUCTION

Philips moved for partial summary judgment ("MSJ") on all of Defendants' counterclaims and two of its affirmative claims. Summary judgment on Defendants' counterclaims should be denied because the record of Philips' pervasive and myriad unlawful conduct, including its baseless intellectual property claims, shows its specific intent and pervasive attempts to chill competition in North Carolina and nationally. For Philips' affirmative claims, Defendants' Summary Judgment Motion shows Philips fails to meet necessary elements of each claim.[1]

Philips seeks to limit the counterclaims to Philips' denials of essential (AIAT) information arguing they are precluded.[2] The record demonstrates Philips' ubiquitous unlawful, deceptive, unethical business dealings, commercial unfairness and anticompetitive practices. This conduct violates the North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA"), which does NOT require the elements that underlie Philips' Motion (*i.e.*, relevant markets, monopoly power, duties to deal)**.** In addition, the totality of *all* of Philips' unlawful, deceptive, and anticompetitive practices—including but separate from AIAT issues—sufficiently demonstrates Philips violated both the Sherman Act and the NCUDTPA.

In arguing its Digital Millennium Copyright Act ("DMCA") and the Computer Fraud and Abuse Act ("CFAA") claims, Philips essentially parrots the conclusory allegations in its Second Amended Complaint, misstates the applicable law and evidence, and fails to address required elements of its claims for which there is no evidentiary support in the record. Philips' DMCA claim

---

[1] ECF No. 384, at 14-20; 31-40.

[2] Notably, Philips' preclusion argument for Defendants' counterclaims is at odds with its position that its own claims—which are all centered on the scope of AIAT information—are not precluded. Defendants have filed a trade complaint with the FDA requesting a determination on the scope of AIAT material that Philips was and is required to provide to ISOs like Transtate. Contemporaneously with this Opposition, Defendants have alternatively filed a motion to stay this action until the FDA has made its determination.

1

fails because Philips has failed to identify any protected work that was accessed by Defendants. Philips' CFAA claim fails because Philips cannot establish that Defendants were not authorized to access customer computers or that Philips suffered any cognizable damage. The detailed record of Philips' misconduct—in its entirety—shows Philips' MSJ should be denied.

## STATEMENT OF MATERIAL FACTS

Philips asserts numerous "facts" disputed by Defendants and contradicted by the record.

### I. Philips Views ISOs As a Competitive Threat

During the current pandemic, these these systems have been critical to diagnoses and treatment of COVID-19.[3] Defendants repair those systems and sell refurbished and new parts for these systems.[4] As an original equipment manufacturer ("OEM"), Philips competes ISOs including Transtate to service Philips' systems after the warranty expires.[5] ISOs provide lower-priced, 24/7 services that increase access to vital healthcare.[6] The annual cost of a Philips' service contract is over ▮▮▮▮▮.[7]

### II. Philips Has Engaged in Conduct Injuring Defendants, Competition, and Patients

While Philips' service prices are significantly higher than ISOs,[8] Philips' service levels, including response times, are well-below its competitors,[9] sometimes intentionally. Philips deliberately delays service to ▮▮▮▮▮▮▮▮▮▮ Redacted by Plaintiffs ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ as a North Carolina field service engineer was told by his superiors.[10] Egregiously, **Philips**

---

[3] Ex. 1; Ex. 4.
[4] Ex. 3, 102:10-108:10; 116:1-9.
[5] In 2017, Philips identified Transtate as successfully competing against Philips to service Philips' systems. Ex. 5
[6] Defs. Br. at 2 ¶ 2.
[7] Pl. Br., at Ex. H.
[8] *See* Ex. 6, ¶ 4; Ex. 7, at 4.
[9] Ex. 8, ¶ 16.
[10] Ex. 9, 142:18-151:04; Ex. 10, 96:01-96:16.

2

delayed ███████ Redacted by Plaintiffs ███████ **because the hospital didn't have a contract.[11]** This coerces hospitals into entering Philips' expensive service contracts[12]—at the cost of patient safety—while excluding ISO competition.

Additionally, Philips artificially shortens its systems' useful life. For example, in 2017, Philips restricted its systems' end of life ("EOL") to 8 years, despite data showing an EOL of 10 years or more, ██ ███████ Redacted by Plaintiffs ███████ ████ and ███████ Redacted by Plaintiffs ███████ ██████████████ . Philips feared third parties' access to lightly-used parts ███████ Redacted by Plaintiffs ███████ ██████[13] Philips has continued to prey upon its own customers to extract profits and prevent competition.[14] Philips also raised its rivals' costs by increasing the trade-in value of used Philips' systems and parts, which effectively became the cost of the used part.[15] Philips also mandated only new parts could be used in Philips' non-EOL machines,[16] even though it refuses to use new parts in EOL or EOS machines.

Additionally, Philips told customers that they needed Philips-trained engineers to service their machines before receiving the access to service tools and information for which they paid.[17] But per an "ongoing policy," Philips refuses essential service training to Defendants and other

---

[11] Ex. 81; *see also* Ex. 6; Ex. 8, ¶ 16.
[12] Exs. 11-13; Ex. 14, 58:21-59:24; Ex. 9, 142:18-151:04; Ex. 10, 98:24 – 99:01
[13] For example, Exs. 15-16; Ex. 17 at 10; Ex. 18.
[14] Exs. 15, 18-19; *see also* Ex. 79-80.
[15] *See* Ex. 20, 165:7-20 ███████ Redacted by Plaintiffs ███████ ████████████████████████████████
[16] Ex. 92 ███████ Redacted by Plaintiffs ███████
[17] Ex. 69, 139:5-140:3 and at Ex. 35; Ex. 70, 155:3-22; Ex. 71, at Ex. 12, at Philips_TEC0108971-Philips_TEC0108972.

3

ISOs, despite Defendants' offers to pay or to enter service contracts.[18]  Philips provides training only by non-disclosure agreements, and only to specifically-designated in-house biomeds employed by purchasers of Philips' "first-look" service contracts.[19]

### A.     Customers Cannot—and Do Not—Easily Switch OEM Imaging Systems

Philips argues that customers who are dissatisfied with its poor service can simply switch to a different OEM's imaging systems.[20]  In reality purchasers of these capital-intensive, long-lived systems are "locked in" to Philips' services, despite Philips' high prices, slow service, and information restrictions.[21]  A new system can cost <span>Redacted by Defendants</span> plus significant installation, renovation, and training costs.[22]  They require specially-configured secured rooms—<u>which are unique to each OEM</u>—and complex system integration.[23]  Regulatory barriers also exist: for example, North Carolina medical facilities must obtain State approval to replace or upgrade their systems.[24]  Defendants' economic expert interviewed customers who affirmed that due to the "absurdly high" cost, no customer would respond to dissatisfaction with Philips' services by removing a Philips system before its end-of-life to replace it with another OEM's system; and no one had ever heard of this.[25]

---

[18] Transtate Ans. to Sec. Am. Compl. [ECF No. 274] ¶ 167; Ex. 69, 38:21-40:5, 115:16-116:20, and at Ex. 24.

[19] Ex. 32, 88:6-9 <span>Redacted by Plaintiffs</span>

[20] Pls. Mot. for Partial Summ. J. 9-10 [ECF No. 380] ("Pl. Br."); *see, e.g.*, Pl. Br., at Ex. AA at 8, 11, 40.

[21] Ex. 21; Ex. 20, 111:23-114:9.

[22] Ex. 22, ¶¶ 9-10 <span>Redacted by Defendants</span>).

[23] Ex. 22, ¶¶9-10.

[24] *See* Ex. 25.

[25] Ex. 20, 111:23-114:9. Philips points to one customer, Piedmont Healthcare, who switched away from Philips; they claim this shows bad service is fixed by different equipment. But Piedmont decided to switch in 2011 due to its standardization process for replacing equipment (usually after 10-12 years). Ex. 22, ¶¶ 7-11, 14. In 2020, Piedmont only agreed to buy Philips devices after "a great deal of negotiation" for special service. *Id.* ¶ 12 (**"it is unlikely smaller hospital systems would have our volume to extract similar deals."**) (emphasis added).

4

## B. Philips Controls the Parts Market

Philips makes 100% of all the parts for its imaging systems.[26] Because Philips' new parts are expensive, Transtate and other ISOs utilize used parts derived from buying, cannibalizing, or reconditioning equipment.[27] Philips also buys, reconditions, and sells used parts for a premium.[28] Starting in 2012, Philips began a campaign to buy up the available supply of used parts and remove them from the market.[29] This increased Philips' control over prices of new and used parts, and increased competitors' costs for used parts.



First, Philips **[Redacted by Plaintiffs]** [30]

Second, as the OEM, Philips applied a "certified service parts" mark to its used parts so that **[Redacted by Plaintiffs]**, so **[Redacted by Plaintiffs]** [31]

Third, Philips seized an anticipated **[Redacted by Defendants]** Opportunity" to crush **[Redacted by Plaintiffs]** in the **[Redacted by Plaintiffs]** market: "**[Redacted by Plaintiffs]**", giving its subsidiary AllParts "**[Redacted by Plaintiffs]**"; recycling parts not selected for refurbishing; and using Philips' engineers for deinstallation jobs rather than third parties.[32] As Philips' board chairman noted in 2018: "Closing

---

[26] Ex. 26, 155:12-155:16.
[27] Ex. 20, 168:23-25-169:5; Ex. 68, 38:1-39:7, 42:3-43:11; Ex. 90, ¶ 6; *see* Ex. 77.
[28] *See generally* Ex. 77.
[29] Ex. 27; *see also* Ex. 28, at 9; Ex. 17 ("**[Redacted by Plaintiffs]**"); Ex. 29; Ex. 77 ¶¶ 4-7.
[30] Ex. 27; *see also* Ex. 77, ¶¶ 4-7.
[31] Ex. 27; *see also* Ex. 22, ¶ 20.
[32] Ex. 29.

5

the loop is good business because I don't want our medical equipment to fall in the hands of third parties who then cannibalize the systems and destroy my spare parts business. So it is actually— it makes eminent sense to do this and close that loop for 100%, which we have committed to do."[33] Philips augmented this removal of used equipment and reduction in available used parts by increasing trade-in value for used Philips machines, raising third-party costs.[34]

In March 2020, Philips refused to sell used parts to ISOs.[35] Philips also refuses to install any part from a non-Philips source, *even if* it is a Philips-branded used part from a third-party; this drives up costs and delays repairs because Philips only sells brand-new parts at a premium, for far more than used parts sold by reputable third parties.[36] Additionally, Philips appointed it subsidiary AllParts as the sole seller of its parts: but AllParts does not keep a full inventory of new parts (for ISOs and customers' purchase) or of used parts (for customers).[37] For both new and used parts, this increased prices and slowed fulfillment of orders (and thus repairs).[38] Philips also reached agreements with suppliers to cut off rivals from essential parts,[39] impacting competition.

## III.    Availability of and Access to Philips' CSIP Materials is a Significant Problem

Philips is required by law to provide "adequate" access to information for the assembly, installation, adjustment and testing ("AIAT") of its cath lab systems and other radiation emitting devices, to third parties, including ISOs that perform essential services on the machines, in order to meet federal performance and compatibility standards.[40] Philips designates its service software,

---

[33] Pl. Br., Ex. A, at 24 n.147; *see* Ex. 20, 169:9-18.
[34] Ex. 30, at 9; Ex. 77 ¶ 7.
[35] Transtate Ans. to Sec. Am. Compl. [ECF No. 274] ¶ 159; *see* Ex. 22, ¶ 20; Ex. 77, ¶¶ 4-7, 9-12.
[36] Ex. 22, ¶ 20 (third parties charge "a fraction of the price" of new parts).
[37] Ex. 77, ¶¶ 4-7 (Philips/AllParts policy change increased parts costs), ¶¶ 9-12 (Philips/AllParts policy changes prevent Defendants from purchasing parts); Ex. 26, 194:1-12.
[38] Ex. 21, at 22; Ex. 26, 141:13-21 (more supply of used parts would lead to lower prices); *see generally* Ex. 77.
[39] Ex. 31 (██████████ Redacted by Plaintiffs ██████████); *see* Ex. 26, 194:1-12.
[40] Defs. Br. 3, at ¶ 4; Pl. Br. 8.

6

documentation, training materials, and other materials as "CSIP" and assigns "Levels" corresponding to access.[41] Philips designates "Level 0," or what it unilaterially deems "AIAT," access for information that it claims it is required to disclose by the FDA, and limits ISOs, including Defendants, only to Level 0 CSIP access.[42]

Philips refuses to provide access to or license necessary servicing information. Philips claims Level 0 CSIP materials are available to anyone who requests access, including Transtate and all ISOs.[43] But customers and ISOs must request access to even Level 0 CSIP information from Philips and do not receive it in a timely, unhindered manner, or in some cases, at all.[44] Philips regularly denies access to Level 0 CSIP materials, including but not limited to: (i) revoking access to useful manuals and tools that third parties relied on for years,[45] claiming they were shared "in error"[46] or were "proprietary IP";[47] (ii) providing outdated information;[48] (iii) giving updated information only to Contract Customers;[49] (iv) effectively making access unavailable to competitors;[50] (v) arbitrarily changing ISOs' access levels.[51] Philips' Level 0 CSIP materials also do not include access to all materials the law authorizes Defendants to access and use, including

---

[41] Defs. Br. 4, at ¶ 11-12.
[42] Defs. Br. 3, at ¶ 12 & 5 at ¶ 15.
[43] Defs. Br. 1; Pl. Br. 5.
[44] Ex. 32, 59:4-9; Ex. 3, 112:6-113:10 ; Ex. 70, 90:21-92 :15, 147:20-149:12, and at Exs. 1, 6 ; Ex. 71 161:17-163:2, and at Ex. 16.
[45] Ex. 33; Ex. 34.
[46] Defs. Br., at Ex. 33 ██████████ Redacted by Plaintiffs ██████████ ██████████.
[47] Ex. 35.
[48] Ex. 36.
[49] Ex. 37; Ex. 36.
[50] Ex. 39, ¶¶ 10-11.; Ex. 40-41 ; Ex. 43 ¶ 9.
[51] Transtate Ans. to Sec. Am. Compl. [ECF 274] ¶ 87; TEC Ans. to Sec. Am. Compl. [ECF No. 275] ¶ 88; Ex. 51 (from ISO Frontier Imaging Services); Ex. 59, 160:20-161:18, 162:21-163:24; Ex. 78, 77:16-79:08 (actual access may not correspond to access level on document's face); Ex. 91, 81:7-82:6; 82:11-82.22; 279:21-280:11.

7

those identified in Philips' own AIAT manuals.[52]

Even to set up Level 0 access, Philips reaps millions of dollars in fees[53] and labor for "no regulatory reason."[54] These exceeded its costs of providing access (violating its obligations under 21 CFR 1020.30(g), (h)).[55] Philips also derived "substantial fees" of at least ████████ from "licensing" Level 0 information.[56] Philips' CSIP denials are calculated business decisions that often create delays and compromise patient safety.[57] For example, without warning, Philips removed an ISO's access to all instructions for *all* cardiovascular systems.[58]

Facing revenue pressures from servicing rivals, Philips wields its CSIP in an attempt to justify technological lockouts to life saving equipment they do not own.[59] Philips explicitly recognizes the anticompetitive nature of its CSIP access denials;[60] its CSIP access guidelines even list elements of a competition law claim.[61]

## IV. Philips also Uses TPMs to Hinder ISOs' Ability to Properly Service Its Machines

Philips' attempted use of restrictive technological protective measures ("TPMs") to deny access to data files, including error logs, configuration files, and event logs, hinders biomeds' and ISOs' ability to diagnose faults and errors in the operation of a system.[62] This prevents them from

---

[52] Defs. Br. 5, ¶ 16; Ex. 91 ¶ 6.
[53] Ex. 42 (Philips refusing to provide information).
[54] *See, e.g.*, Ex. 82 (████████████ Redacted by Plaintiffs ██████████ ).") (emphasis added); Ex. 43 1-5; Ex. 44 ¶ 9 (must pay for ████ service call <u>simply to populate an IP address</u>); Ex. 84 ¶ 6.
[55] Ex. 43, ¶¶ 4-8.
[56] Ex. 46; Ex. 47 (████ smartcard and ██ access dongle).
[57] Ex. 48-50.
[58] Ex. 51 (from ISO Frontier Imaging Services).
[59] Ex. 52, at 5; *id.* at 9.
[60] Ex. 53, at Philips_TEC0108969, Philips_TEC0108974.
[61] Ex. 53 ("competition law arguments (discrimination, refusal to deal)").
[62] Ex. 57, 307:2-13 (explaining that for Transtate engineers to determine what part is needed they must service the machine which sometimes includes "reviewing the customer's inner logs").

8

accessing Level 0 or other functions that are undisputedly essential for servicing the machines.[63]

## V. Defendants' Access to and Service of Philips' Products Is Authorized

Philips claims to use its "IST" technology to control a user's access level to Philips' CSIP and that it sometimes prevents customers and ISOs from accessing menu options above their CSIP levels.[64] Access to the actual system files, however, is not protected, and anyone with a rudimentary understanding of the Windows XP operating system can view the files.[65] Due to pernicious issues accessing Level 0 CSIP materials (and other required AIAT information), Andy Wheeler, President of both TEC and Transtate, developed the FD_Service software tool through proper reverse-engineering of Philips' used equipment TEC owned.[66] FD_Service makes available the necessary service functions on Allura cath labs that Philips fails to make readily available.[67] Contrary to Philips' contentions, FD_Service does not provide access to any Philips software code or other copyrighted work to which Defendants do not already have access.[68] FD Service merely makes available for use service functions from the field service framework ("FSF") service menus on the systems that are not otherwise visible to a user.[69] These changes are not made to allow access to the Allura software, which indisputably Defendants already can access.[70] No other file is

<span style="background:black">Redacted by Defendants</span> .

---

[63] Ex. 39, ¶¶10-11; Ex. 44, ¶ 9.
[64] Defs. Br. 5 ¶ 13.
[65] Ex. 58; Pl. Br., at Ex. L at ¶¶ 44-50.
[66] Defs. Br. 8 ¶ 26.
[67] Defs. Br. 8 ¶ 26.
[68] Pl. Br. 7; Ex. 57, 37:18-21, 53:21-54:2 (Explaining that FD_Service only provides access to AIAT functions).
[69] Defs. Br. 8 ¶ 26. Although Philips states that FD Service ███████ **Redacted by Defendants** ██████████████████████████████████████████ . Ex. 58, 127:17-128:7; Pl. Br., Ex. AD at ¶¶32-34; Ex. 59, 55:1-17. No other file is modified. Ex. 59, 55:1-23.
[70] Ex. 57, 77:22-23 ("FD Service, it's my understanding FD Service ████ Redacted by Defendants ████ .").

9

## A.     Philips' Interference With Third-Party Repairs

Philips monitored hospitals' equipment and stated use of ISOs constituted it "unauthorized service in the field" even though it knew the hospitals' contracts allow them to grant full access to third-party servicers.[71] If Philips detects that a biomed or ISO conducted a repair, it will delay service to the hospital.[72] Philips also monitors heavy use periods in hospitals, leveraging it to extract supracompetitive revenues on part sales.[73]

Further, Philips hinders non-contract customers by making unauthorized and unnecessary repairs to machines. For example, Philips conducted firmware upgrades on equipment owned outright by two medical facilities—for which Philips provided no warranty, no service, and no support—which excluded those medical facilities from their own equipment.[74]

## B.     Philips Deceived Customers and Disparaged ISO Services.

Philips disparaged Transtate and TEC's services, resulting in lost income and several customers.[75] Philips sabotaged its own systems to falsely blame Transtate and interfere with its service contracts.[76] Philips also disparaged ISOs generally, and deceived customers by saying only Philips-trained technicians could not service its systems (while denying ISO training).

---

[71] Ex. 60; Ex. 85, 118:22-121:1, and at Ex. 18.

[72] Ex. 9, 142:18-150:25 (explaining that service engineers were instructed by Philips to not provide same day service for customers that did not have service contracts with Philips; "If they don't have a contract, they'd have to suffer."); Ex. 43, ¶ 12.

[73] *See* Ex. 23, at Philips_TEC1335643.

[74] Ex. 61, ¶ 23, 30.

[75] Pl. Br., at Ex. A ¶¶ 80-119; Ex. 3, 39:13-58:8; Pl. Br., at Ex. AK at 41:7-:12 (▮▮▮▮▮▮▮▮▮▮ Redacted by Defendants ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ at least partially ceased Transtate's services after interacting with Philips representatives).

[76] Ex. 9, 164:23-166:3; Ex. 3, 41:7-52:6; Pl. Br., at Ex. AK at 51:5-55:13 (Philips serviced system installed by Transtate and blamed Transtate when system crashed; Transtate lost the business).

<u>**ARGUMENT**</u>

**I.      PHILIPS' AGGREGATE CONDUCT SHOWS ANTICOMPETITIVE INTENT.**

A monopolist's conduct must be examined in its totality to determine its legality.[77]

Antitrust plaintiffs "should be given the full benefit of their proof without tightly

compartmentalizing the various factual components and wiping the slate clean after scrutiny of

each."[78] NCUDTPA is "a comprehensive law designed to include "both federal antitrust laws

*and* "commercial unfairness," and "deception" beyond traditional antitrust concepts."[79]  The

Sherman Act covers "every conceivable act which could possibly come within the spirit or

purpose of the prohibitions of the law, without regard to the garb in which such acts were

clothed."[80] Moreover, contrary to Philips' claims,[81] collective conduct can support a

monopolization claim <u>even if each aspect alone might have been lawful</u>.[82] Even lawful conduct,

in aggregate, can have an anticompetitive effect. "It is the mix of various ingredients . . . in a

monopoly broth that produces the unsavory flavor."[83] Under this long-standing precedent, the

Courts should consider Philips' <u>aggregate</u> exclusionary conduct.

---

[77] *LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) ("courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation."); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 289 n.20 (3d Cir. 2012), *cert. denied*, 133 S. Ct. 2025 (2013) (analyzing if conduct as a whole affected competition).

[78] *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).

[79] *L.C. Williams Oil Co. v. Exxon Corp.*, 625 F. Supp. 477, 481 (M.D.N.C. 1985).

[80] *United States v. Am. Tobacco Co.*, 221 U.S. 106, 181 (1911).

[81] Philips mischaracterizes well-established law in arguing that a refusal to deal claim could not arise from independent violations of the *Aspen* test. Pl. Br. 33.

[82] *Swift & Co. v. United States*, 196 U.S. 375, 396 (1905); *In re Gabapentin Patent Litig.*, 649 F. Supp. 2d 340, 358–9 (D.N.J. 2009) (three lawful acts could state overall monopolization claim: "courts have allowed antitrust plaintiffs to pursue such claims even . . . absen[t] allegations that each of the scheme's predicate actions was independently violative of antitrust laws").

[83] *City of Mishawaka, Ind. v. American Elec. Power Co.*, 616 F.2d 976, 986 (7th Cir. 1980), *cert. denied*, 449 U.S. 1096 (1981) (analyzed effects of challenged conduct as a whole).

11

## II.     FACTUAL DISPUTES EXIST ON DEFENDANTS COUNTERCLAIMS.

### A.     Genuine Disputes of Fact Exist as to Whether Philips' Unfair, Deceptive, and Anticompetitive Conduct Violated the NCUDTPA.

The records shows that Philips' conduct independently violated the NCUDTPA. The NCUDTPA has a "broad remedial purpose of promoting ethical business dealings",[84] and prohibits (1) an unfair or deceptive act or practice; (2) in or affecting commerce; and (3) that proximately caused injury.[85] Determining an "unfair or deceptive trade" practice usually depends upon each case's facts and the practice's impact in the marketplace.[86] While Defendants' NCUDTPA claim is premised upon the totality of Philips' unfair, deceptive, and anticompetitive conduct,[87] it is distinct from other claims in this case, and should survive summary judgment regardless of any determinations on Defendants' Sherman Act claims.

"An unfair business practice 'offends established public policy;' is 'immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers;' or has a tendency to deceive.'"[88] "A party is guilty of an unfair act or practice when it engages in conduct . . . which amounts to an inequitable assertion of its power or position."[89] Disparagement, false statements, and misrepresentations about another's business or business practices can constitute unfair or

---

[84] *L.C. Williams Oil Co. v. Exxon Corp.*, 625 F. Supp. 477, 481 (M.D.N.C. 1985).

[85] NC Gen. Stat. § 75-1.1, *et seq.*; *Hyundai Motor Am., Inc. v. Direct Techs. Int'l, Inc.*, No. 3:17-CV-732-MOC-DSC, 2018 WL 4110544, at *4 (W.D.N.C. Aug. 29, 2018) (citing *Boyce & Isley, PLLC v. Cooper*, 568 S.E.2d 893, 901 (2002) (Cogburn, J.)).

[86] *Nexus Techs., Inc. v. Unlimited Power, Ltd.*, No. 1:19-CV-00009-MR, 2020 WL 6940505, at *8 (W.D.N.C. Nov. 25, 2020).

[87] This unfair conduct includes AIAT access denials but does not require a determination of the scope of required AIAT information.

[88] *Hyundai*, 2018 WL 4110544, at *4.

[89] *McInerney v. Pinehurst Area Realty, Inc.*, 590 S.E.2d 313, 316-17 (N.C. App. 2004); *Gen. United Co. v. Am. Honda Motor Co.*, 618 F. Supp. 1452, 1455 (W.D.N.C. 1985) (unfair competition is conduct which a court of equity would consider unfair).

deceptive acts or practices in violation of the NCUDTPA.[90] The record is replete with evidence of Philips' improper conduct that more than satisfies Defendants' NCUDTPA claims.

### 1. Philips' Conduct Was Egregious.

Philips *touts* the importance of its systems to treat time-sensitive cardiac conditions, including COVID.[91] But Philips' pursuit of increased profits has harmed already-strained hospital resources and vulnerable patients. Philips' policy of intentionally delaying services to non-contract customers made patients and hospitals "suffer."[92] When one hospital pleaded with Philips to "**imagine if he was the patient having to lay there [on the table] all this time,**" Philips responded: "**she has no contract with them and they can't help her.**"[93] This has exacerbated the pandemic's impact: COVID has increased hospital costs and diverted budgets, reducing capital expenditures for imaging equipment, so hospitals try to extend their aging machines' life - which Philips refuses to support because it artificially deems such systems beyond their "end of life."[94] The record shows Philips' many unscrupulous—and *successful*—attempts to prevent customers from using Defendants' and other ISOs' lower-priced, 24/7 services, or to get their biomeds trained forcing them to pay higher costs for Philips' services, which were then passed on to patients, and even with a contract, delaying life-saving treatments. This disproportionately impacted rural hospitals/patients, small ISOs, and low-income communities.[95]

---

[90] *See, e.g.*, *SMD Software*, 2010 WL 11416303, at *4 (finding allegations of disparagement constitute unfair and deceptive conduct under NCUDTPA).

[91] Ex. 1 (emphasizing systems' importance to COVID and need for cost-effective, efficient, and continuous services).

[92] Ex. 9, 142:18-151:04 (North Carolina engineer); Ex. 10, 96:01 – 96:16 ("**they needed to feel some pain, because they didn't have a contract.**").

[93] *Id.*; Ex. 81 (Philips' Regional Manager <span style="color:red">Redacted by Plaintiffs</span>); Ex. 6.

[94] Ex. 8, ¶ 16.

[95] Ex. 4.

## 2. Philips Inequitably Asserted Its OEM Power to Deceive Customers.

As the only supplier of *new* Philips-brand systems, Philips deliberately provided misinformation to consumers. At purchase, Philips deceived customers by providing inaccurate, misleading TCOs and led them to believe they had options other than Philips' expensive contracts to keep service costs low after purchase then sabotaged those efforts. For example, Philips told customers that only Philips-trained engineers could work on their systems, while deceptively withholding the fact that Philips refuses to provide training, materials, or any methods that allow any non-Philips employee from becoming trained and qualified.[96] Indeed, after purchase, customers were surprised to learn Philips withholds information needed for a customer or third party service system.[97] Deceived customers were forced into purchase Philips' expensive service contracts.[98] Philips' post-purchase policy of retroactively shortening its systems' EOL/EOS[99] also misled customers about their system's useful life and its refusal to service EOS systems coerced them into purchasing new Philips-brand replacements early. Philips relied upon the fact that its customers must keep buying Philips' systems because high costs and barriers (*i.e.*, OEM-specific renovations) prevented using another OEM's systems.

Philips also disadvantaged its competitors. It disparaged the quality of service provided by ISOs like Transtate to induce customers to use their services. Philips affirmatively sought to deprive ISOs of materials like "book boxes, including user manuals and service manuals and other materials made available by Philips, which Philips took steps to limit or prohibit use of by

---

[96] Ex. 69, 139:5-140:3, and at Ex. 35; Ex. 70, 155:3-22; Ex. 71, at Ex. 12 at Philips_TEC0108971- Philips_TEC0108972.
[97] Ex. 21 at 10.
[98] *Id.*
[99] Philips retroactively changed its EOL policy. *See, e.g.,* Ex. 79; *see also* Ex. 80; Exs. 15-16; Ex. 17 at 10; Ex. 18.

14

claiming retroactively that they were proprietary."[100] Philips also wrongfully denied access to information by revoking Level 0 access.[101] Philips' deceptions and refusal to provide, training blocked ISOs from servicing Philips' newer, expensive systems like Azurion, preventing them from providing cheaper, 24/7 service to customers.[102] Philips also specifically disparaged Transtate, in direct interference with Transtate's contracts, resulting in Transtate losing business from at least one customer.[103]

Philips also improperly wielded its power as the only sole parts manufacturer to increase costs for both new and used parts, including by bulk-purchasing used parts to reduce availability in the market (and to its rivals); appointing AllParts as the gatekeeper owhen it kept an incomplete inventory and delayed parts orders (even when in stock); and refusing to sell rivals used parts.[104]

Philips unfair and deceptive practices put patients at risk, quashed competition from Defendants and others, reduced parts' availability for Defendants, and strained hospital resources mid-pandemic, violating the NCUDTPA. While Philips' conduct in violation of the Sherman Act also suffices to prove a NCUDTPA violation,[105] Defendants' NCUDTPA claims are separate from, and not dependent upon their Sherman Act claims and require no market definition on

---

[100] Transtate Ans. to Sec. Am. Compl. [ECF No. 274] ¶ 237; TEC Ans. to Sec. Am. Compl. [ECF No. 275] ¶ 230; *see also* Wheeler Ans. to Sec. Am. Compl. [ECF No. 276] ¶ 195; *see, e.g.,* Exs. 87-89 (CSIP Level 2 documents, now claimed proprietary, that supports Philips' claims).

[101] *See, e.g.,* Ex. 69, at Ex. 35 (customers granted "huge access"); Ex. 78, 77:16 -79:08 (explaining the access on a document may not correspond with the purported access level on the face of the document).

[102] Ex. 69, 139:5-140:3, and at Ex. 35; Ex. 70, 155:3-22; Ex. 71, at Ex. 12 at Philips_TEC0108971- Philips_TEC0108972.

[103] Ex. 3, 39:13-58:8; *Ameritox, Ltd. v. Millennium Lab'ys, Inc.*, No. 8:11-CV-775-T-24-TBM, 2014 WL 12795383, at *2 (M.D. Fla. May 6, 2014); *Jaro Transp. Servs., Inc. v. Grandy*, No. 403-CV-01227, 2006 WL 2553424, at *16 (N.D. Ohio Sept. 5, 2006).

[104] Ex. 77, ¶¶ 4, 7, 9-12.

[105] *R. J. Reynolds Tobacco Co. v. Philip Morris, Inc.*, 199 F. Supp. 2d 362, 395-96 (M.D.N.C. 2002); *L.C. Williams Oil Co. v. Exxon Corp.*, 625 F. Supp. 477, 481 (M.D.N.C. 1985).

15

market power.

**B.    A Genuine Dispute Material of Fact Exists as to Defendants' Counterclaims under Section 2 of the Sherman Act.**

This Court should deny summary judgment on Trantstate's and TEC's federal antitrust counterclaims due to material factual disputes about key claim elements. Summary judgment is not preferred in antitrust cases due to their complex and fact-sensitive nature.[106] The Supreme Court "prefer[s] to resolve antitrust claims on a case-by-case basis, focusing on the 'particular facts' disclosed by the record."[107] Under Section 2, a monopolization claim requires (1) possessing monopoly power in a relevant market, which is (2) willfully acquired or maintained;[108] an attempted monopolization claim requires (1) predatory or exclusionary conduct, (2) specific intent to monopolize, and (3) a dangerous probability of success.[109]

Here, both direct and indirect proof show Philips specifically intended to, or did, acquire monopoly power or market power in each Relevant Market, which it used to exclude or cripple its rivals; it lacked a legitimate business justification for this conduct;[110] and the natural and probable consequence of its conduct was to solidify both its control over prices and ability to exclude or destroy competition. A jury should be permitted to consider the "particular facts" of Philips' myriad conduct which cumulatively had an anticompetitive effect on the Relevant Markets.[111] Such a fact-specific complex inquiry requires a trial.

---

[106] *Dickson v. Microsoft Corp.*, 309 F.3d 193, 212 (4th Cir. 2002) (used "sparingly").
[107] *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 467 (1992).
[108] *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.,* 637 F.3d 435, 441 (4th Cir. 2011).
[109] *Bell Atl. Corp. v. AT&T Corp.,* 339 F.3d 294, 302 (5th Cir. 2003).
[110] A factual dispute exits about whether Philips' justifications for its conduct are pretextual. *Red Lion Med. Safety, Inc. v. Ohmeda, Inc*., 63 F. Supp. 2d 1218, 1234–35 (E.D. Cal. 1999) (fact dispute about pretextual justifications were triable issue).
[111] *ZF Meritor*, 696 F.3d at 289 n.20.

### 1. Material Factual Disputes Exists on Relevant Market.

#### a. The Parties Dispute Market Definition.

Defendants' economic expert has sufficiently opined on the existence of the Relevant Markets: a servicing aftermarket; a parts aftermarket; and a training aftermarket. Dr. Warren-Boulton analyzed the facts, the alleged markets, conducted witness interviews, and opined that these three aftermarkets are each, in fact, a relevant antitrust market.[112] "Transtate alleges a set of sufficient conditions for the servicing of Philips manufactured machines to be a relevant antitrust market."[113] He then analyzed each element of the necessary conditions, concluding that the allegations and evidence he reviewed up to the time of his report—including customer information—is "more than sufficient to meet the conditions for post-sale opportunism to be potentially profitable."[114]

Philips argues that the relevant antitrust market is the primary market—not the aftermarket—and should encompass all manufacturers' sales of diagnostic X-ray machines (or "IGT" systems). MSJ at 26. But a relevant market is determined by product substitution, among other things.[115] The record shows customers respond to service dissatisfaction by switching servicers, not systems, due to "lock-in effects" from Philips' Installed Base Opportunism. Dr. Warren-Boulton set out necessary economic conditions that must be present for a post-warranty service market, among other economic opinions.[116] Those conditions are not (and could not credibly be) disputed by Philips or its expert economist. The detailed record and expert testimony

---

[112] Ex. 21, at 3-4, 7; Ex. 20 48:4-49:14.
[113] Ex. 21, at 4.
[114] *Id.* at 7.
[115] *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).
[116] Ex. 21, at 5 (a firm supplying a differentiated durable product can increase its profits by unreasonably restricting access to competitors and raising or maintaining supercompetitive pricing in aftermarkets).

sufficiently create a genuine issue of material fact regarding the Relevant Markets, which a jury should determine.[117]

> **b. The Parties Dispute Whether Philips Has Monopoly or Market Power in the Relevant Markets.**

The record shows both direct and indirect proof of the existence—and exercise of—Philips' monopoly power in the Relevant Markets.[118] Monopoly power may be established by either direct evidence that it "profitably raise[d] prices substantially above the competitive level" or excludes competitors in the relevant markets, or indirect evidence of a high market share.[119] A company has market power when it can raise costs profitably by restricting the output.[120] The direct evidence shows Phillips was able to sell parts and services at higher prices by: restricting output of new and used parts, including EOL parts; forcing customers to upgrade service contracts (by delaying services) or accelerate adoption of new systems (by issuing arbitrary EOL dates); and excluding its competitors through other various anticompetitive conduct detailed above. Defendants' indirect evidence includes its economic expert, Dr. Warren-Boulton, who has analyzed the structure of the market to show Philips has monopoly power.[121] Year after year, Philips has earned unusually high profits for its parts and services, despite charging premiums and third-party competition. This proves "competition must be weak or absent, because it has failed to force prices down to cost".[122] Philips' exclusionary conduct has shaped each Relevant Market,

---

[117] *Red Lion*, 63 F. Supp. 2d at 1226–28 (disputes over relevant market and alleged monopolist's dominant share were "triable" issues).
[118] *Ohio v. American Express Co.*, 138 S. Ct. 2274, 2288 (2018).
[119] *See United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001).
[120] *Virtual Maint., Inc. v. Prime Computer, Inc.*, 11 F.3d 660, 665 (6th Cir. 1993) ("true market power" is the "power sufficient to change and sustain anticompetitive prices").
[121] Ex. 20, 67:9-68:8, 74:23-75:6; Ex. 21, at 4, 14-26.
[122] *In re Brand Name Prescription Drugs Antitrust Litig.,* 123 F.3d 599, 603 (7th Cir. 1997) ("power to raise price above cost without losing so many sales as to make the price rise unsustainable" is evidence of "monopoly power"), *cert. denied,* 118 S. Ct. 1178, 1336 (1998).

18

and its ability to charge undeniably supracompetitive prices for a significant time shows market power.[123] Together, these establish Philips has monopoly power. No competitive restraints limit Philips' ability to set prices for, or restrict, services, training, parts, or information, because customers cannot switch to competitors if Philips' prices get too high.

### c. Post-Warranty Service Aftermarket ("Service Market").

Despite Philips' refusal to provide discovery relevant to Defendants' analysis of the Service Market,[124] Transtate and TEC calculate Philips has at least a 70% share of the service aftermarket.[125] Without providing an alternative market share, Philips merely claims Defendants' estimate is insufficient to show monopoly power. [126] But when evidence of a monopolist's ability to control prices or exclude competition exists, even a 50 to 60 percent market share can establish monopoly power.[127] Here, direct evidence of market power demonstrates Philips' monopoly power in the Service Market.[128] Philips controls access to unique parts, information, training, and tools required for service and Philips excluded its rivals to restrain legitimate competition.[129] Philips' monopoly power also arises from a lack of competitive constraints on its aftermarket price increases.[130] Competitors' services are not reasonable substitutes for an aftermarket monopolist's

---

[123] *See* Transtate Ans. to Sec. Am. Compl. [ECF No. 274].

[124] *See, e.g.*, Ex. 86, at Request No. 91.

[125] Transtate Ans. to Sec. Am. Compl. [ECF No. 274] ¶ 212; Ex. 20 76:10-85:3, 201:13-205:7.

[126] ECF No. 382-2.. The underlying Philips' 30(b)(6) witness statement to which Dr. Warren-Boulton referred in his report states the witness was uncertain as to Philips' share. Ex. 71, 337:16-338:14.

[127] *LendingTree, LLC v. Zillow, Inc.*, No. 3:10-CV-439-FDW-DCK, 2011 WL 13222698, at *5 (W.D.N.C. Nov. 4, 2011); *Powderly v. Blue Cross & Blue Shield of N. Carolina*, No. 3:08-CV-00109-W, 2008 WL 4129767, at *2 (W.D.N.C. Sept. 4, 2008) (finding 60% market share sufficient); *In re Aggrenox Antitrust Litig.*, 199 F. Supp. 3d 662, 666 (D. Conn. 2016) (supracompetitive prices conclusive of market power).

[128] Ex. 20, 74:15-19 (testifying if you have direct evidence of monopoly power, very small share of relevant market necessary).

[129] TEC Ans. to Sec. Am. Compl. [ECF No. 275] ¶ 189.

[130] Philips' antitrust expert testified monopoly power depends on whether there is enough competition to discipline price. Ex. 26, 154:8 – 154:16.

19

services if (1) consumers have no realistic option to choose a competitor's service, and (2) the relevant market is composed only of service providers who actually have realistic access to the market.[131] Here, price increases in Philips' aftermarket system services are not restrained by other OEMs' services or systems; services for Philips systems are not interchangeable with other OEMs' systems, and there are no viable alternatives to Philips parts, training, and information.

### d. Customers Are "Locked In" to Philips' Systems.

If the cost of switching between OEM systems is high, consumers who already have purchased the equipment, and thus "locked in," and will tolerate some level of price increases in the aftermarket before changing products.[132] Thus, a monopolist like Philips "profitably could maintain supracompetitive prices in the aftermarket" with high switching costs and a high number of locked-in customers.[133] Customers are "locked-in" when the TCO is unknown at time of purchase, or a change in aftermarket prices or policies is a "surprise" to the installed base.[134] The record shows a significant portion of consumers in the primary market are locked into Philips systems and its associated aftermarket services.[135] Intensive capital costs, state regulatory approvals, and OEM-specific system environments prevent easy switching to competing OEM systems.[136] The threat of switching does not discipline the primary market in the short term.[137]

Philips argues that customers *can* switch systems when they are dissatisfied, pointing to one customer, Piedmont; but Philips critically ignores that Piedmont switched only after the useful

---

[131] *Kodak*, 504 U.S. at 481-82.
[132] *Id.* at 476.
[133] *Id.* at 477-79 (aftermarket might form basis for antitrust liability if high costs of switching equipment locks customers in to using specific aftermarket parts or service).
[134] *Id.* 476.
[135] Dr. Warren-Boulton opined that 80-90% of customers are locked-in to Philips for replacement systems, a critical fact omitted by Philips. Ex. 21 at 18.
[136] *See* Ex. 25.
[137] *See* Ex. 21, at 19-21.

life of its systems had expired and thus could not avoid aftermarket lock-in exploitation.[138] Neither facts nor reality support Philips' conclusions. There is <u>no</u> evidence in the record that any Philips customer has switched to a non-Philips machine prior to its End of Life ("EOL"), even if the only alternative is to rely on more expensive, slower and lower quality service from Philips.[139] Dr. Warren-Boulton interviewed customers who affirmed that the "absurdly high" cost made switching illogical, and there is no evidence anyone ever responded to Philips' exclusion or behavior in aftermarkets by discarding Philips machines. Philips' own antitrust expert Dr. Wu admitted there are switching costs to switch to equipment from another OEM, and when asked whether there was a level at which switching costs would be low enough to foreclose the possibility of an aftermarket, Dr. Wu pointed to Philips' motion papers, rather than identifying switching costs.[140] Philips' business records illustrate the difficulty of overcoming the sunk cost: "divorce is expensive."[141] The record also demonstrates Philips understands the lock-in effect on its customers.[142] Removing high-cost durable goods is not a close substitute for service concerns.[143] The record demonstrates when a hospital is not able to use an ISO, biomed, or is unhappy with their aftermarket service, the hospital changes service providers, most-often agreeing to a service contract with Philips. Even where customers wish to service their own system or use third parties, Philips is unwilling to permit it.[144]

> **e.** **Consumers Cannot Acquire Information on Lifecycle Maintenance and Service Costs.**

As Dr. Warren-Boulton testified, customer "surprise" derived from change in policy,

---

[138] *See generally* Ex. 22.
[139] Ex. 20, 111:23 – 113:21; *see, e.g.*, Ex. 6, ¶ 4; Ex. 44 ¶ 18; Ex. 63 ¶¶ 6-7; Ex. 8 ¶ 16; Ex. 22.
[140] Ex. 26, 60:9-62:20 (switching not zero cost); Ex. 76.
[141] Ex. 23 at 91.
[142] *See* Ex. 6; Ex. 44; Ex. 63; Ex. 8.
[143] Ex. 20, 161:3-162:11.
[144] Ex. 11.

procedure or other issues reflects installed base opportunism.[145] Limited life-cycle cost information is available to consumers in the primary market. Philips provides total cost of ownership ("TCO") estimates *only* upon request, *only* for its high-priced service plans, and *only* over the short-term, not for the useful machine life (approximately 7-15 years). TCOs do not address the largest post-purchase costs which Philips causes: significant machine downtime seriously impacting patients.[146] Customers must make great efforts, at great cost, to address these concerns. Philips' TCOs are often inaccurate and Philips' anticompetitive conduct (raising prices on parts, changing EOL/EOS dates, and excluding other service providers and even customers) drive up costs and create serious unexpected delays exceeding the TCOs, resulting in surprises.[147] Customers cannot accurately determine the complex long-term maintenance costs in part because a system's useful life surpasses Philips' short-lived TCOs and arbitrary EOL/EOS dates. The record also reflects that customers lack information about TCOs in the primary market; customers are confused about what is available to them without a contract.[148] According to Dr. Warren-Boulton even if there are sophisticated customers in the market those customers are unlikely to be able to protect other less sophisticated consumers who have difficulty assessing TCO.[149] Philips' inaccurate TCO estimates dupe customers into believing Philips' maintenance costs are lower over time, locking them into Philips products and, expensive service contracts.

### f.      Philips' Actions Prevent Customers from Assessing TCO.

As OEM, Philips deliberately provided misinformation to consumers in the primary market deceiving them into believing there would be sufficient competition in the relevant aftermarket to

---

[145] Ex. 21, at 5.
[146] Ex. 6, ¶¶ 14-20; Ex. 22, ¶ 23 (rural hospital especially sensitive to downtime); Ex. 84 ¶ 3; Ex. 90, at 7.
[147] Ex. 21, 9-10; Ex. 20, 178:19-22, 182:4-11, 215:11-216:16.
[148] Ex. 42; Exs. 64-66.
[149] Ex. 21, at 8 (emphasis added); *see also* Ex. 21, at 23.

22

restrain prices during the life of the Philips devices. Philips has no contractual right to monopolize the aftermarket, and consumers did not knowingly agree to use only Philips in the aftermarket.[150] Philips told them they could use Philips' services, their own in-house biomeds, or ISOs; then Philips tried to eliminate its competition to dissuade customers from using cheaper ISOs, including Transtate. Further, as Philips' economic expert Dr. Wu stated, Philips initiated post-sale policy changes for its parts.[151] To "increase control of [the] parts resale market" to deprive third parties of access to used parts, Philips modified its return policy for old parts.[152] Previously, customers purchasing new parts received a credit for sending a used part back to Philips (a "core exchange").[153] Under the revised policy, Philips charges customers high fees if they do not return a used part soon after receiving a new part.[154] For example, a part that previously garnered a ▮▮▮▮▮ credit on return, now imposes a ▮▮▮▮▮ fee if a customer does not send it back to Philips.[155] This effectively raised costs to preconditioners and foreclosed them from the market.[156]

### g. Philips Has Monopoly Power in the Parts Market.

The Supreme Court and other courts have declared the competitive process may be impaired if a challenged practice "limit[s] consumer choice."[157] To maintain its monopoly on new parts and increase prices for its new and reconditioned parts, Philips strategically and artificially restricted the supply of used parts in the market, then refused to sell used parts to its competitors, forcing them to pay supracompetitive prices for new parts.[158] Scarcity of used parts forced

---

[150] Ex. 60 (recognizing hospitals' contracts permit full access to third party repairs).
[151] Ex. 20, 170:9-173:21, 215:11-20.
[152] Ex. 21, at 22.
[153] Ex. 20, 168:1-169:23.
[154] *See* Ex. 67 (email from "APM Sales" stating "additional billing is what is charged if there is no core exchange returned to Philips.").
[155] Ex. 77.
[156] Ex. 20, 169:6-18 (noting Philips' chairman announced that was Philips' strategy).
[157] *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 459–60 (1986); *see generally* Ex 77.
[158] *See*, *e.g.*, Transtate Ans. to Sec. Am. Compl. [ECF No. 274] ¶ 180.

23

customers to purchase new parts or used parts at a premium. Even when third-parties can obtain used parts, Philips refuses to install any parts not purchased itself. Philips' successful campaign to limit distribution and supply of parts continues to harm competition and consumers. Philips limited customers' choice by creating difficulties in acquiring new or used parts, inducing delays, increasing prices, and compromising patient safety.

### h. Philips has Market Power in the Training Market.

Training to service Philips machines is unique and not interchangeable with any other training for other machines. As the OEM, Philips is the only original source for training on Philips manufactured systems, especially for newer systems like Philips' Azurion line.[159] Philips excluded ISOs from training on its equipment,[160] *while simultaneously* telling health care providers that training is required to work on Philips equipment.[161] This foreclosed ISOs from the service market.

### 2. Fact Issues Exist Regarding the Injury Caused By Philips.

The parties dispute whether Philips' conduct injured Transtate, TEC, and competition as a whole, and to what degree, as well as whether the damages experts can withstand challenge at trial. Transtate alleges, and the record supports, that Philips' anticompetitive conduct injured Transtate and competition as a whole, and that the amount of damages it seeks credible.

Philips claims a lack of injury based on Transtate and TEC's revenues, which are irrelevant to whether Philips has foreclosed it and other ISOs from the market. Dr. Warren-Boulton's opinion that the appropriate market conditions for foreclosure and competitive harm existed shows that Defendants' performance as servicers necessarily suffered. Philips also gerrymandered its estimate of Transtate and TEC's servicing revenues: Philips' own economic expert, Dr. Wu, stated

---

[159] Ex. 21, at 26; Ex. 84, ¶ 8.
[160] Ex. 68, 84:11-86:23.
[161] Ex. 69, 139:5-140:3, and at Ex. 35; Ex. 70, 155:3-22; Ex. 71, at Ex. 12 at Philips_TEC0108971-Philips_TEC0108972.)

that he compared Defendants' revenues to the full market, and only during the (improper) 5 year time period between 2015-2020; he did not measure against competitive restraints.[162]

Regardless of growth, the issue is whether the market would have grown more absent Philips' antitrust violation.[163] The record shows sustained effects on competition. As Defendants' damages expert, Dr. Warren-Boulton, testified, due to Philips' exclusionary conduct, hospitals and consumers suffered by having to pay higher prices, and having fewer parts available in the market.[164] But-for Philips' conduct, TEC, Transtate, other ISOs, and hospitals would have paid less for parts—new and used—and could have sourced them elsewhere rather than paying supra-competitive prices for new parts due to Philips' induced scarcity of used parts in the marketplace. Philips' monopolization caused higher prices and reduced consumer choice, both harming competition.[165] But-for Philips' anticompetitive conduct, Defendants' service revenues and market shares would have increased—as would other ISOs, increasing competition as a whole.

Further, Philips' disparagement resulted in lost income and business for ISOs.[166] Damages may be awarded on a plaintiff's estimate of sales it could have made absent the antitrust violation: while Philips demands a more exacting standard, "[t]he vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation."[167] Defendants would have obtained more service contracts "but for" Philips' damaging false statements about Transtate to hospital customers. It would have expanded

[162] Pl. Br., Ex. AA at 39.
[163] *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 233–34 (1993) (fact that output and others' market shares in relevant market increased after defendant's alleged predation was "not dispositive" as "[o]ne could speculate . . . that the rate of segment growth would have tripled, instead of doubled, without Brown & Williamson's alleged predation").
[164] Ex. 21, at 28-29.
[165] *Brooke Grp.*, 509 U.S. at 234.
[166] Pl. Br., at Ex. A ¶¶ 90, 104.
[167] *J. Truett Payne Co., v. Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981).

investment and excelled in areas that it was denied training. Transtate and TEC stated a causal antitrust injury, both to themselves and to competition, with sufficient specificity to deny summary judgment.

Philips argues that Defendants have not shown its antitrust injury flowed from Philips' anticompetitive conduct, and that their sole alleged anticompetitive conduct is lack of access to "necessary AIAT information." Defendants can show a reasonably probable causal link between the antitrust violation and a recognized business loss.[168] Transtate and TEC directly lost income from Philips' anti-competitive actions and monopolization of the relevant markets, including "████ Redacted by Defendants ████" that Transtate and TEC purchased from AllParts.[169] And while Philips' alleged conduct is not limited to AIAT access, Philips' concession that Transtate, other ISOs, and biomeds were authorized to access Level 0 materials means its denial of that access caused deterioration in their quality of service. This limited customer choice as to service, as did Philips' deception about the need to use new parts for its machines, disparagement by telling customers that ISO technicians were not trained, and intentional delays in servicing non-contract customers. Defendants' damages claims evidence its claim that it, ISOs, and biomeds, have been foreclosed from the alleged markets.

Lastly, Philips complains that Defendants' damages expert should have segregated lost profits totals between Philips' disparagement and antitrust violations, and damages between Philips' antitrust violations and other unfair business practices, because an expert must "separate lawful from unlawful conduct." But all of this conduct is unlawful. The Fourth Circuit does not

---

[168] *Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 149 (4th Cir. 1990); *A.J. Buck & Son, Inc. v. Merck & Co.*, No. CIV. A. HAR 94-2721, 1995 WL 131148, at *3 (D. Md. Feb. 7, 1995) (recognizing a monopolist need only successfully commit the alleged anticompetitive acts; antitrust injury incurs regardless of the monopolist's actual success).
[169] Pl. Br. 6, 31 (████ Redacted by Plaintiffs ████).

require an antitrust expert "separate unlawful from unlawful conduct." Transtate and TEC need only show an injury of the type which the antitrust laws were drafted to prevent and which flows from defendant's unlawful practices.[170] It has done so. The parties' dispute as to the extent and scope of damages are best suited for the jury.[171]

### 3. Fact Issues Exist as to Whether Philips Denied Essential Facilities.

Philips refused to deal with Defendants in anti-competitive ways in violation of Section 2.[172] Under the "essential facility" doctrine, owners of facilities that competitors must access to effectively compete, even when there is no prior course of dealing can be liable under Section 2.[173] A company that has exclusive control over a facility essential to effective competition may refuse to deal with its competitor as long as it has valid business reasons for that refusal.[174]

Philips denied Transtate and TEC access to essential facilities—new and used parts, training, and essential access—without a valid business reason. As an owner of an essential facility, Philips has a heightened duty to cooperate with rivals. It is undisputed that Philips will not sell Defendants training to service Philips systems, even when offered money. Philips provides training only by non-disclosure agreements, and only to specifically-designated in-house biomeds employed by purchasers of Philips' "first-look" service contracts.[175] Philips claims that Defendants were not denied access to training because it hired former Philips employees and has provided training to third parties. While TEC and Transtate managed to teach themselves to some degree, Philips is the only original source and such training is "essential" to provide service, particularly on Philips' newer machines, and Philips regularly tells customers such training is essential to

---

[170] *Petrie v. Virginia Bd. of Med.*, 648 F. App'x 352, 355 (4th Cir. 2016).
[171] *Red Lion* 63 F. Supp. 2d at 1235.
[172] *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004).
[173] *Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275, 284 (4th Cir. 2012).
[174] *DocMagic, Inc. v. Ellie Mae, Inc.*, 745 F. Supp. 2d 1119, 1134 n.4 (N.D. Cal. 2010).
[175] Pl. Br. 5.

27

service its systems. This dispute alone precludes summary judgment on the issue.[176]

> **a. The Parties Dispute Whether Philips Had a Duty to Deal With Defendants in the Used and New Parts Market.**

Philips claims that its policies are not refusals to deal or exclusive dealing because Defendants have access to Philips training and parts. But it is undisputed that in 2020, Philips ceased selling used parts to third parties. This unilaterally terminated a profitable business of selling used parts to Transtate, *its fourth biggest customer*, and other ISOs. Philips then restricted and delayed new parts sold to its fourth largest customer, Transtate, in violation of rational economic sense.[177]

Philips also deliberately raised and maintained prices of new and used parts to above-competitive levels through its campaign of simultaneously bulk-buying used parts; refusing to sell them to Defendants and other ISOs; raising its rivals' costs by increasing the trade-in value of used Philips' systems;[178] and mandating only new parts for Philips' non-EOL machines.[179] New or used, Philips' parts are essential and cannot practically or economically be duplicated by potential competitors. But-for Philips' monopoly, ISOs and Transtate could purchase used parts without interfering with Philips' ability to conduct its parts business. Philips' parts policies and practices are inconsistent with profit-maximizing, absent desired effects in other markets.

---

[176] Phillips lacks any business justification for denying training, and has excluded ISOs because the ISO business model requires ISO technicians to service a portfolio of customers. *See Red Lion*, 63 F. Supp. 2d at 1234–35.

[177] Ex. 72 (no resolution after two months elapsed of Transate's request to Philips for updated parts finder); Ex. 73 (finally resolving Transtate's request for updated parts finder after four months).

[178] *See* Ex. 20, 165:7- 20 (Do I think there's behavior by Philips to try to restrict and raise costs to firms that recondition parts? Yes. . . .if you want to raise cost to rivals to reconditioning, what you do is you raise the trade-in value because that becomes the cost of the used part. The arithmetic is pretty straightforward."); Ex. 77.

[179] Ex. 29.

**Fact Issues Exist As to Whether Philips Denied Access to Essential Facilities.**

A decision to alter a course of dealing together with evidence of anticompetitive malice may constitute a refusal to deal.[180] Defendants contend that Philips has altered its course of providing "necessary information" for servicing (including Level 0 access). Philips argues that it has never engaged in a prior course of dealing with Defendants in the Servicing Market, solely because it has never licensed Level 1 or higher CSIP to Defendants, nor "engaged in any profitable course of dealing where Defendants had access to the alleged "necessary information" in the relevant Servicing Market.[181] Philips has conceded that Transtate's access to CSIP tools allowed it "to service Philips imaging systems more efficiently and profitably."[182] Philips also recognized its denials of such CSIP information could constitute "refusal to deal."[183] Despite Philips' admitted legal duty to provide Defendants with Level 0 access, it improperly charged supracompetitive fees for such access then unilaterally revoked access. Alongside direct evidence of Philips' anticompetitive malice (above), this constitutes an unlawful refusal to deal.[184] Philips does not dispute that Defendants are entitled to Level 0 materials which Philips considers "essential," but argues Defendants were not injured because they allegedly "hacked" or "circumvented" Philips' systems. By definition, Defendants' entitlement to the information is not "hacking". Philips violated its legal duty to provide it, and thus the antitrust laws.

Philips seeks to limit the refusal to deal in the servicing market merely to violations of the AIAT access. But that is not the only example of Philips "refusal to deal" that injured competition.

---

[180] *Kodak*, 125 F.3d at 1195.
[181] Ex. 74 (stating although Transtate owns the machine, Philips should not enter into co-operation agreement because Transtate is a competitor).
[182] Pl. Br. 1 (emphasis added); Ex. 56.
[183] Ex. 53 (listing "successful competition law claim for access rights").
[184] *Kodak,* 125 F.3d at 1195.

29

For example, Philips also "stopped using third party installers" for de-installation jobs, specifically to cut off supply of used parts to third-parties like Defendants.[185]

## C. There Is a Genuine Dispute of Material Fact on Transtate's Tortious Interference Claims.

Philips' disparagement, false statements, and misrepresentations about Transtate also constitutes direct interference with Transtate's contracts. Under North Carolina law, "[a]cts of fabricating information about a party to a contract and disparaging that party are intentional in nature" constitute tortious interference.[186] Transtate employees testified that Philips disparaged Transtate to customers and even falsely blamed Transtate for a system crash that Philips caused.[187] Transtate lost income, contracts, and business from these customers as late as 2018,[188] well within the three year limitations period.[189] Such circumstantial evidence can be considered[190] and sufficiently creates a genuine dispute of material fact, precluding summary judgment on this claim.

## III. DEFENDANTS' COUNTERCLAIMS AND DEFENSES ARE NOT PRECLUDED.

## A. Defendants Claims Exceed Philips' Failure to Provide AIAT Information

Seeking to avoid the mountain of evidence showing Philips violated the Sherman Act and the NCUDTPA, Philips mischaracterizes these counterclaims as limited only to Philips' violations of the AIAT regulations in order to argue they should be precluded or preempted.[191] But

---

[185] Ex. 27; *Kodak,* 125 F.3d at 1195.

[186] *Red Arrow v. Pine Lake Preparatory, Inc. Bd. of Directors*, 741 S.E.2d 511 (N.C. App. 2013) (finding disparagement sufficient for tortious interference).

[187] Ex. 3, 41:7-52:6; Pl. Br., at Ex. AK at 51:5-55:13.

[188] Pl. Br., at Ex. A, ¶¶ 80-119; Ex. 3, 39:13-58:8; Pl. Br., at Ex. AK at 41:7-:12.

[189] *TaiDoc Tech. Corp. v. OK Biotech Co.*, No. 12 CVS 20909, 2016 WL 1221425, at *17 (N.C. Super. Mar. 28, 2016) (finding the continuing wrong doctrine applied to toll the statute of limitations when the breach of the contract underlying the claim was breached within the limitations period).

[190] *Legacy Data Access, LLC v. MediQuant, Inc.*, No. 3:15-cv-00584, 2017 WL 6001637, at *5 (W.D.N.C. Dec. 4, 2017) (refusing to grant summary judgment for tortious interference claim based on circumstantial evidence).

[191] Pl. Br. 20-21 (citing *Amarin Pharma, Inc. v. ITC*, 923 F.3d 959 (Fed. Cir. 2019)).

30

Defendants' counterclaims are not precluded: they allege a wide variety of anticompetitive, unfair, and deceptive non-AIAT misconduct, and they do not require an interpretation of the AIAT regulation. Preempting Defendants' defenses also would improperly conflate the determinations necessary to resolve Philips' own affirmative claims. Each of Philips' claims requires a threshold determination about the scope of Philips' enforceable property interests in the allegedly infringed, improperly accessed, or misappropriated information. Defendants' argument that the materials and information at issue are AIAT information is not an affirmative defense,[192] but rather recognizes Philips cannot establish a critical element in its own claims.[193] Philips must—and admittedlycannot—prove that the information it seeks to restrict is legally protectable and falls outside the AIAT regulations requiring disclosure.[194] Thus, Philips' own claims require the Court's determination that Philips did not restrict information subject to AIAT regulations. Yet Philips asks the Court to summarily preclude Defendants' defenses and counterclaims, seeking to "completely deprive [Defendants] of defenses to those claims and the ability to obtain the corresponding relief it seeks."[195] Defendants agree the FDA should determine the AIAT issues here, and the Court should deny Philips' claims that are based on its contention service materials

---

[192] Defendants' Answer includes two defenses that reference an AIAT determination: Defenses 27 and 28. *See*, *e.g.*, Transtate Ans. and Counterclaims [ECF No. 274] ¶¶ 56-57. These defenses are not affirmative defenses and were provided to give Philips adequate notice of the basis upon which Defendants would defend against Philips' claims. Accordingly, the Court should treat these defenses as specific denials, rather than strike them. *See McLendon v. Carnival Corp.*, No. 20-cv-24939, 2021 WL 848945, at *4 (S.D. Fla. Mar. 5, 2021); *F.D.I.C. v. Stovall*, No. 2:14-CV-00029-WCO, 2014 WL 8251465, at *1 (N.D. Ga. Oct. 2, 2014).

[193] Additionally, Defendants are entitled to provide evidence regarding whether they believed their acts constituted a violation for purposes calculating damages under the CFAA. 17 U.S.C.A. § 1203(c)(5)(A). Defendants' understanding that they had the right to the allegedly accessed information does not require an actual determination on whether their belief that the underlying information was AIAT information was correct.

[194] Defs. Br. 11-14.

[195] *Chessie Logistics Co. LLC v. Krinos Holdings, Inc.,* No. 13 C 8864, 2016 WL 7034101 at *9 (N.D. Ill. Dec. 2, 2016).

are not AIAT absent an FDA ruling. Preemption should apply equally to both parties' claims to the extent they require interpretation of FDA rules. If the Court believes both Parties' claims require a determination of the AIAT regulations, the Court should dismiss those portions of **both** parties' claims or alternatively, as set forth in Defendants' Motion for a Stay, the Court should stay this action until the FDA has acted on Defendants' trade complaint. Defendants' claims far exceed the AIAT issues before the FDA and thus can survive without a ruling on the AIAT regulation: Philips' claims cannot.[196]

Lastly, even if Philips' AIAT conduct may have been lawful, the combination of that conduct with the misconduct noted above renders it unlawful.

## IV. PHILIPS IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS CLAIMS.

### A. Philips Cannot Show that Defendants Violated § 1201 of the DMCA.

#### 1. Philips Has Not Shown the Copyright Act Protects Any Work at Issue.

Philips barely addresses protectability of works.[197] Philips cannot show that the works Defendants allegedly **used** are entitled to protection under the Copyright Act.

*First*, Philips incorrectly states that the service software code constitutes "original literary works,"[198] when in fact the statute and registrations for the code explicitly state that portions of the code are not original.[199] Moreover, the Copyright Act is explicit that "[i]n no case does copyright protection" extend to any "procedure, process, system, [or] method of operations" regardless of the form in which it is embodied.[200] Further, Philips has failed to identify which portions of the code are original to each registration, and thus cannot show that any portion of the

---

[196] *See* Defs. Br. 11-14 and at Exs. 50-51.
[197] *See* Pl. Br. 12.
[198] Pl. Br. 12.
[199] 17 U.S. Code § 103(b); Defs. Br. 14-15.
[200] 17 U.S.C. § 102(b).

code is entitled to protection.[201]

*Second*, as discussed in Defendants' MSJ, even if Philips had identified any allegedly original code, Defendants are exempt from infringement under both Section 107 (Fair Use) and 117 (Machine Repair and Maintenance) of the Copyright Act.[202] These exceptions to copyright infringement render the works unprotected in relation to Defendants' actions.[203]

*Third*, to the extent the underlying code is copyrightable, Defendants did not bypass any of Philips' technological measures to access the underlying code. Defendants only made available the uncopyrightable command functions of the software present on customer machines.[204] Philips' alleged IST technological access controls only control access to functionality of the software, which is not protected.[205] The IST technological measures do not control access to the underlying file system and therefore do not control access to any work protectable under the Copyright Act.[206]

### 2. Philips Did Not "Effectively Control" Access.

A technological measure is not effective if it "restricts one form of access but leaves another route wide open."[207] Although Philips' measures may limit a user's ability to use certain service functions, those measures do not control access to the underlying file system, which is readily accessible through the Microsoft Windows operating system.[208]

---

[201] *Id.*

[202] 17 U.S.C. Sec. 103(b); Defs. Br. 16-20.

[203] Defs. Br. 14-20.

[204] *Lotus Develop. Corp. v. Borland Int'l., Inc.,* 49 F.3d 807, 815 (1st Cir. 1995), *aff'd*, 516 U.S. 233 (1996) (holding a "menu command hierarchy is uncopyrightable because it is a system, method of operation, process, or procedure foreclosed from copyright protection by 17 U.S.C. § 102(b).").

[205] Pl. Br., at Ex. X at 88:17-92:22.

[206] *See* Defs. Br., at Ex. 21 at 71:25-76:4.

[207] *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 547 (6th Cir. 2004).

[208] *See Dig. Drilling Sata Sys., LLC v. Petrolink Servs.*, 965 F.3d 365, 376-77 (5th Cir. 2020) (granting summary judgment in favor of defendants on DMCA § 1201 claim because, while plaintiff's USB dongles may have limited ability to use proprietary program, they did not control access to the program's database itself).

Since at least 2012, Philips has left open commonly known access points to its Allura systems such that anyone with a rudimentary understanding of Windows XP operating systems can obtain access to the underlying file system, including all Allura files and log files.[209] Once a user has access to the Allura file system, a user can ███████ Redacted by Plaintiffs ███████████████████████████████ ██████.[210] Although Philips' claims that it adopted a "closed profile" framework to limit access to the system files, it in fact did not.[211] Defendants' technical expert Mr. Fenn explained, the closed profile mode only prevents the running of selected applications and leaves open a number of ways of accessing the underlying system files.[212] Philips simply does not effectively control access to Philips' underlying software.

Philips' reliance on *JCW Software* is misplaced.[213] Critically, in *JCW Software*, the only way to access the underlying information was through the registration key, and there was no alternative means of access.[214] By contrast, this case instead much more closely parallels *Lexmark*[215] and *Digital Drilling*.[216] In *Lexmark*, the Sixth Circuit held that although the plaintiff's technological measures blocked one form of access (*i.e.*, use), it did not block another form of access—"the 'ability to [] obtain' a copy of the work or to 'make use of' the literal elements of the program (its code)."[217] The Sixth Circuit noted that "[n]owhere in its deliberations over the DMCA

---

[209] Defs. Br. 22-23, and at Ex. 21 at 71:25-76:4.
[210] *Id.*
[211] Pl. Br., at Ex. AI at 16 n.12.
[212] Ex. 58, 113:19-118:14; Pl. Br., at Ex. L at ¶¶ 44-50.
[213] Pl. Br. 14-15 (citing *JCW Software, LLC v. Embroidme.com, Inc.*, No. 10-80472-CIV, 2012 WL 13015051 (S.D. Fla. May 29, 2012)).
[214] *See generally id.*
[215] 387 F.3d 522 (6th Cir. 2004).
[216] *Dig. Drilling*, 965 F.3d at 376-77.
[217] *Id.* at 547 (quoting 17 U.S.C. § 1201(a)(2)) (alteration in original). Defendants did not access the underlying compiled code. Defs. Br. 31.

did Congress express an interest in creating liability for the circumvention of technological measures designed to prevent consumers from using consumer goods while leaving the copyrightable content of a work unprotected."[218]

In *Digital Drilling Data Systems*, the Fifth Circuit, following *Lexmark*, held that the plaintiff's use of USB dongles to control use of its mining software programs did not effectively control access for the purposes of § 1201 because, while the plaintiff's USB dongles may have limited the ability to use a proprietary program, they did not control access to the program's database itself.[219]

Here, as in *Lexmark* and *Digital Drilling Data Systems*, Philips' technology blocked at most access to the use of some unprotectable Field Service menu commands and left the underlying files available for anyone to access and read.[220] Accordingly, Philips has failed to effectively control access to the allegedly protected information, dooming its claim under § 1201.

### B. Defendants Have Not Violated the CFAA.

#### 1. Defendants' Access Was Authorized.

Earlier in this case the Georgia Court held that Defendants cannot be liable for unauthorized access under the CFAA because Philips could not show Defendants "lacked express authorization from customers to access any medical imaging systems."[221] Similarly, Philips cannot show that Defendants "exceeded authorized access" under the CFAA because customers expressly authorized Defendants to access their systems, without any restrictions, and expected Defendants to access their systems to the full extent needed to service those machines.[222] "Exceeding

---

[218] *Id.* at 549.
[219] *Dig. Drilling*, 965 F.3d at 376-77.
[220] *See* Defs. Br. 22-23.
[221] Order p. 10, Mar. 14, 2018 [ECF No. 42].
[222] Defs. Br. 31-33; Ex. 22 ¶18 ("[W]e authorize them to access the machine to the extent necessary to perform the service,"); Defs. Br., at Ex. 8, 281:19-21; Defs. Br., at Ex. 9, 233:24-234:6, 359:23-

35

authorized access" under § 1030(a) means accessing particular areas within a computer, such as files, folders, or databases, to which the accessor's authorization to access the computer system does not extend.[223] Defendants' customers placed no such restrictions on access. Under the CFAA, it is the *extent of the access* that must be unauthorized for a CFAA claim, and not the *method* of access or the accesser's intent.[224] Further, § 1030(a) does not proscribe use of particular *software, programs, or applications* housed on the computer.[225] Therefore, it is the customer who controls access to the computer system itself that has the authority to authorize access to any part of the computer system—which Defendants' customers authorized. Transtate does not violate the CFAA if it does not exceed the access authorized by its customer.[226]

Philips' CFAA claim is addressed to the use of specific types of software residing on the computer system that Defendants had been given complete and full access to by their customers. Defendants' relationship with their customers determines the extent of their authorized access, not a third party asserting rights to software located on that computer.[227] Philips, in essence, argues

---

362:5; Defs. Br., at Ex. 9, 157:25-158:12; Defs. Br., at Ex. 9, 158:13-161:10; Defs. Br., at Ex. 21, 66:1-10; Defs. Br., at Ex. 21, 299:4-21, 304:17-20; Defs. Br., at Ex. 26; Defs. Br., at Ex. 45; Defs. Br., at Ex. 45, 24:15-27:20, 34-35:22; Defs. Br., at Ex. 45, 27:18-28:11, 31:24-34:1; Defs. Br., at Ex. 34:23-35:8, 36:23-37:4; Defs. Br., at Ex. 46, at TRANSTATE-0194865; Defs. Br., at Ex. 47, 222:9-224:12; Defs. Br., at Ex. 48; Defs. Br., at Ex. 74, 23:13-20; Defs. Br., at Ex. 10, 58:1-9, 161:13-162:10, and at Ex. 25; Defs. Br. 32 n.200; Defs. Br. 34 n.217; Order pp. 9-11, Mar. 14, 2018 [ECF No. 42].

[223] *Van Buren v. United States*, 141 S. Ct. 1648, 1652 (2021).

[224] *Brodksy, v. Apple, Inc.*, 445 F. Supp. 3d 110, 129 (N.C. Cal. 2020); *AtPac, Inc. v. Aptitude Sols., Inc.*, 730 F. Supp. 2d 1174, 1180-81 (E.D. Cal. 2010).

[225] 18 U.S.C. §§ 1030(a), 1030(e)(1); *Psychas v. Dist. DOT*, 2019 U.S. Dist. LEXIS 163397, *19 (D.D.C. Sept. 24, 2019) ("[A] computer under the [CFAA] is not its software or an application available over the internet. Rather, it is the device itself.").

[226] 18 U.S.C. §§ 1030(a), 1030(e)(1); *see United States v. Phillips*, 477 F.3d 215, 219 (5th Cir. 2007) (Courts "typically analyze[] the scope of a user's authorization to access a protected computer on the basis of . . . the nature of the relationship established *between the computer owner and the user*.") (emphasis added).

[227] *See, e.g.*, *Phillips*, 477 F.3d at 219 ("Courts have therefore typically analyzed the scope of a user's authorization to access a protected computer on the basis of . . . the nature of the relationship

36

that authorization by Defendants' customers violated independent licensing agreements that Philips had with those customers.[228] But Philips' license dispute is properly addressed to those customers, not to Defendants who merely used the access authorized by the customers to service their systems as requested. Philips, however, has decided not to enforce its purported licenses with its customers.[229] The CFAA does not impose liability on an authorized accessor for alleged wrongful use of software or information in which another party claims rights, especially where the third-party has affirmatively stated it will not seek to enforce such rights.[230] It proscribes only access to a device that goes beyond what has been authorized.[231] Defendants had no obligation to police Philips' license agreements (nor could they), especially where Defendants' customers explicitly warranted they have the right to authorize Defendants to perform all services.[232]

In addition, even if Philips' authorization was required, authorization under the CFAA may also be implied from conduct.[233] Philips purported to give Defendants "AIAT" level access and also consistently gave Defendants access to all sorts of CSIP Level 1 and 2 materials.[234] Philips cannot prove Defendants exceeded authorization from Philips without proving that such materials are not AIAT. At the very least, this evidence creates a genuine issue of material fact regarding Philips' implicit authorization of Defendants to access materials and information properly classified as AIAT. Again, this factual question requires an interpretation and application of the

---

established between the computer owner and the user."); *Christie*, 2019 U.S. Dist. LEXIS 72175 at \*19-20; *Oce N. Am., Inc. v. MCS Servs.*, 748 F. Supp. 2d 481, 487 (D. Md. 2010); *AtPac, Inc.*, 730 F. Supp. 2d at 1182; *SecureInfo Corp. v. Telos Corp.*, 387 F. Supp. 2d 593, 608-09 (E.D. Va. 2005).

[228] *See id.*; Pl. Br. 16-17.
[229] *See, e.g.,* Ex. 75 ("Philips has no interest in pursuing any action against its valued customers").
[230] *Van Buren*, 141 S. Ct. 1648, 1652 (2021).
[231] Defs. Br. 31-33.
[232] *See, e.g.,* Ex. 83 at TRANSTATE-0194893.
[233] *See Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1062, 1069 (9th Cir. 2016).
[234] *See, e.g.,* Defs. Br. 12 n.76; Defs. Br., at Ex. 21, 295:20-296:1.

AIAT regulations, which means that Philips' CFAA claims necessarily are precluded.[235]

## 2. Philips Cannot Prove CFAA "Damages" or "Loss."

Philips' CFAA claim also fails because Philips cannot prove either "damage" or "loss" as which requires evidence that a computer was impaired, such as by physical or electronic damage, loss of data, or interruption of service.[236] Philips motion does not show any of these.[237]

Philips cannot establish that it suffered any "damage"[238] because there is no evidence that any alleged CFAA violation destroyed data or rendered it otherwise inaccessible or unusable.[239]

To establish "loss," in the absence of an interruption of service in the computer system at issue, Philips must show that it incurred costs in "responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense."[240] Costs associated with the misappropriation of confidential information or lost customers or business revenue cannot qualify as losses under the CFAA.[241] The costs of an investigation for alleged CFAA violations only constitute a "loss" when the investigation is

---

[235] Defs. Br. 11-12.

[236] 18 U.S.C. § 1030(e)(8) & (11); 18 U.S.C. § 1030(g); *Harley Auto. Group, Inc. v. AP Supply, Inc.*, 2013 U.S. Dist. LEXIS 179626; 2013 WL 6801221 (D. Minn. 2013); *Mintz v. Mark Bartelstein & Assocs.*, 906 F. Supp. 2d 1107, 1029-30 (C.D. Cal. 2012); *Jarosch v. Am. Family Mut. Ins. Co.*, 837 F. Supp. 2d 980, 1022 (E.D. Wis. 2011); *Tyco Int'l (U.S.), Inc. v. Does*, 2003 U.S. Dist. LEXIS, * 4 & n.3 (S.D.N.Y. July 11, 2003).

[237] Defs. Br., at Ex. 1, 126:17-128:3, 241:9-244:7; Defs. Br., at Ex. 10, 66:5-67:18; Defs. Br., at Ex. 65, at pp. 19-20, 21-22; Defs. Br., at Ex. 23, at pp. 39-43.

[238] 18 U.S.C. § 1030(e)(8) ("[T]he term 'damage' means any impairment to the integrity or availability of data, a program, a system, or information."); *Epic Sys. Corp. v. Tata Consultancy Servs.*, 2015 U.S. Dist. LEXIS 155713, *14 (W.D. Wis. Nov. 18, 2015); *Instant Tech., LLC v. Defazio*, 40 F. Supp. 3d 989, 1019 (N.D. Ill. 2014); *Volk v. Zeanah*, 2010 U.S. Dist. LEXIS 5621, *7-8 (S.D. Ga. Jan. 25, 2010).

[239] Defs. Br., at Ex. 1, 126:17-128:3, 241:9-244:7; Defs. Br., at Ex. 10, 66:5-67:18; Defs. Br., at Ex. 65, at pp. 19-20, 21-22; Defs. Br., at Ex. 23, at pp. 39-43.

[240] 18 U.S.C. § 1030(e)(11); *Brown Jordan Int'l, Inc. v. Carmicle*, 846 F.3d 1167, 1174 (11th Cir. 2017).

[241] *Id.*

connected to impairment or remediation of impairment of the computer.[242]

Philips cannot establish that it suffered any loss because the evidence does not show that any of the alleged CFAA violations caused any interruption of service, and Philips has not identified any costs incurred in responding to any impairment or harm to its computer systems.[243]

The only purported loss Philips identifies is that it "incurred internal investigation costs exceeding ██████."[244] All of this alleged loss, however, is for alleged costs to investigate, misappropriation of trade secrets, and redesign costs, none of which is cognizable under the CFAA.[245] Investigative costs constitute a "loss" under the CFAA only where their purpose is to assess the extent of the harm caused to the computer system or to repair the system following a violation.[246] Here, Philips' investigation was not used to determine the extent of harm to the computer systems or the need for repairs, but to build its case against Defendants.[247] Moreover, Philips' cannot prove that it suffered a loss of at least $5,000 during a one-year period attributable to a specific violation. Losses may not be aggregated over time unless they stem from a single act of unauthorized access.[248] Philips contends Defendants' wrongfully accessed Philips' software "thousands of times" over multiple years without attributing any loss to any specific accused

---

[242] 18 U.S.C. § 1030(g); *Harley Auto. Group, Inc. v. AP Supply, Inc.*, 2013 U.S. Dist. LEXIS 179626 (D. Minn. 2013); *Mintz*, 906 F. Supp. at 1029-30; *Jarosch*, 837 F. Supp. 2d at 1022; *Tyco Int'l (U.S.), Inc. v. Does*, 2003 U.S. Dist. LEXIS, * 4 n.3 (S.D.N.Y. July 11, 2003).

[243] *Volk*, 2010 U.S. Dist. LEXIS 5621 at *8; *Mintz,* 906 F. Supp. at 1029-30 (C.D. Cal. 2012); *Jarosch*, 837 F. Supp. at 1022; *Tyco Int'l (U.S.), Inc. v. Does*, 2003 U.S. Dist. LEXIS, * 4 & n.3 (S.D.N.Y. July 11, 2003)

[244] Pl. Br. 18.

[245] 18 U.S.C. § 1030(g); *Harley Auto. Group, Inc. v. AP Supply, Inc.*, 2013 U.S. Dist. LEXIS 179626; 2013 WL 6801221 (D. Minn. 2013).

[246] *See, e.g., Van Buren*, 141 S. Ct. 1648, 1652 (2021); *Mintz,* 906 F. Supp. 2d at 1029-30; *Jarosch*, 837 F. Supp. at 1022.

[247] Def. Br, at Ex. 66, 35:18-39:1, 44:12-46:13, 49:22-65:17, 68:10-78:5, 79:11-80.7, 85:14-21; 87:4-17, and at Exs. 6-8, 10.

[248] *In re Doubleclick Privacy Litig.*, 154 F. Supp. 2d 497, 523-24 (S.D.N.Y. 2001).

39

access and has no evidence that it suffered losses of at least $5,000 for any alleged violation.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs'

motion for partial summary judgment.

40

Respectfully submitted, this the 27th day of September, 2021.


**MORNINGSTAR LAW GROUP**

/s/ J. Christopher Jackson
J. Christopher Jackson
N.C. State Bar No. 26916
cjackson@morningstarlawgroup.com
John T. Kivus
N.C. State Bar No. 42977
jkivus@morningstarlawgroup.com
Marie V. Farmer
NC State Bar No. 55145
mfarmer@morningstarlawgroup.com
421 Fayetteville Street, Suite 530
Raleigh, NC 27601
Telephone: (919) 590-0365
Facsimile: (919) 882-8890

Harrison M. Gates
N.C. State Bar No. 43793
hgates@morningstarlawgroup.com
112 W. Main Street, Second Floor
Durham, NC 27701
Telephone: (919) 590-0364
Facsimile: (919) 882-8890

*Counsel for Defendants TEC Holdings, Inc.*
*and Transtate Equipment Company, Inc.*

**PARKER POE ADAMS &**
**BERNSTEIN, LLP**

/s/ Nicholas H. Lee
Charles E. Raynal, IV
charlesraynal@parkerpoe.com
Stephen V. Carey
stevecarey@parkerpoe.com
PNC Plaza, 301 Fayetteville Street, Suite 1400
Raleigh, NC 27601

Nicholas H. Lee
nicholaslee@parkerpoe.com
401 South Tryon Street, Suite 3000
Charlotte, NC 28202

**FAEGRE DRINKER BIDDLE & REATH**
**LLP**

/s/ Lora A. Brzezynski
Lora A. Brzezynski (*admitted pro hac vice*)
lora.brzezynski@faegredrinker.com
Nick Colic *(admitted pro hac vice)*
Nick.colic@faegredrinker.com
Bethany N. Mihalik (*admitted pro hac vice*)
Bethany.mihalik@faegredrinker.com
1500 K Street, NW, Suite 1100
Washington, DC 20005

David W. Higer (*admitted pro hac vice*)
david.higer@faegredrinker.com
191 N. Wacker Dr., Suite 3700
Chicago, IL 60606

Thatcher A Rahmeier (*admitted pro hac vice*)
thatcher.rahmeier@faegredrinker.com
222 Delaware Ave., Suite 1410
Wilmington, DE 19801

*Counsel for Defendant Robert A. Wheeler*

**DENTONS US LLP**

/s/      *Kirk R. Ruthenberg*
Kirk R. Ruthenberg (*admitted pro hac vice*)
Kirk.ruthenberg@dentons.com
1900 K Street, NW
Washington, DC 20006

David R. Metzger (*admitted pro hac vice*)
David.metzger@dentons.com
233 South Wacker Drive, Suite 5900
Chicago, IL 60609

Brian K. O'Bleness (*admitted pro hac vice*)
Brian.obleness@dentons.com
4520 Main Street
Kansas City, MO 64111

*Counsel for Defendant Transtate Equipment Company, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on September 27, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of filing to all counsel of record in this matter.

_/s/ J. Christopher Jackson_
J. Christopher Jackson
N.C. State Bar No. 26916

_Counsel for Defendants TEC Holdings, Inc. and_

_Transtate Equipment Company, Inc._